*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

IN RE: WINTER STORM URI NATURAL GAS LITIGATION:

RUSS MEHL, et al.,

*Plaintiffs-Appellants,*

v.

BP ENERGY CO., et al.,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the District of Kansas – Wichita*
*Case Nos. 6:24-cv-1073, 6:23-cv-1192, 6:23-cv-1195, 6:23-cv-1245,*
*6:24-cv-1005, 6:23-cv-1249 · Honorable Daniel D. Crabtree, U.S. District Judge*

# CONSOLIDATED ANSWERING BRIEF
## [ORAL ARGUMENT REQUESTED]

STEPHEN R. MCALLISTER
MEGAN M. CARROLL
DENTONS US LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Phone: (816) 460-2400
Fax: (816) 531-7545
stephen.mcallister@dentons.com
megan.carroll@dentons.com

*Attorneys for Defendant-Appellee,*
*Macquarie Energy LLC*

ALAN R. PFAFF
WALLACE SAUNDERS
200 West Douglas, Suite 400
Wichita, Kansas 67202
Phone: (316) 219-8308
Fax: (316) 269-2479
apfaff@wallacesaunders.com

*Attorneys for Defendants-Appellees,*
 *BP Energy Company and*
*BP Canada Energy Marketing Corp.*

**Additional Counsel Listed on Inside Cover**

---



WILLIAM R. H. MERRILL
ALEXANDRA FOULKES GRAFTON
MEGAN E. GRIFFITH
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Phone: (713) 615-9366
Fax: (713) 654-6666
bmerrill@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com
mgriffith@susmangodfrey.com

BEATRICE C. FRANKLIN
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, New York 10001-8602
Phone: (212) 336-8330
bfranklin@susmangodfrey.com

MICHAEL YUFFEE
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
Phone: (202) 639-7700
Fax: (202) 639-7890
michael.yuffee@bakerbotts.com

*Attorneys for Defendant-Appellee,*
*Macquarie Energy LLC*

CASEY L. JONES
HINKLE LAW FIRM LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Phone: (316) 660-6200
Fax: (316) 660-6024
cjones@hinklaw.com

RICHARD C. PEPPERMAN II
AMANDA F. DAVIDOFF
MICHAEL P. DEVLIN
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
peppermanr@sullcrom.com
davidoffa@sullcrom.com
devlinm@sullcrom.com

*Attorneys for Defendants-Appellees,*
 *BP Energy Company and*
*BP Canada Energy Marketing Corp.*

JEFFREY D. MORRIS
BERKOWITZ OLIVER, LLP - KCMO
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
Phone: (913) 649-7007
Fax: (816) 561-1888
jmorris@berkowitzoliver.com

STEPHEN CRAIN (*pro hac vice*)
BRADLEY J. BENOIT (*pro hac vice*)
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: (713) 223-2300
Fax: (800) 404-3970
stephen.crain@bracewell.com
brad.benoit@bracewell.com

*Attorneys for Defendant-Appellee,*
*Tenaska Marketing Ventures*

MATTHEW D. MODERSON
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Phone: (816) 691-2736
Fax: (816) 412-8123
matt.moderson@stinson.com

ANDREW ZEVE
KYLE A. MASON
WHITE & CASE LLP
609 Main Street, Suite 2900
Houston, Texas 77002
Phone: (713) 496-9700
Fax: (713) 496-9701
andrew.zeve@whitecase.com
kyle.mason@whitecase.com

*Attorneys for Defendant-Appellee*
*Southwest Energy L.P.*

CHANTALE FIEBIG
CLAIRE L. CHAPLA
LAUREL ZIGERELLI
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
chantale.fiebig@weil.com
claire.chapla@weil.com
laurel.zigerelli@weil.com

*Attorneys for Defendant-Appellee,*
*ETC Marketing, Ltd.*

SHANE A. ROSSON
TYLER E. HEFFRON
TRIPLETT WOOLF GARRETSON LLC
2959 N. Rock Road, Suite 300
Wichita, Kansas 67226
Phone: (316) 630-8100
Fax: (316) 630-8101
sarosson@twgfirm.com
theffron@twgfirm.com

JOHANNA SPELLMAN
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Phone: (312) 777-7039
Fax: (312) 993-9767
johanna.spellman@lw.com

LOUIS LAYRISSON
LIAM O'ROURKE
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Phone: (713) 229-1421
Fax: (713) 229-7721
louie.layrisson@bakerbotts.com
liam.orourke@bakerbotts.com

Michael Yuffee
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
Phone: (202) 639-7700
Fax: (202) 639-7890
michael.yuffee@bakerbotts.com

*Attorneys for Defendant-Appellee,*
*CIMA Energy, LP*

CASEY O. HOUSLEY
SANDERS WARREN & RUSSELL, LLP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, Kansas 66210
Phone: (913) 234-6100
Fax: (913) 234-6199
c.housley@swrllp.com

DAVID T. MCDOWELL
MARY E. GREEN
WILLIAM B. THOMAS
MCDOWELL HETHERINGTON LLP
1001 Fannin, Suite 2400
Houston, Texas 77002
Phone: (713) 337-5580
Fax: (713) 337-8850
david.mcdowell@mhllp.com
mary.green@mhllp.com
william.thomas@mhllp.com

*Attorneys for Defendant-Appellee,*
*Mercuria Energy America, Inc.*

Nathan M. Saper
LATHAM & WATKINS LLP
355 S. Grand Avenue, Suite 100
Los Angeles, California 90071
Phone: (213) 891-7485
Fax: (213) 891-8763
nathan.saper@lw.com

Nicholas J. Boyle
Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Phone: (202) 637-2200
Fax: (202) 637-2201
nicholas.boyle@lw.com
melissa.sherry@lw.com

Robert J. Malionek
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Phone: (212) 906-1816
Fax: (212) 751-4864
robert.malionek@lw.com

*Attorneys for Defendant-Appellee,*
*Rockpoint Gas Storage LLC*

William Perry Brandt
SANDBERG PHOENIX &
VON GONTARD, PC
4600 Madison Avenue, Suite 1000
Kansas City, Missouri 64112
Phone: (314) 779-1380
Fax: (816) 627-5532
pbrandt@sandbergphoenix.com

John F. Bash, III
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78701
Phone: (737) 667-6117
Fax: (737) 667-6110
johnbash@quinnemanuel.com

Todd E. Shadid
KLENDA AUSTERMAN LLC
301 North Main, Suite 1600
Wichita, Kansas 67202
Phone: (316) 267-0331
Fax: (316) 267-0333
tshadid@klendalaw.com

David E. Harrell, Jr.
Deanna Markowitz Willson
TROUTMAN PEPPER LOCKE
600 Travis Street, Suite 2800
Houston, Texas 77022
Phone: (713) 226-1200
david.harrell@troutman.com
deanna.willson@troutman.com

*Attorneys for Defendant-Appellee,*
*Spotlight Energy, LLC*

Torsten M. Kracht
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 368-4823
tkracht@hunton.com

Christopher M. Pardo
60 State Street, Suite 2400
Boston, Massachusetts 02109
Phone: (617) 413-2315
cpardo@hunton.com

Leah Nommensen
600 Travis, Suite 4200
Houston, Texas 77002
Phone: (713) 220-3935
leahnommensen@hunton.com

*Attorneys for Defendant-Appellee,*
*Concord Energy LLC*

SETH E. MONTGOMERY
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Phone: (213) 443-3000
Fax: (213) 443-3100
sethmontgomery@quinnemanuel.com

*Attorneys for Defendant-Appellee,
Nextera Energy Marketing, LLC*

TRISTAN L. DUNCAN
STEVEN D. SODEN
HOLLY PAULING SMITH
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri 64108
Phone: (816) 474-6550
Fax: (816) 421-5547
hpsmith@shb.com
ssoden@shb.com
tlduncan@shb.com

*Attorneys for Defendant-Appellee,
Williams Energy Resources LLC*

# DISCLOSURE STATEMENTS

**BP Energy Co.:** BP Energy Co. is a corporation organized under the laws of the State of Delaware with its principal place of business in Texas. BP Energy Company is wholly owned by BP Company North America Inc. BP Company North America Inc. is wholly owned by BP Corporation North America Inc. BP Corporation North America Inc. is wholly owned by BP America Inc. BP America Inc. is wholly owned by BP America Limited. BP America Limited is wholly owned by BP Holdings North America Limited. BP Holdings North America Limited is wholly owned by BP p.l.c. BP p.l.c. is a publicly held corporation. BP p.l.c. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

**BP Canada Energy Marketing Corp.:** BP Canada Energy Marketing Corp. is a corporation organized under the laws of the State of Delaware with its principal place of business in Texas. BP Canada Energy Marketing Corp. is wholly owned by BP Canada Investments Inc. BP Canada Investments Inc. is wholly owned by BP Corporation North America Inc. BP Corporation North America Inc. is wholly owned by BP America Inc. BP America Inc. is wholly owned by BP America Limited. BP America Limited is wholly owned by BP Holdings North America Limited. BP Holdings North America Limited is wholly owned by BP p.l.c. BP p.l.c. is a publicly held corporation. BP p.l.c. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

**Concord Energy LLC:** Concord Energy LLC ("Concord") is a Colorado limited liability company with its principal place of business in Denver, Colorado and its parent company is Concord Energy Holdings LLC, a Delaware limited liability company with its principal place of business in Denver, Colorado. There is no publicly held corporation that owns 10% or more of Concord Energy LLC's stock.

**CIMA ENERGY, LP (formerly CIMA ENERGY, LTD):** CIMA ENERGY is a Texas limited partnership. CIMA ENERGY's general partner is CIMA Energy Management, LLC, which is wholly owned by CIMA Energy Investment Corporation. CIMA ENERGY's limited partner is CIMA Energy Investment Corporation, which is a wholly owned subsidiary of Diamond Gas North America Corporation, which is a wholly owned subsidiary of Mitsubishi Corporation (Americas), which is a wholly owned subsidiary of Mitsubishi Corporation, a Japanese publicly traded company. Mitsubishi Corporation does not have a parent corporation, and no publicly held corporation owns 10% or more of Mitsubishi Corporation's stock.

**ETC Marketing, Ltd.:** ETC Marketing, Ltd. is a for-profit limited partnership organized in Texas with its principal place of business in Texas. ETC Marketing, Ltd.'s general partner is LGM, LLC, which is a subsidiary of ET Midstream Holdings LLC, which is a subsidiary of Energy Transfer LP, a publicly traded Delaware limited partnership with common units traded on the New York Stock

Exchange under the ticker symbol "ET." Energy Transfer LP does not have a parent corporation and no other entity or person owns 10% or more of its equity.

**Macquarie Energy LLC:** Macquarie Energy LLC ("Macquarie Energy") is a limited liability company organized in Delaware with its principal place of business in Texas. Macquarie Energy's sole member and 100% owner is Macquarie Energy North America Trading, Inc., a Delaware corporation headquartered in Texas. Macquarie Energy's indirect parent, Macquarie Group Limited, is publicly traded in Australia.

**Mercuria Energy America, Inc.:** Mercuria Energy America, Inc. is organized in Delaware with its principal place of business in Texas. Mercuria Energy America, Inc.'s parent company is Mercuria Energy Group, Ltd. There is no publicly held corporation that own 10% or more of Mercuria's stock.

**NextEra Energy Marketing, LLC:** NextEra Energy Marketing, LLC, is a Delaware limited liability company with its principal place of business in Florida. Its parent entities are NextEra Energy Resources, LLC; NextEra Energy Capital Holdings, Inc.; and NextEra Energy, Inc. NextEra Energy Resources, LLC is a Delaware limited liability company with its principal place of business in Florida. NextEra Energy Capital Holdings, Inc. is a Delaware corporation with its principal place of business in Florida. NextEra Energy, Inc. is a Delaware corporation with its

principal place of business in Florida. No other publicly held corporation owns 10% or more of NextEra Energy Marketing, LLC's stock.

**Southwest Energy, L.P.:** Southwest Energy L.P. is a Texas limited partnership with its principal place of business in Tulsa, Oklahoma. Southwest Energy, L.P. hereby states that there is no parent company and no publicly held corporation owning 10% or more of its stock.

**Tenaska Marketing Ventures:** Tenaska Marketing Ventures is a general partnership with its principal place of business in Nebraska. Tenaska Marketing Ventures states that TMV Holdings, LLC is its direct parent entity. No publicly held corporation holds more than 10% of the stock of Tenaska Marketing Ventures or of any of its direct or indirect parent entities.

**Rockpoint Gas Storage LLC:** Defendant Rockpoint Gas Storage LLC ("Rockpoint") is a Delaware LLC with its principal place of business in Calgary, Alberta, Canada. Rockpoint's direct parent entity is Rockpoint Gas Storage US, LLC, which is also a Delaware LLC with its principal place of business in Calgary, Alberta, Canada. Two of Rockpoint's indirect parent entities, Brookfield Corporation and Brookfield Infrastructure Partners LP, are publicly traded on the New York Stock Exchange. No other publicly held entity owns more than 10% of Rockpoint stock and/or the stock of Rockpoint's direct or indirect parent entities.

**Spotlight Energy, LLC:** Spotlight Energy, LLC, is a Texas limited liability company with its principal place of business in Texas. Spotlight Energy, LLC has no parent company and no publicly held corporation owning 10% or more of its stock.

**Williams Energy Resources LLC:** Williams Energy Resources LLC was a Delaware limited liability company with its principal place of business in Oklahoma. Williams Energy Resources LLC was a wholly owned subsidiary of The Williams Companies, Inc. On March 1, 2022, Williams Energy Resources LLC was merged into Sequent Energy Management LLC. Williams Field Services Group, LLC, is the sole owner and member of Sequent Energy Management LLC. The Williams Companies, Inc., is the sole owner and member of Williams Field Services Group, LLC. The Williams Companies, Inc., is organized under the laws of Delaware, and its principal place of business is in Oklahoma. No publicly held corporation owns 10% or more of stock in The Williams Companies, Inc.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS ................................................................i

TABLE OF AUTHORITIES ................................................................ix

STATEMENT OF RELATED CASES ..................................................xvi

INTRODUCTION ...............................................................................1

ISSUES PRESENTED..........................................................................4

STATEMENT OF THE CASE................................................................5

    I.    Factual Background..................................................................5

        A.    Defendants Sold Natural Gas To Nonparty
              Intermediaries During Winter Storm Uri....................................5

        B.    The Wholesale Market For Natural Gas Necessarily
              Crosses State Lines .........................................................6

        C.    Winter Storm Uri Disrupted Energy Markets In
              Profound And Unprecedented Ways .............................................9

        D.    FERC Investigated Wholesale Transactions During
              Winter Storm Uri And Found No Basis To Act Against
              Any Of The Defendants .............................................11

    II.    Procedural History..............................................................13

SUMMARY OF ARGUMENT ...............................................................16

ARGUMENT ...................................................................................19

    I.    The District Court Correctly Held That The NGA Field
        Preempts Plaintiffs' State-Law Claims ................................................19

        A.    The NGA's Text And Supreme Court Precedent
              Recognize FERC's Exclusive Jurisdiction Over The
              Field Of Wholesale Natural-Gas Prices....................................20

             1.    The NGA Gives FERC Exclusive Jurisdiction
                    Over The Price of Natural Gas In Wholesale
                    Transactions ..................................................20

2.   The Supreme Court Has Repeatedly Confirmed
     FERC's Exclusive Jurisdiction Over Wholesale
     Natural-Gas Prices ........................................................24

B.   Plaintiffs' State-Law Claims Are Preempted Because
     They Seek To Impose Liability For Wholesale
     Transactions Governed Exclusively By Federal Law ..............30

     1.   Plaintiffs Challenge The Prices Charged In
          Wholesale Transactions....................................................30

     2.   Plaintiffs' Claims Would Impose State-Law
          Standards On Defendants ...............................................32

     3.   Any Downstream Effects Of Wholesale
          Transactions On Retail Rates Do Not Displace
          Federal Preemption........................................................35

II.   Plaintiffs' State-Law Claims Are Also Conflict Preempted ..............37

III.  Plaintiffs Do Not Plead A Cognizable KCPA Claim..........................41

A.   Plaintiffs Allege No Conduct By Defendants "In
     Connection With" A Consumer Transaction ...........................42

B.   Defendants Are Not "Suppliers" Under The KCPA
     Because They Do Not Solicit, Engage In, Or Enforce
     Consumer Transactions In The Ordinary Course Of
     Their Business........................................................................49

C.   Plaintiffs Do Not Allege That Any Defendant Engaged
     In An Unconscionable Act Under The KCPA..........................51

     1.   Plaintiffs Fail To Plead An Unconscionable Act
          Under K.S.A. § 50-627(a) ...............................................52

     2.   Plaintiffs Fail To Plead Profiteering From A
          Disaster Under K.S.A. § 50-6,106...................................54

CONCLUSION....................................................................................55

STATEMENT ON ORAL ARGUMENT ...............................................56

ADDENDUM

15 U.S.C.A. § 717 ...................................................................... ADD-1

15 U.S.C.A. § 717c ...................................................................... ADD-3

15 U.S.C.A. § 717c-1 ........................................................................ ADD-6

15 U.S.C.A. § 717d ..........................................................................  ADD-7

18 C.F.R. § 284.402 ......................................................................... ADD-8

68 F.E.R.C. ¶ 66,332 (Nov. 26, 2003) ........................................... ADD-10

179 F.E.R.C. ¶ 61, 1036 (Aug. 18, 2022) ...................................... ADD-62

K.S.A. § 50-627 ............................................................................. ADD-95

K.S.A. § 50-6,106 .......................................................................... ADD-97

K.S.A. § 60-101 ............................................................................. ADD-99

OHIO REV. CODE § 1345.03(A) ..................................................... ADD-100

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alexander v. Certified Master Builders Corp.*,
    268 Kan. 812, 1 P.3d 899 (2000)...........................................................49-50

*Amundson & Assocs. Art Studio. v. Nat'l Council on Comp. Ins.*,
    26 Kan. App. 2d 489, 988 P.2d 1208 (1999).................................................41

*Anderson v. Barclay's Cap. Real Est.*,
    136 Ohio St. 3d 31, 989 N.E.2d 997 (Ohio 2013).......................................50

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*,
    461 U.S. 375 (1983)..............................................................................20, 22

*Berry v. Nat'l Med. Servs.*,
    41 Kan. App. 2d 612, 205 P.3d 745 (2009).........................................43, 44

*Bradshaw v. Am. Airlines*,
    123 F.4th 1168 (10th Cir. 2024)..................................................................33

*Burris v. Panhandle Eastern Pipe Line Co.*,
    935 F.2d 1469 (7th Cir. 1991)....................................................................35

*California v. Fed. Power Comm'n*,
    369 U.S. 482 (1962)....................................................................................35

*Carstensen v. Brunswick*,
    49 F.3d 430 (8th Cir. 1995).........................................................................33

*City of Mulberry v. BP Energy Co.*,
    No. 2021-CV-000031 (Kan. Dist. Ct. Feb. 9, 2022)....................................48

*Cipollone v. Liggett Grp.*,
    505 U.S. 504 (1992)....................................................................................33

*Cole v. Hewlett Packard Co.*,
    2004 WL 376471 (Kan. Ct. App. Feb. 27, 2004)........................................47

*Colo. Dep't of Pub. Health v. United States*,
    693 F.3d 1214 (10th Cir. 2012)...................................................................19

*Corp. Comm'n v. Fed. Power Comm'n*,
    415 U.S. 961 (1974)....................................................................................22

ix

*Dana v. Heartland Mgmt. Co.*,
48 Kan. App. 1048, 301 P.3d 772 (2013).......................................................54

*Doe v. Lyft*,
756 F. Supp. 3d 1110 (D. Kan. 2024) ................................................... 52, 53

*Ellibee v. Aramark Corr. Servs.*,
37 Kan. App. 2d 430, 154 P.3d 39 (2007)....................................................44

*Entergy Corp. v. Jenkins*,
469 S.W.3d 330 (Tex. App.—Houston [1st Dist.] 2015)............................29

*Farmland Indus., v. KCC*,
29 Kan. App. 2d 1031, 37 P.3d 640 (2001)..................................................41

*Fed. Power Comm'n v. La. Power & Light Co.*,
406 U.S. 621 (1972)........................................................................................26

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)........................................................ 6, 23, 28, 29, 31, 36

*Frey v. Town of Jackson, Wyo.*,
41 F.4th 1223 (10th Cir. 2022)......................................................................42

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)........................................................................................33

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997)........................................................................................23

*Gonzales v. Assocs. Fin. Serv. Co. of Kan.*,
266 Kan. 141, 967 P.2d 312 (1998)..............................................................54

*Hahn v. Doe*,
1995 WL 127863 (Ohio Ct. App. Mar. 23, 1995)........................................45

*Hayes v. Find Track Locate*,
60 F. Supp. 3d 1144 (D. Kan. 2014) .............................................................43

*Hughes v. Talen Energy Mktg.*,
578 U.S. 150 (2016)............................................................... 25, 26, 40

*Ill. Nat. Gas Co. v. Cent. Ill. Pub. Serv. Co.*,
314 U.S. 498 (1942)........................................................................................21

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
146 F. Supp. 3d 1217 (S.D. Cal. 2015) .......................................................29

x

*In re Forta File Transfer Software Data Sec. Breach Litig.*,
　　749 F. Supp. 3d 1240 (S.D. Fla. 2024) ..........................................45

*Kastner v. Intrust Bank*,
　　2011 WL 2149432 (D. Kan. June 1, 2011) ...................................43

*Kestrel Holdings I v. Learjet*,
　　316 F. Supp. 2d 1071 (D. Kan. 2004) ..........................................44

*Krause v. Nationstar Mortg.*,
　　2015 WL 4041662 (D. Kan. July 1, 2015) ....................................43

*Kucharski-Berger v. Hill's Pet Nutrition*,
　　60 Kan. App. 2d 510, 494 P.3d 283 (2021)..................................47

*Kurns v. R.R. Friction Prods. Corp.*,
　　565 U.S. 625 (2012)................................................ 32, 33, 34, 37

*Luttrell v. Brannon*,
　　2018 WL 3032993 (D. Kan. June 19, 2018) ................................44

*Matthews v. Bergdorf*,
　　889 F.3d 1136 (10th Cir. 2018) ..................................................53

*Miss. Power & Light v. Mississippi*,
　　487 U.S. 354 (1988)................................................... 25, 36, 39

*Moral v. PHH Mortg. Co.*,
　　2022 WL 4016583 (D. Kan. Sept. 2, 2022)..................................45

*Nantahala Power & Light v. Thornburg*,
　　476 U.S. 953 (1986)............................................... 25, 26, 36, 39

*N. Nat. Gas v. State Corp. Comm'n of Kan.*,
　　372 U.S. 84 (1963).....................................................................24

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
　　489 U.S. 493 (1989)......................................................24-25, 40-41

*ONEOK, Inc. v. Learjet*,
　　575 U.S. 373 (2015).............................. 15, 22, 23, 26, 27, 28, 29, 30, 34, 38

*Otter Tail Power Co. v. United States*,
　　410 U.S. 366 (1973)....................................................................35

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*,
　　332 U.S. 507 (1947)....................................................................23

*Panhandle E. Pipeline Co. v. Okla. ex rel. Comm'rs*,
83 F.3d 1219 (10th Cir. 1996) ............................................................... 22, 40

*Price v. Lambert Ford*,
1992 WL 103746 (Ohio Ct. App. May 13, 1992) ........................................45

*Pub. Utils. Comm'n of Cal. v. FERC*,
900 F.2d 269 (D.C. Cir. 1990).................................................................38

*Pub. Utils. Comm'n v. United Fuel Gas*,
317 U.S. 456 (1943).................................................................................24

*Richison v. Ernest Grp.*,
634 F.3d 1123 (10th Cir. 2011) ...............................................................38

*San Diego Bldg. Trades Council v. Garmon*,
359 U.S. 236 (1959).................................................................................32

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988)........................................ 19, 20, 21, 24, 25, 26

*Sikkelee v. Precision Airmotive*,
822 F.3d 680 (3d Cir. 2016) ......................................................................38

*Simmons v. Sabine River Auth. La.*,
732 F.3d 469 (5th Cir. 2013) .....................................................................33

*Smith v. United States*,
561 F.3d 1090 (10th Cir. 2009) ....................................................................8

*Sprietsma v. Mercury Marine*,
537 U.S. 51 (2002)...............................................................................33-34

*Stair v. Gaylord*,
232 Kan. 765, 659 P.2d 178 (1983)................................................ 46, 50-51

*State ex rel. Miller v. Midwest Serv. Bureau*,
229 Kan. 322, 623 P.2d 1343 (1981).........................................................46

*State ex rel. Stovall v. ConfiMed.com*,
272 Kan. 1313, 38 P.3d 707 (2002).............................................................53

*State v. Dooley*,
308 Kan. 641, 423 P.3d 469 (2018).............................................................49

*SWKI-Seward W. Cent. v. KCC*,
2018 WL 385692 (Kan. Ct. App. Jan. 12, 2018).........................................41

*Tufts v. Newmar Corp.*,
    53 F. Supp. 2d 1171 (D. Kan. 1999) ............................................................48

*United Distrib. Cos. v. FERC*,
    88 F.3d 1105 (D.C. Cir. 1996)............................................ 22, 23, 24

*United States v. Pub. Utils. Comm'n*,
    345 U.S. 295 (1953)...........................................................................20

*Valdez v. Grisham*,
    2022 WL 2129071 (10th Cir. June 14, 2022)................................12

*Via Christi Reg'l Med. Ctr. v. Reed*,
    298 Kan. 503, 314 P.3d 852 (Kan. 2013)....................................52

*Woolsey v. J.P Morgan Ventures Energy Corp.*,
    2015 WL 6455571 (S.D. Cal. Oct. 26, 2015)................................37

*Wyeth v. Levine*,
    555 U.S. 555 (2009)...........................................................................33


**Statutes & Regulations:**

15 U.S.C. § 717(b) .............................................................. 21, 30

15 U.S.C. § 717(c) ......................................................................22

15 U.S.C. § 717c ........................................................................20

15 U.S.C. § 717c(a).....................................................................21

15 U.S.C. § 717c(a)-(e) ..............................................................21

15 U.S.C. § 717c-1 .....................................................................23

15 U.S.C. § 717d ........................................................................21

15 U.S.C. § 717d(a) .......................................... 20, 21, 24, 38

15 U.S.C. § 3301 ........................................................................23

15 U.S.C. §§ 3311-33 (1988).....................................................23

18 C.F.R. § 284.402 ...................................................................38

K.S.A. § 50-623 .........................................................................14

K.S.A. § 50-624(b)......................................................................42

K.S.A. § 50-624(c) ................................................................42

K.S.A. § 50-624(l) ................................................................49

K.S.A. § 50-627 ...................................................................42

K.S.A. § 50-627(a) ........................................... 42, 46, 51, 52, 54

K.S.A. § 66-101 ...................................................................41

K.S.A. § 50-6,106 .......................................................... 52, 54

K.S.A. § 50-6,106(b)(1)(B) ....................................................55

Natural Gas Policy Act of 1978, Pub. L. 65-621, 92 Stat. 3350, 15 U.S.C.
§§ 3301, *et seq.* (2012) ..................................................23

Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60,103
Stat. 157 (1989) .............................................................23

OHIO REV. CODE § 1345.03(A) ...............................................46

**Other Authorities:**

68 F.E.R.C. ¶ 66,332 (Nov. 26, 2003) .....................................37

*2024 Report on Enforcement*, Docket No. AD07-13-018 (Nov. 21, 2024)
http://www.ferc.gov/sites/default/files/2024-
11/2024%20Report%20on%20Enforcement_1121.pdf ................13

BLACK'S LAW DICTIONARY (12th ed. 2024) ...............................50

EIA, *Natural Gas Pipeline Network*,
https://www.eia.gov/naturalgas/archive/analysis_publications/ngpip
eline/interstate.html. ........................................................21

*Fiscal Year 2021 Annual Report on Enforcement* (Nov. 18, 2021),
https://ferc.gov/media/fiscal-year-2021-annual-report-enforcement ..... 11, 12

Kan. Municipal Energy Agency, *2021 Annual Report* 6 (2021),
*available at* https://kmea.com/wp-content/uploads/2022/09/2021-
Annual-Report-Final.pdf ......................................................9

Kan. Sup. Ct. R. 7.04 ...........................................................48

*Order on Rehearing and Clarification*,
139 F.E.R.C. ¶ 61,132 (May 17, 2012) ....................................21

S. Rep. No. 1162, 75th Cong., 1st Sess., 2 (1937)....................................................22

S&P Global, *Methodology and Specifications Guide* 11 (2025),
    *available at* https://www.spglobal.com/commodity-
    insights/en/pricing-benchmarks/our-methodology/methodology-
    specifications/natural-gas .............................................................................8

*The February 2021 Cold Weather Outages in Texas and the*
    *South Central United States* (Nov. 16, 2021),
    https://www.ferc.gov/media/february-2021-cold-weather-outages-
    texas-and-south-central-united-states-ferc-nerc-and .....................................11

# STATEMENT OF RELATED CASES

This Court and the District Court consolidated the following related cases.

| USCA No. | District Court No. | Case Name |
|---|---|---|
| 25-3046 | 6:24-cv-01073 | *In re: Winter Storm Uri Natural Gas Litigation* |
| 25-3047 | 6:23-cv-01195 | *Stoneberger, et al. v. BP Energy Company, et al.* |
| 25-3049 | 6:23-cv-01192 | *Mehl, et al. v. BP Energy Company, et al.* |
| 25-3050 | 6:23-cv-01245 | *Rebein, Giroux, et al. v. BP Canada Energy Marketing Corp., et al.* |
| 25-3051 | 6:24-cv-01005 | *Rice, et al. v. Southwest Energy, et al.* |
| 25-3052 | 6:23-cv-01249 | *Deutscher, et al. v. Tenaska Marketing Ventures, et al.* |

**INTRODUCTION**

Plaintiffs' claims arise out of an extraordinary storm, known as Winter Storm Uri, that wreaked havoc across the midcontinent region in February 2021. Natural-gas prices spiked due to increased demand for heating, while infrastructure freeze-offs drastically reduced supply. The Federal Energy Regulatory Commission ("FERC"), the agency empowered under federal law to regulate and investigate activities in wholesale natural-gas markets, investigated natural-gas prices during the storm and neither instituted any enforcement action nor reversed the regulatory presumption that wholesale prices are lawful.

Unsatisfied with that determination, Plaintiffs invoke a state consumer-protection law to invade the federal government's exclusive jurisdiction over wholesale, interstate gas markets. Plaintiffs assert claims under the Kansas Consumer Protection Act ("KCPA") against a group of natural-gas wholesalers based on the prices Plaintiffs paid for gas during Winter Storm Uri in their downstream, *retail* transactions with nonparties. As the District Court (Crabtree, J.) correctly recognized, however, federal law preempts such claims. And even if the claims were not preempted, Plaintiffs fail to state a claim against Defendants under the KCPA. The dismissal of the Complaints therefore should be affirmed, both for the reasons stated by the District Court and for multiple alternative grounds the court did not need to reach.

1

First and foremost, the District Court correctly held that Plaintiffs' state-law claims under the KCPA are field preempted by the Natural Gas Act ("NGA"), which grants FERC exclusive jurisdiction over wholesale natural-gas transactions. Plaintiffs challenge Defendants' trades and related conduct that took place *solely* in the *wholesale* market. Decades of Supreme Court precedent affirm FERC's exclusive jurisdiction over prices and practices in the wholesale market, which preempts any state-law claims that target such prices or practices. As the District Court rightly determined, an indirect effect on prices in downstream, retail transactions is not enough to subject wholesale trades to state jurisdiction. FERC investigated the very prices and practices Plaintiffs challenge, elected not to bring an enforcement action against any wholesaler, and did not declare any wholesale prices during Winter Storm Uri unlawful. This Court need not look beyond field preemption to affirm the dismissal of the Complaints.

Even though the District Court did not reach the issue, conflict preemption provides an additional ground for affirmance. Plaintiffs challenge the index prices to which Defendants and their commercial counterparties agreed, which were informed by wholesale trading prices in the region. But FERC has the sole authority to declare wholesale prices unreasonable and unlawful, and FERC has not done so— even after a thorough review of Winter Storm Uri. To allow Plaintiffs to proceed

with claims that challenge Defendants' wholesale prices under state law would put state and federal law in direct conflict.

Beyond federal preemption, Plaintiffs' claims fail as a matter of law under the KCPA. That statute applies only to conduct (i) "in connection with" a consumer transaction, (ii) by a "supplier" that solicits, engages in, or enforces consumer transactions in the ordinary course of its business, and (iii) that is "unconscionable." Plaintiffs cannot satisfy any of these elements of a KCPA claim.

*First*, Plaintiffs do not allege that Defendants engaged in any conduct "in connection with" a consumer transaction. No Defendant is alleged to have sold, marketed, or offered natural gas to Plaintiffs or any other retail consumers. Nor could they. Plaintiffs admit the challenged transactions are *one*—and in the *Rice* case *two*—steps removed from any consumer transaction.

*Second*, Plaintiffs do not allege that Defendants solicit, engage in, or enforce consumer transactions in the ordinary course of their business. Defendants therefore are not "suppliers" under the KCPA.

*Third*, Plaintiffs fail to plead "unconscionable" conduct by Defendants in connection with their wholesale trades. Plaintiffs do not allege that Defendants deceived any of their commercial counterparties or that there was unequal bargaining power between them. Instead, these sophisticated nonparties agreed to pay the challenged index prices, and Defendants lawfully charged those index prices

consistent with natural-gas prices throughout the entire region during the Winter Storm.

## ISSUES PRESENTED

1.  Does the NGA field preempt state-law claims challenging the price of wholesale natural-gas transactions and practices related to such transactions?

2.  Does the NGA conflict preempt state-law claims seeking to declare the price of wholesale transactions unlawful when FERC has exclusive authority over these transactions and—after investigating natural-gas trading during Winter Storm Uri—declined to disturb the presumption that the wholesale prices were lawful?

3.  Can Plaintiffs state a claim under the KCPA when:

    a.  Defendants did not engage in any conduct in connection with any transaction involving a consumer?

    b.  Defendants do not solicit, engage in, or enforce consumer transactions in the ordinary course of their business?

    c.  Defendants did not deceive any of their sophisticated commercial counterparties, there was no unequal bargaining power between them, and Defendants' prices were directly in line with other market prices in the surrounding area?

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Defendants Sold Natural Gas To Nonparty Intermediaries During Winter Storm Uri.

Defendants sell natural gas in interstate commerce exclusively through wholesale transactions. App. 1:156-157 (¶¶10-15).[1] None of the Defendants is alleged to have sold, marketed, or offered natural gas directly to Plaintiffs or other consumers through retail sales. Instead, Plaintiffs allege that Defendants sold gas (directly and indirectly) to one of five nonparty distributors in wholesale transactions in February 2021 during Winter Storm Uri. App. 1:160, 1:162-165 (¶¶28-29, 34-39).

Those nonparty intermediaries are large, sophisticated companies that buy natural gas in the wholesale market and then resell it. The five distributors whose wholesale purchases are at issue here are:

- Kansas Gas Service ("KGS"), which is "the largest natural gas distributor in Kansas." App. 1:160 (*Mehl* ¶29);

- Kansas Municipal Gas Agency ("KMGA"), which is "a non-profit, interlocal public agency that purchases, schedules, and manages natural-gas supply for more than 30 cities in Kansas" by selling that gas to the municipal utilities. App. 1:192 (*Stoneberger* ¶27);

---

[1] For efficiency, Defendants cite the first Complaint in the appendix (*Mehl*) as representative and to the other Complaints where needed for specifics. Defendants show appendix citations as App. Volume: Page.

- Black Hills/Kansas Gas Utility Company, LLC ("Black Hills"), which "distributed natural gas to 113,511 customers in Kansas" in 2021. App. 2:327 (*Rebein* ¶28);

- Atmos Energy Corporation ("Atmos"), the "country's largest natural gas-only distributor," which "distribut[ed] natural gas to … 125,000 Kansas residential customers" in 2021. App. 2:370 (*Rice* ¶¶30-31); and

- Midwest Energy, Inc. ("Midwest Energy"), which is "an electric and natural-gas cooperative that serves approximately 93,000 customers throughout 40 counties in central and western Kansas." App. 2:351 (*Deutscher* ¶24).

Plaintiffs are residents of Kansas who allege that their "utilities were served by" the five distributors. App. 1:179 (¶83). Plaintiffs do not allege that they had a relationship with or ever bought natural gas from any Defendant. Nor do Plaintiffs allege that Defendants marketed their natural gas to them or that they had any role in the transactions between Defendants and the five distributors.

## B.     The Wholesale Market For Natural Gas Necessarily Crosses State Lines.

The market for natural gas includes both wholesale sales and retail sales. Wholesale sales are "sales for resale," as opposed to retail sales, which are "sales directly to users." *FERC v. Elec. Power Supply Ass'n* ("*EPSA*"), 577 U.S. 260, 266-67 (2016). Before natural gas reaches any end user (commercial or residential), it moves through several layers of commerce. App. 1:158 (¶18). Producers extract natural gas from the ground. Gas then is usually sold and shipped through one or more wholesalers across state lines and through interstate pipelines managed by third

parties. Distributors then purchase the natural gas and, finally, provide it to individual consumers through last-mile networks. The only challenged conduct here concerns wholesale transactions at the intermediate step of the process or even further removed—either sales between marketers and distributors or between marketers and the distributors' suppliers. Blue Br. 16-17 (collecting allegations).

To secure a supply of natural gas, distributors rely on a combination of "baseload," "callable," and "spot gas" contracts. App. 1:158-159 (¶¶21-24). In these wholesale transactions, buyers and sellers of natural gas often agree to floating prices based on market-wide indexes published by Platts, the leading independent provider of benchmark prices for commodities markets, including the natural-gas market. App. 1:158-160 (¶¶19-28). Platts "collects data on natural-gas trades and publishes both daily and monthly price indexes for various trading locations for natural gas." App. 1:158 (¶19).

Baseload gas is usually priced monthly, either as a fixed price or based on an index, and it may be lower than the daily price, which also is either a fixed price or based on an index. App. 1:159 (¶¶22-24). In baseload contracts, the distributor usually negotiates a contract many months before the delivery date and commits to buy the same volume of gas each day of the month. App. 1:159 (¶¶22-24). Because the volume of baseload gas supply is not flexible, distributors choose *not* to lock in a monthly price for their full supply, preferring to use callable and spot transactions

to match daily forecasted needs. App. 1:159 (¶¶22-24). In times of higher gas demand or constrained supply, when distributors use callable or spot-price gas, the daily-index price and available fixed-price gas will usually be more expensive than the monthly index. App. 1:159 (¶¶22-24). Distributors combine their baseload, callable, and spot contracts to hedge gas prices and ensure flexibility. App. 1:161 (¶30 n.5).

Plaintiffs challenge transactions—whether for baseload, callable, or spot gas—"tied to" a Platts index price. Blue Br. 16 (collecting allegations). The Complaints refer to several trading locations for Platts indexes, most of which are in the midcontinent region.[2] Each of the pipelines at those referenced Platts locations crosses state lines.[3] For at least one Defendant, Concord, Plaintiffs fail to identify any transaction at all.[4]

---

[2] *See* App. 1:158-161 (*Mehl* ¶¶19, 27, 32), 1:190-192 (*Stoneberger* ¶¶17, 25, 29), 2:325-27 (*Rebein* ¶¶18, 26-27), 2:349-351 (*Deutscher* ¶¶15, 22-23), 2:368-370 (*Rice* ¶¶19, 29, 32).

[3] *See* S&P Global, *Methodology and Specifications Guide* 11 (2025), *available at* https://www.spglobal.com/commodity-insights/en/pricing-benchmarks/our-methodology/methodology-specifications/natural-gas. Because the Complaints cite this source, App. 1:160 (¶25 n.2), the Court may consider it in reviewing the District Court's decision. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

[4] *See* Suppl. App. 1:93 (Concord's Motion to Dismiss).

**C.   Winter Storm Uri Disrupted Energy Markets In Profound And Unprecedented Ways.**

In February 2021, Winter Storm Uri swept through the entire midcontinent region, not just Kansas, and profoundly disrupted energy markets in a large area with sub-zero temperatures. App. 1:166-169 (¶¶41-48). The storm's "[l]ow temperatures with sub-zero wind chills … accompanied by snow, sleet, and freezing rain" dramatically increased demand for gas in the region. App. 1:169 (¶48).

The storm also created serious supply challenges that extended throughout the midcontinent region. Gas wellheads in multiple states froze, causing a significant disruption in natural-gas supply in Kansas and beyond and limiting the industry's ability to supply gas to pipelines like Southern Star. App. 1:169 (¶48); *see also* Kan. Municipal Energy Agency, *2021 Annual Report* 6 (2021), *available at* https://kmea.com/wp-content/uploads/2022/09/2021-Annual-Report-Final.pdf (cited in App. 1:202 (*Stoneberger* ¶62 n.16)). Despite the increased demand for natural gas, supply on pipelines did not increase to match. App. 1:173 (¶64).[5]

In response to these issues, Governor Laura Kelly declared a state of emergency in Kansas. App. 1:169 (¶48). Following this declaration, the Kansas

---

[5] Plaintiffs implausibly assert that the storm did not cause any shortages of natural-gas supply. Blue Br. 15. That assertion contradicts their own allegations that the pipelines did not transport more natural gas to meet the increased demand and the content of other documents like distributor testimony cited in their Complaints. App. 1:168-169, 1:173, 1:176 (¶¶47-50, 62 n.56, 70, 73).

Corporation Commission ("KCC")—which oversees certain intrastate natural-gas sales—ordered all natural-gas utilities under its jurisdiction "to do all things possible and necessary to ensure natural gas … services continue to be provided to their customers in the State." App. 1:169 (¶49). In response to this order, "natural-gas distributors in Kansas made substantial purchases of natural gas at the prevailing spot price." App. 1:169 (¶¶48-50).

Leading up to the storm, the wholesale price of natural gas rose as temperatures dropped, and spot prices continued to rise after the unprecedented storm struck the region. App. 1:166-168 (¶¶42-45). These price increases were not limited to specific sellers, specific transactions, or specific States. Instead, the storm affected the entire wholesale market throughout the region. Each of the daily indexes Plaintiffs cite experienced extreme price increases during Winter Storm Uri.[6]

In purchasing callable and spot gas at historically high prices, the five distributors necessarily incurred higher costs during the storm. App. 1:176 (¶¶70-72). All five distributors elected to shift these higher costs downstream to their customers, including Plaintiffs. App. 1:161, 1:176-178 (¶¶30, 71-73, 77-79). For example, one distributor, KMGA, and its member cities established their own programs to "spread the costs of Winter Storm Uri over years to … retail customers."

---

[6] *See* App. 1:160, 1:167-168 (*Mehl* ¶¶27, 43-45), 1:192, 1:196-197 (*Stoneberger* ¶¶25, 37-39), 2:326-330 (*Rebein* ¶¶26, 33-35), 2:350-353 (*Deutscher* ¶¶22, 30-32), 2:370-373 (*Rice* ¶¶29, 39-41).

App. 1:204 (*Stoneberger* ¶64). Three other distributors (KGS, Atmos, and Black Hills) worked with the KCC to "securitize" the millions of dollars in "extraordinary costs and financing costs" incurred during Winter Storm Uri. App. 1:176-178 (*Mehl* ¶¶72-73, 77), 2:338 (*Rebein* ¶¶62-64), 2:379 (*Rice* ¶¶67-68).

Under settlement agreements approved by the KCC, those distributors' residential customers now pay a fixed securitization charge. App. 1:178 (*Mehl* ¶¶77-79), 2:338 (*Rebein* ¶¶63-65), 2:379-380 (*Rice* ¶¶68-69, 71). Midwest Energy also adopted a "natural-gas cost-recovery plan" to recover approximately $9.68 million "in excess natural gas charges" by passing those costs on to its residential customers over two years. App. 2:357 (*Deutscher* ¶¶47-49).

### D. FERC Investigated Wholesale Transactions During Winter Storm Uri And Found No Basis To Act Against Any Of The Defendants.

FERC extensively investigated wholesale transactions and possible market manipulation during Winter Storm Uri. Exercising duties authorized by Congress, FERC comprehensively reviewed the wholesale natural-gas market activity during Winter Storm Uri to determine whether any market participants engaged in market manipulation or other violations.[7] As part of that review, FERC "examined physical

---

[7] *See Fiscal Year 2021 Annual Report on Enforcement* (Nov. 18, 2021), https://ferc.gov/media/fiscal-year-2021-annual-report-enforcement; *see also The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 16, 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and at 21 (noting investigation of

wholesale natural gas trade data" and "financial natural gas … positions."[8] FERC further evaluated tips about "potentially improper market participant behavior … [and] met with industry participants and public interest groups to discuss their concerns."[9] And FERC coordinated with state and federal representatives "as appropriate."[10]

After culling through 2,280 screen tips related to market activity during February 2021—up dramatically from the 471 tips FERC received one year earlier—FERC classified 190 tips as "surveillance alerts."[11] Where "concerns persisted through more thorough review," a surveillance inquiry followed, which triggered "a more in-depth staff review of the specific trading behavior, which in some cases involve[d] contacting market participants for additional information or to discuss the conduct at issue."[12] FERC conducted "34 such natural gas surveillance inquiries" for all 2021.[13]

_____

possible market manipulation). This Court can take judicial notice of information on a government website and the content of the Federal Register. *See Valdez v. Grisham*, 2022 WL 2129071, at *2 (10th Cir. June 14, 2022).

[8] *Fiscal Year 2021 Annual Report on Enforcement* 79 (Nov. 18, 2021), https://ferc.gov/media/fiscal-year-2021-annual-report-enforcement.

[9] *Id.*

[10] *Id.*

[11] *Id.* at 80 & n.78.

[12] *Id.*

[13] *Id.*

Of these many inquiries, two were referred for further investigation, but neither resulted in any enforcement action. In particular, FERC investigated Defendant Macquarie Energy's trading activity during the storm, including the exact same trades in Kansas about which Plaintiffs complain. Blue Br. 12. FERC later closed that investigation without any enforcement action or assertion of wrongdoing. *Kansas v. Macquarie Energy LLC*, 5:23-cv-04116, ECF 50 at 10 (D. Kan. Aug. 2, 2024). FERC also investigated whether "a company violated the Commission's Anti-Manipulation Rule by contacting a price index reporter about the continued inclusion of a lower-priced point in one of the reporter's price indices when the timing of that request (during Winter Storm Uri) would have a significant positive financial effect on that company (and others)."[14] FERC closed that investigation "without further action."[15]

## II. Procedural History

Notwithstanding that FERC's extensive investigation revealed no evidence of wrongdoing, Plaintiffs filed these five putative class actions, seeking to recover the charges their distributors levied on their monthly utility bills after Winter Storm Uri. Plaintiffs complain that the prices the *distributors* charged them (Plaintiffs had no

---

[14] *2024 Report on Enforcement*, Docket No. AD07-13-018, at 39 (Nov. 21, 2024), http://www.ferc.gov/sites/default/files/2024-11/2024%20Report%20on%20Enforcement_1121.pdf.

[15] *Id*. at 40.

contact with any Defendant) during a period of unprecedented market turmoil were too high, and they seek to recover their personal costs, not from the distributors, but from Defendants based on Defendants' upstream, *wholesale* transactions. Plaintiffs do not allege any direct transactions or communications between Plaintiffs and Defendants. Instead, they claim Defendants' transactions in the wholesale market indirectly affected the retail market, leading to an increase in the charges on Plaintiffs' natural-gas bills.

Plaintiffs seek to represent putative classes of "all residential customers whose utilities were served" by one of the five distributors. *See* App. 1:179 (¶83). Plaintiffs assert three separate state-law claims against Defendants, all under the KCPA, K.S.A. §§ 50-623 *et seq.*, including a claim for attorneys' fees. Defendants jointly and individually moved to dismiss the Complaints on May 31, 2024. Suppl. App. 1:66-2:217.

The District Court granted Defendants' joint motion to dismiss on February 28, 2025, holding that FERC's exclusive jurisdiction over the wholesale market preempts Plaintiffs' state-law claims. App. 3:600-640.[16] As the court explained, under controlling Supreme Court precedent, whether FERC or the States have jurisdiction depends "on whether the regulation [is] aimed at the wholesale market or the retail market, *regardless of the ripple effect it might have in the other*

---

[16] The Court denied all individual motions to dismiss as moot. App. 3:681.

14

*market*." App. 3:620. The District Court determined that Plaintiffs' claims here "challenge rates and practices that occurred in the natural gas *wholesale* market—between defendants and distributors they sold to—and not in the *retail* market." App. 3:621. The court noted that even if those transactions had "ripple effects" on the retail market, "plaintiffs never dispute that the transactions at issue were wholesale transactions in interstate gas, regulated under the Natural Gas Act." App. 3:620. As the court explained, "plaintiffs' concerns about price indexes and market manipulation are prototypal FERC territory" because "the challenged rates and practices occurred during wholesale transactions." App. 3:625.

The District Court also rejected Plaintiffs' attempt to analogize their KCPA claims to the state-law claims at issue in *ONEOK, Inc. v. Learjet*, 575 U.S. 373 (2015), noting that "the *Oneok* plaintiffs' claims arose in the context of direct-consumer sales—the retail market—with consequences for the wholesale market. Plaintiffs' claims here are just the opposite." App. 3:631. Extending *ONEOK* to Plaintiffs' claims, the court held, "necessarily would … undermine FERC's role as the exclusive enforcer in those wholesale markets"—which the States may not do. App. 3:634-635. The District Court further concluded that "the pass-through effects on the retail market don't open a path for state law claims to challenge rates and practices that rest squarely within FERC jurisdiction." App. 3:622.

Because the District Court dismissed Plaintiffs' claims on field-preemption grounds, it did not reach the other grounds for dismissal raised in Defendants' motions. Plaintiffs appealed the District Court's order.

## SUMMARY OF ARGUMENT

Plaintiffs' state-law claims seek to impose liability on Defendants based entirely on their wholesale natural-gas trades. Even accepting the Complaints' allegations as true, Plaintiffs' claims face multiple insurmountable hurdles.

**I.** The District Court correctly held that the NGA field preempts Plaintiffs' state-law claims. It is undisputed that the trades and related conduct Plaintiffs challenge took place *only* in the *wholesale* market. And it is equally undisputed that FERC has *exclusive jurisdiction* over prices and practices in the wholesale market. Indeed, decades of Supreme Court precedent confirm FERC's exclusive jurisdiction over the wholesale market, which preempts any state laws—or state-law claims—targeting wholesale prices or practices. As the District Court correctly determined, an ancillary pass-through effect on retail prices is not enough to subject wholesale trades to state jurisdiction. Notably, FERC investigated the very prices and practices about which Plaintiffs complain, and it neither took any enforcement action nor declared any wholesale prices unlawful. Field preemption ends the matter.

To distract from this result, Plaintiffs assert that Defendants and the District Court viewed the *entire* KCPA as preempted. But this is a straw man. Neither the

Defendants nor the District Court questioned that the KCPA has many constitutional applications—just not when the statute is used to usurp exclusive federal authority to regulate wholesale natural-gas prices and practices by imposing separate state standards of conduct. The record here is clear: under Plaintiffs' claims, the *only* basis for liability is Defendants' *wholesale* activity, an area reserved exclusively to federal law and federal regulation by FERC.

**II.** Conflict preemption provides an alternative ground for affirmance. The index prices about which Plaintiffs complain were informed by wholesale trading prices, and FERC has the sole authority to declare wholesale prices unreasonable and unlawful. FERC did not do so here—even after extensive investigation following Winter Storm Uri. State and federal law would be in direct conflict if Defendants' wholesale prices now were to be declared unlawful under the KCPA.

**III.** Even putting federal preemption aside, Plaintiffs' KCPA claims fail under that statute's own terms. As a consumer-protection statute, the KCPA applies only to conduct (i) "in connection with" a *consumer* transaction, (ii) by a "supplier" that solicits, engages in, or enforces *consumer* transactions in the ordinary course of its business, and (iii) that is "unconscionable." Plaintiffs cannot satisfy any of these three statutory elements of a KCPA claim.

**A.** There is no allegation—nor could there be—that Defendants engaged in any conduct "in connection with" a *consumer* transaction. None of the Defendants

is alleged to have sold, marketed, or offered natural gas to Plaintiffs or any other consumer. Indeed, Defendants are not alleged to have played any role at all in Plaintiffs' purchases of natural gas. Instead, Plaintiffs allege that Defendants sold gas (directly and indirectly) to one of five nonparty distributors in upstream, wholesale transactions. Rather than sue the companies that supposedly charged them unconscionable prices, Plaintiffs seek to jump up the chain of distribution to challenge upstream transactions between sophisticated commercial counterparties in the wholesale market.

**B.** Plaintiffs do not allege that Defendants are "suppliers" under the KCPA. There is no allegation that Defendants, as wholesale marketers of natural gas, *solicit*, *engage in*, *or enforce* consumer transactions in the ordinary course of their business. As a result, Defendants are not and cannot be "suppliers" as the KCPA defines that term.

**C.** Plaintiffs do not allege that Defendants engaged in "unconscionable" conduct in connection with the challenged wholesale transactions. There is no allegation of any deceptive conduct by Defendants in connection with those transactions, all of which were with sophisticated commercial counterparties. Nor is there any allegation of unequal bargaining power. Moreover, Defendants' wholesale prices were based on index prices determined by a third party and were consistent with the prices charged by marketers throughout the region during the storm.

18

\*     \*     \*

At bottom, Plaintiffs are unhappy about the unprecedented supply-and-demand dynamics Winter Storm Uri created, and they do not want to accept FERC's decision to close its investigation and find no unreasonable pricing during the storm. Plaintiffs may be disappointed with the arrangements their distributors made for securing natural gas and recouping the costs incurred during Winter Storm Uri, including those the KCC approved. But nothing in federal or Kansas law permits Plaintiffs to impose liability on Defendants based on Defendants' upstream, wholesale trades.

## ARGUMENT

### I. The District Court Correctly Held That The NGA Field Preempts Plaintiffs' State-Law Claims.

This appeal turns on a straightforward application of federal preemption doctrine because federal law ousts any state regulation "where Congress intends to occupy a field." *Colo. Dep't of Pub. Health v. United States*, 693 F.3d 1214, 1222 (10th Cir. 2012). It is "well settled" that through the NGA "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988). The NGA field preempts state law when it is "directed at … things over which FERC has comprehensive authority" or when it "amounts to a regulation" of matters within the federal field. *Id.* at 307-08.

Applying these bedrock preemption principles, Plaintiffs' state-law claims are field preempted: they target wholesale natural-gas transactions and challenge the reasonableness of wholesale prices and wholesale practices. The NGA gives FERC exclusive authority over (i) the rates of wholesale gas transactions and (ii) any "practice" by a "natural gas company" that directly "affect[s]" those rates. 15 U.S.C. §§ 717c, 717d(a). Because FERC has exclusive jurisdiction over these matters, the States do not, and Plaintiffs' state-law claims cannot proceed. *See Schneidewind*, 485 U.S. at 305, 308.

### A. The NGA's Text And Supreme Court Precedent Recognize FERC's Exclusive Jurisdiction Over The Field Of Wholesale Natural-Gas Prices.

#### 1. The NGA Gives FERC Exclusive Jurisdiction Over The Price of Natural Gas In Wholesale Transactions.

For nearly a century, Congress has placed wholesale natural-gas transactions—and the rates and conduct associated with them—under exclusive federal control.

Congress enacted the NGA to create FERC (originally the Federal Power Commission) and arm that agency with the power to regulate wholesale rates. *See Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n* ("*AECC*"), 461 U.S. 375, 377-79 (1983); *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 307-08, 311 (1953).

The NGA's plain text reflects Congress's intent to create broad, exclusive federal regulatory jurisdiction over wholesale natural-gas sales and the companies

engaged in them. Only FERC has jurisdiction over (i) "the transportation of natural gas in interstate commerce," (ii) "the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use," and (iii) natural-gas companies "engaged in such transportation or sale." 15 U.S.C. § 717(b).[17]

The NGA also makes several grants of power that obligate FERC to oversee prices for wholesale transactions as well as practices affecting such prices. *See Schneidewind*, 485 U.S. at 301. For example, FERC maintains "extensive control over the rates at which the gas is sold for resale." *Ill. Nat. Gas Co. v. Cent. Ill. Pub. Serv. Co.*, 314 U.S. 498, 507 (1942); *see* 15 U.S.C. § 717c(a)-(e). Among other things, the NGA requires FERC to ensure those rates are "just and reasonable." 15 U.S.C. § 717c(a). Similarly, FERC must regulate "practices that directly affect or are closely related to" wholesale rates. *Order on Rehearing and Clarification*, 139 F.E.R.C. ¶ 61,132, at ¶ 358 (May 17, 2012); *see* 15 U.S.C. § 717d. And if ''any rate [or] charge,'' or ''any rule, regulation, practice, or contract affecting such rate [or] charge[,]'' falls short of the NGA's required standard, FERC alone must rectify the problem. 15 U.S.C. § 717d(a).

---

[17] Contrary to Plaintiffs' assertion that this jurisdictional scope is "limited," Blue Br. 34, most natural gas in the United States travels between States and thus is within FERC's jurisdiction. *See* EIA, *Natural Gas Pipeline Network*, https://www.eia.gov/naturalgas/archive/analysis_publications/ngpipeline/interstate.html.

With similar precision, the NGA confines the States' role to regulating local activities: the NGA exempts from federal preemption "intrastate transactions" as "matters primarily of local concern." 15 U.S.C. § 717(c). As had existed beforehand, States retained jurisdiction over *intrastate*, *retail* gas sales. *AECC*, 461 U.S. at 377-78. Thus, "without supplanting any of the existing authority of the state agencies, the Act was intended to provide a powerful regulatory partner … which could regulate activities *where the state bodies could not*." *Corp. Comm'n v. Fed. Power Comm'n*, 415 U.S. 961, 962 (1974) (emphasis added) (Rehnquist, J., dissenting from summary affirmance) (citing S. Rep. No. 1162, 75th Cong., 1st Sess., 2 (1937)).

Under the exclusive authority bestowed by the NGA, FERC's predecessor initially set the rates at which gas pipelines both bought gas (from producers) and sold gas (to distributors). *ONEOK*, 575 U.S. at 379-80.[18] By the 1970s, however, as prices for unregulated-intrastate gas sales soared while federally-regulated-interstate gas prices remained artificially low, "it became clear" that the NGA's price-setting "regulatory structure was inadequate." *Panhandle E. Pipeline Co. v. Okla. ex rel. Comm'rs*, 83 F.3d 1219, 1226 (10th Cir. 1996). As a result, Congress and FERC acted to deregulate the natural-gas market and to restructure it to facilitate

---

[18] Plaintiffs are correct that Congress was motivated by concern for captive-consumer vulnerability. Blue Br. 17. But it was the interstate pipeline monopolies, not wholesale gas marketers, that motivated this concern by charging exorbitant prices and providing poor services to retail consumers. *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1122 (D.C. Cir. 1996).

competition. *ONEOK*, 575 U.S. at 379-80. For example, Congress deregulated the pricing of sales from producers to pipelines. *Id.* at 380.[19] FERC then gradually decoupled the pipelines' natural monopoly power (over transportation) from the sale of gas. *United Distrib.*, 88 F.3d at 1122-27. FERC also started issuing "blanket certificates" that permit producers of natural gas and new intermediaries like marketers to sell gas at market rates, provided those sellers do not have or exercise outsized market power. *See ONEOK*, 575 U.S. at 380-81.

But no part of this history changes the fact that, ever since Congress enacted the NGA, "sales for resale … were beyond the reach of state power, regardless of the character of ultimate use." *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 515 (1947); *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 292 (1997). This remains true today. Under the NGA, FERC retains exclusive authority over wholesale prices in interstate energy markets. 15 U.S.C. § 717c-1; *see EPSA*, 577 U.S. at 277. Instead of setting natural-gas rates, FERC now regulates the wholesale market through the conditions on blanket certificates, the guidelines for reporting transactions to private indexes, and its investigations of suspected market manipulation. *See ONEOK*, 575 U.S. at 380-82.

---

[19] *See also*, *e.g.*, Natural Gas Policy Act of 1978, Pub. L. 65-621, 92 Stat. 3350, 15 U.S.C. §§ 3301, *et seq.* (2012); Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60,103 Stat. 157 (1989) (repealing Title I of the NGPA) (codified at 15 U.S.C. §§ 3311-33 (1988)).

Federal law is thus clear: only FERC is authorized to determine when wholesale natural-gas sales violate federal law or are otherwise unjust and unreasonable, unduly discriminatory, or unduly preferential. *See* 15 U.S.C. § 717d(a); *Schneidewind*, 485 U.S. at 301, 307-08; *United Distrib.*, 88 F.3d at 1163.

> ### 2. The Supreme Court Has Repeatedly Confirmed FERC's Exclusive Jurisdiction Over Wholesale Natural-Gas Prices.

For decades, Supreme Court precedent has confirmed FERC's exclusive jurisdiction over wholesale gas transactions. Over eighty years ago, the Supreme Court held that the NGA preempts a State's assertion of jurisdiction over the rate of a wholesale natural-gas sale to a local distribution company for resale to consumers. *Pub. Utils. Comm'n v. United Fuel Gas*, 317 U.S. 456, 466-68 (1943). Later cases have consistently preserved exclusive federal jurisdiction over wholesale prices and rates:

- In *N. Nat. Gas v. State Corp. Comm'n of Kan.*, 372 U.S. 84 (1963), the Supreme Court invalidated a State's orders that were "purposely directed at interstate wholesale purchasers" because the "federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas … *or for state regulations which would indirectly achieve the same result*." *Id*. at 91-92 (emphasis added).[20]

---

[20] By contrast, the Supreme Court upheld a state regulation restricting when producers may extract gas because the regulated activity was "the physical act[] of drawing gas from the earth," an activity within States' jurisdiction. *Nw. Cent.*

- In *Nantahala Power & Light v. Thornburg*, 476 U.S. 953 (1986), the Supreme Court found a state retail-rate regulation preempted because it contravened FERC-approved wholesale power rates. *Id*. at 959-62.[21] Even though FERC had approved specific rates for Nantahala, in calculating the rate that Nantahala could charge its retail customers, North Carolina regulators tried to allocate power costs differently than what FERC had ordered, essentially rejecting FERC-approved rates when setting retail rates for consumers. *Id*. at 959-60. This state regulation was preempted because "FERC clearly has exclusive jurisdiction over the rates to be charged Nantahala's interstate wholesale customers." *Id*. at 966.

- In *Schneidewind v. ANR Pipeline*, the State had required interstate pipelines to obtain state approval before issuing securities, and the "crux of the issue" was whether the State had attempted "regulation of the rates … used in … sale for resale of natural gas in interstate commerce." 485 U.S. at 306. The Supreme Court concluded that the state regulation was field preempted because "the things [the state statute's] regulation is directed at, the control of rates … of natural gas companies, are precisely the things over which FERC has comprehensive authority." *Id*. at 308.

- In *Miss. Power & Light v. Mississippi*, 487 U.S. 354 (1988), certain FERC-authorized orders relating to wholesale rates necessitated an increase in the company's retail rates. The Supreme Court held that the State could not refuse to permit these increases. *Id*. at 356-57. As the Court explained, "States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair," and "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts." *Id.* at 371, 372, 375.

- In *Hughes v. Talen Energy*, the Supreme Court held that FERC's exclusive jurisdiction over the wholesale energy market preempted a Maryland program regarding subsidies for electricity generators. 578 U.S. at 153-54. Under the challenged program, Maryland required participation in power

---

*Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 510 (1989) (quoting *N. Nat. Gas*, 372 U.S. at 90).

[21] As Plaintiffs concede, Blue Br. 20 n.16, the NGA and the FPA divide jurisdiction between FERC and the States in virtually identical ways. For that reason, cases involving NGA jurisdiction are binding precedent in FPA disputes and vice versa. *See Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 164 n.10 (2016).

capacity auctions and guaranteed a rate different from the interstate wholesale rate. *Id.* at 155-56. As it had in prior cases, the Supreme Court invalidated Maryland's "attempts to second-guess the reasonableness of interstate wholesale rates." *Id.* at 165.

These controlling Supreme Court decisions establish that the NGA confers exclusive power on FERC to regulate the reasonableness of wholesale rates and related conduct. *See Nantahala*, 476 U.S. at 966; *Miss. Power*, 487 U.S. at 371; *Hughes*, 578 U.S. at 165. The NGA therefore field preempts any attempts at state regulation of the same. *See Schneidewind*, 485 U.S. at 307-08; *N. Nat. Gas*, 372 U.S. at 88-89.

While the NGA leaves rate-setting authority for "direct," retail sales (which are necessarily intrastate) to the States, *see Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 639-40 (1972), that is the limit of state authority under the NGA. The case on which Plaintiffs principally rely—*ONEOK*—is consistent with that fundamental principle. In *ONEOK*, retail customers asserted state antitrust claims against various interstate pipelines alleging that the retail rates the pipelines charged for natural gas were inflated by market manipulation. 575 U.S. at 376. In holding that the state-law claims in that case were not preempted, the Supreme Court emphasized that the retail customers had purchased natural gas *directly* from the defendant-pipelines for their own consumption. *See, e.g.*, *id.* ("institutions that buy natural gas directly from interstate pipelines sued the pipelines"); *id.* at 383 ("Respondents, as we have said, bought large quantities of natural gas directly from

interstate pipelines for their own consumption."); *id*. at 388 (sales were "by a pipeline to a direct consumer").

The *ONEOK* defendants conceded that their direct sales to plaintiffs were not FERC-jurisdictional sales. They nevertheless argued that state-imposed liability on those retail sales might "affect wholesale rates" within FERC's jurisdiction. *Id*. at 384. In rejecting this argument, the Supreme Court concluded that field preemption did not bar state-law claims based on *the defendants' direct*, *retail sales to the plaintiffs* merely because the challenged conduct also might affect wholesale rates. *Id*. at 389-90. *ONEOK*'s preemption ruling rests squarely on the nature of the specific transactions that were targeted by the claims in that case—retail consumers asserted state-law claims based on their direct, retail purchases and sued the entities that directly sold them natural gas in those retail transactions. *Id*. at 376-77, 384. By contrast, Plaintiffs' claims here specifically target *wholesale* trades—to which Plaintiffs were not parties—and the conduct associated with them.

Plaintiffs try to avoid this obvious distinction by asserting that the Supreme Court got the record wrong and that some wholesale transactions also were at issue in *ONEOK*. Blue Br. 35 & n.21. It is revealing that the only way Plaintiffs can address *ONEOK* is to run from the opinion's plain language. The legal rule announced in *ONEOK* is binding precedent regardless of Plaintiffs' conjecture that the Supreme Court misunderstood the underlying facts. And the briefs in *ONEOK*

described the claims and the plaintiffs as involving only retail transactions. *See, e.g.*, *Br. for Resp'ts*, 2014 WL 6613095, at \*1, \*7, \*10 (2014) ("In the wake of the crisis, respondents—manufacturers, hospitals, educational institutions, and others who purchased gas at inflated rates through retail contracts—brought suit under state antitrust laws."); *Appellants' Joint Reply Br.*, 2012 WL 831209 (2012), at \*1-2 ("[H]ere FERC admittedly never had authority over the retail sales of natural gas that plaintiffs challenge."). *ONEOK* means what it says: state antitrust claims premised on direct, retail sales are not field preempted even if state regulation of those sales may have an ancillary effect on wholesale rates.

Post-*ONEOK* cases confirm that FERC, not the States, "has the authority—and, indeed, the duty—to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *EPSA*, 577 U.S. at 277. The Supreme Court in *EPSA* addressed the limits of FERC's authority and drew on Congress's central purpose—filling regulatory gaps—to recognize expansive federal power. *Id.* at 266, 289 ("Congress passed the [Federal Power Act ('FPA')] precisely to eliminate vacuums of authority over the electricity markets."). The Court grounded its analysis in its precedents addressing preemption, *id.* at 281, and focused on the pragmatic challenges FERC faces given its policies to restructure the energy industry by enhancing competition, *id.* at 294-95, as well as FERC's statutory obligation to ensure "just and reasonable" rates, *id.* at 277-88. FERC regulation does not

impermissibly infringe on state jurisdiction "just because it affects—even substantially—the quantity or terms of retail sales." *Id*. at 281.

Contrary to Plaintiffs' suggestion, Blue Br. 36, since *ONEOK*, courts have found state-law claims preempted, just like the District Court did here, when the claims encroach on exclusive federal jurisdiction to regulate the wholesale market. For example, a California district court found that a "state law conversion claim" alleging illegal conduct in the wholesale electricity market was field preempted. *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp*., 146 F. Supp. 3d 1217, 1227, 1232 (S.D. Cal. 2015) (relying on *Nantahala*). The court held that the state-law claim was preempted because Congress "delegated to [FERC] *exclusive* authority to regulate the … sale at wholesale of electric energy in interstate commerce." *Id*. (citation modified). Likewise, a Texas appellate court concluded that claims under the Texas Theft Liability Act were preempted by FERC-approved tariffs because "FERC's jurisdiction encompasses the determination of just and reasonable rates—including all classifications, practices, regulations, and contracts affecting rates." *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 340, 343 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (distinguishing *ONEOK*).

In sum, the NGA and caselaw are crystal clear: where practices and transactions fall within FERC's exclusive jurisdiction, state law targeted at those practices and transactions is preempted.

### B. Plaintiffs' State-Law Claims Are Preempted Because They Seek To Impose Liability For Wholesale Transactions Governed Exclusively By Federal Law.

#### 1. Plaintiffs Challenge The Prices Charged In Wholesale Transactions.

As the District Court noted in observing "the absence of any argument to the contrary," Plaintiffs do not dispute that the only "transactions at issue here were wholesale transactions in interstate gas, regulated under the Natural Gas Act." App. 3:620-621 n.10. That concession is both unavoidable given the Complaints' allegations and determinative of the preemption question.

Wholesale transactions involve "the sale in interstate commerce of natural gas for resale." *ONEOK*, 575 U.S. at 379; 15 U.S.C. § 717(b). That is the only type of transaction the Complaints describe. As Plaintiffs state in their brief, "Defendants are natural-gas suppliers who sold natural gas to KGS, KMGA, Black Hills, Midwest, and Atmos … during Winter Storm Uri." Blue Br. 6. Defendants sold gas to some of those distributors at delivery locations along the many pipelines listed in the Complaints. *See* App. 2:436. These delivery locations are spread throughout the country, and Plaintiffs' allegations are based on sales at locations in Kansas and other States—where they are based on any sales at all.[22] The distributors to which

---

[22] For example, Plaintiffs' allegations (App. 1:172 (¶60)) reference a $14,940,072.89 sale at the Canadian-Blackwell Pool in Oklahoma from Defendant Macquarie to Symmetry, which then purportedly resold that gas to Atmos elsewhere during Winter Storm Uri. *See* Suppl. App. 2:195 & n.5; *see also* Suppl. App. 1:157

Defendants sold gas, in turn, resold "the natural gas to end users," Blue Br. 7 (collecting cites), like Plaintiffs, who then used the gas to "heat their homes," Blue Br. 6 (collecting cites).

By contrast, retail sales are "sales directly to users" for their own consumption. *See EPSA*, 577 U.S. at 267. Plaintiffs here "buy natural gas from KGS, KMGA, Black Hills, Midwest, and Atmos" for their own consumption. Blue Br. 6 (collecting cites). But KGS, KMGA, Black Hills, Midwest, and Atmos are not the defendants in these cases. Instead, Plaintiffs sued upstream natural-gas marketers that are not alleged to have sold any natural gas to them.

Plaintiffs' claims also challenge certain Defendants' conduct in connection with these upstream, wholesale transactions, alleging that certain Defendants *force-majeured* their sales to KGS, KMGA, Black Hills, Midwest, and Atmos at lower monthly index prices. Plaintiffs allege that these "*force-majeure* declarations were false"[23] and that Defendants cut lower-priced sales at monthly index prices to these distributors under the guise of *force majeure*, only to turn around and sell the same gas back to the distributors at higher daily index prices during the storm. Blue Br. 15 (collecting cites). Leaving aside that Plaintiffs offer no specifics and mischaracterize

---

& n.3 (Rockpoint's only challenged transaction occurred in Oklahoma). Plaintiffs fail to identify any Concord transactions at all. *Supra* n.4.

[23] App. 2:355-356 (*Deutscher* ¶43); App. 2:333 (*Rebein* ¶46).

the actual details of any arm's-length transactions with distributors—some of which were negotiated well before the Storm, *see, e.g.*, Suppl. App 1:155-156 & n.2. Plaintiffs challenge only conduct related to Defendants' wholesale customers and wholesale transactions, not any retail purchaser or retail transaction.

Under the established precedent described above, Plaintiffs' claims are field preempted because they target Defendants' *wholesale* transactions with KGS, KMGA, Black Hills, Midwest, and Atmos (and Atmos' supplier, another nonparty wholesaler) and conduct related to those transactions.

> ### 2. Plaintiffs' Claims Would Impose State-Law Standards On Defendants.

The Complaints allege that Defendants' wholesale prices and related conduct violated the KCPA. Plaintiffs thus seek to impose state-law standards—through damages awards—in a field that Congress reserved to FERC alone. As the Supreme Court "recognized, state 'regulation can be … effectively exerted through an award of damages,' and '[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)).

Contrary to Plaintiffs' suggestion, "state law claim[s]"—as well as state orders or rules—are preempted if they "invade[] [federal] jurisdictional territory." App. 3:603 (quoted at Blue Br. 38). Under such circumstances, state standards, when

enforced through a claim for damages under state law, are field preempted. *See Bradshaw v. Am. Airlines*, 123 F.4th 1168, 1174 (10th Cir. 2024). Indeed, it is "well established" that "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief" because an order to pay damages "can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Carstensen v. Brunswick*, 49 F.3d 430, 432 (8th Cir. 1995) (quoting *Cipollone v. Liggett Grp.*, 505 U.S. 504, 521 (1992)) (alteration in original).

Courts therefore have recognized that "damages claims can serve the same effect as regulations." *Simmons v. Sabine River Auth. La.*, 732 F.3d 469, 477 (5th Cir. 2013);[24] *see also*, *e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881, 886 (2000) (damages awarded under state law had practical effect of imposing state regulation on automobile manufacturers when federal law took a different approach); *Wyeth v. Levine*, 555 U.S. 555, 558-59 (2009) ("The question we must decide is whether the FDA's approvals provide Wyeth with a complete defense to Levine's tort claims.") (cited at Blue Br. 28).

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), is not to the contrary. *See* Blue Br. 39. *Sprietsma* addressed the preemptive effect of the Federal Boat Safety Act ("FBSA") on state common-law tort claims; the Court concluded that these

---

[24] *Simmons* relied on *Kurns*, 565 U.S. at 636—just as the District Court did here (App. 3:603)—for this well-established proposition.

claims were not preempted based on several factors unique to the statute and circumstances of that case. 537 U.S. at 69-70. Most relevant here, the FBSA expressly preserved state common-law liability in its saving clause. *Id.* at 63. And, of course, the Supreme Court in *ONEOK* cited *Sprietsma* for the proposition that implicit preemption may bar a "state law, rule, or *other state action*," such as the common-law claims in that case. 575 U.S. at 376-77.

Plaintiffs respond to Defendants' field-preemption arguments with a straw man, suggesting that Defendants' position is that *the entire KCPA* is preempted. *See* Blue Br. 29-30, 37. Plaintiffs then purport to knock down this straw man by arguing that the KCPA is not preempted in its entirety, Blue Br. 37, and that "consumer protection is an area traditionally regulated by the states," Blue Br. 29-30. But Defendants have never suggested that the NGA preempts the KCPA in its entirety. Nor do Defendants contend that Kansas cannot constitutionally legislate in the area of "consumer protection." Blue Br. 30. Rather, it is the specific theory of Plaintiffs' lawsuits that brings *application* of the KCPA here into conflict with federal law. As the Supreme Court emphasized in *ONEOK*, the relevant question is whether the specific "*lawsuits* are directed at practices affecting retail rates." 575 U.S. at 386 (emphasis added). Plaintiffs' claims here are directed at wholesale transactions and conduct and serve the same effect as state regulation, *Kurns*, 565 U.S. at 636-37,

impermissibly infringing on FERC's exclusive jurisdiction over the price of wholesale natural gas and the reasonableness of related conduct.[25]

### 3. Any Downstream Effects Of Wholesale Transactions On Retail Rates Do Not Displace Federal Preemption.

Plaintiffs try to avoid preemption by arguing that wholesale prices affect retail rates. They allege, for example, that "Defendants charged [distributors] unconscionable prices during Winter Storm Uri, which [the distributors] passed through to the class." App. 1:180 (¶89(b)). They further assert that each distributor that bought gas from Defendants "distribute[s] the cost of the natural gas … across the prices that [they charge their] customers. As a result, … retail end-users bear the ultimate cost for the natural gas that suppliers, like Defendants sell to [others]." App. 1:161 (¶30). The District Court described Plaintiffs' theory like this: "Plaintiffs assert that the pass-through effect of [] wholesale prices on residential consumers permit their state law consumer protection claims here." App. 3:602-603.

This argument is contrary to well-established Supreme Court precedent. The Supreme Court has ruled that the effect of wholesale prices and conduct on retail

---

[25] Because Defendants do not argue the NGA "preempt[s] laws of general applicability" in their entirety, Blue Br. 34, Plaintiffs' reliance on *Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1479-80 (7th Cir. 1991), *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374-75 (1973), and *California v. Fed. Power Comm'n*, 369 U.S. 482, 487 (1962), is misplaced. None of those cases addresses whether state-law claims targeting wholesale transactions and related conduct (and seeking damages in connection with the same) are preempted.

prices—even if substantial—does not take the wholesale transactions and practices outside of FERC's exclusive jurisdiction. *EPSA*, 577 U.S. at 281. As the Supreme Court observed, "[i]t is a fact of economic life that the wholesale and retail markets … in every [] known product, are not hermetically sealed from each other. To the contrary, transactions that occur on the wholesale market have natural consequences at the retail level. And so too, of necessity, will FERC's regulation of those wholesale matters." *Id.*

That wholesale markets may affect retail markets does not change the conclusion here. To recover damages based on their retail transactions, Plaintiffs must impose liability on Defendants for their wholesale sales and alleged related conduct. Under *EPSA*, such sales and conduct are within FERC's exclusive jurisdiction and are not subject to state interference "just because [they] affect[] even substantially—the quantity or terms of retail sales." *Id.* After all, "virtually any action respecting wholesale transactions … has some effect, in either the short or the long term, on retail rates. That is of no legal consequence." *Id.*; *see also Miss. Power*, 487 U.S. at 365, 370-73 (contrary order issued by state agency preempted even though it clearly affected retail prices); *Nantahala*, 476 U.S. at 959-61, 970 (same).

If transactions and conduct are squarely within FERC's exclusive jurisdiction, they cannot be the target of state-law claims. As the District Court correctly held,

"[t]he pass-through effect on retail sales doesn't suffice to supersede Congressional delegation of wholesale jurisdiction to FERC." App. 3:603.[26]

*    *    *

Accordingly, this Court can and should affirm the decision below on the same ground that the District Court dismissed these cases: FERC's exclusive jurisdiction prohibits Plaintiffs from seeking to impose state-law liability on wholesale transactions and practices.

## II. Plaintiffs' State-Law Claims Are Also Conflict Preempted.

Plaintiffs' claims also are barred by conflict preemption. *See* App. 2:588-589 (making argument below). While field preemption forecloses any "state regulation in the area," irrespective of whether state law is consistent or inconsistent with "federal standards," conflict preemption applies where "compliance with both state and federal law is impossible" or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

---

[26] Even the single-Justice statements that Plaintiffs urge this Court to follow support the District Court's ruling. *See* Blue Br. 32. For example, in a concurring opinion in *Kurns*, Justice Kagan recognized that "[b]ecause the agency could have banned use of the brakeshoes as designed, the petitioners' defective-design claims— which would effectively accomplish the identical result—fall within the preempted field." 565 U.S. at 639 (Kagan, J., concurring). FERC could have deemed Defendants' prices unjust and unreasonable and chose not to do so. FERC also could have ordered the "disgorgement of unjust profits." 68 F.E.R.C. ¶ 66,332, 66,333-34 (Nov. 26, 2003). As in *Kurns*, Plaintiffs' claims, if successful, would accomplish a result that FERC rejected. *See Woolsey v. J.P Morgan Ventures Energy Corp.*, 2015 WL 6455571, at *8-9 (S.D. Cal. Oct. 26, 2015).

*ONEOK*, 575 U.S. at 377 (citation modified). "In either situation, federal law must prevail." *Id.*

Given its field-preemption ruling, the District Court did not address conflict preemption, *Richison v. Ernest Grp.*, 634 F.3d 1123, 1130 (10th Cir. 2011), but conflict preemption provides an alternative ground for affirmance, *see*, *e.g.*, *Sikkelee v. Precision Airmotive*, 822 F.3d 680, 703 (3d Cir. 2016) (rejecting field preemption but preserving possibility of conflict preemption); *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 274 n.2 (D.C. Cir. 1990) ("Even where state regulation operates within its own field, it may not intrude indirectly on areas of exclusive federal authority.") (citation modified).

At the heart of Plaintiffs' claims are their complaints about the "extreme increases" in the Platts daily index prices during Winter Storm Uri. Blue Br. 12 (collecting cites). Plaintiffs allege that Defendants' wholesale prices based on these daily indexes in their transactions with distributors and other wholesalers violated the KCPA. Blue Br. 12 (collecting cites). But the wholesale transactions reported to Platts were made under FERC-granted blanket certificates. As a result, those reported trades were, by law, deemed to be just and reasonable, not unduly discriminatory, and not unduly preferential—unless and until FERC determines otherwise. 15 U.S.C. § 717d(a); *see* 18 C.F.R. § 284.402.

After Winter Storm Uri, FERC investigated Defendants' conduct and pricing during the storm and deliberately chose to take no enforcement action. *See supra* 11-13. With respect to Macquarie in particular, FERC examined Macquarie's Kansas trades (including one of the two fixed-price trades informing the Platts Southern Star index referenced by Plaintiffs) and closed its investigation without bringing any enforcement action. *See Macquarie Energy*, 5:23-cv-04116, ECF No. 34, at 24, 26, 29. This means that Defendants' wholesale prices have been blessed twice by federal authority: first, by Congress's and FERC's determination to deregulate the natural-gas market by prescribing that sales made pursuant to blanket certificates are just and reasonable until proven otherwise; and then, by FERC's decision not to take enforcement action.

Plaintiffs nevertheless seek a determination that the wholesale prices that affected the Platts daily index prices—valid under federal law—are unconscionable and invalid *under Kansas law*. But "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked" under state law. *Miss. Power*, 487 U.S. at 375. Plaintiffs "may not alter FERC-ordered allocations of power by substituting [their] own determinations of what would be just and fair." *Id.* at 371.

"Once FERC sets [an interstate wholesale] rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable" or "interfere with this authority." *Nantahala*, 476 U.S at 966 (citation modified).

Similarly, a state program that "adjust[ed] an interstate wholesale rate" for power auctions was found to "invade FERC's regulatory turf." *Hughes*, 578 U.S. at 163; *see also Panhandle E. Pipeline*, 83 F.3d at 1221 (holding that state law regarding royalties imposed on interstate purchasers of natural gas was "preempted by federal law insofar as it burdens interstate purchasers of natural gas").

Plaintiffs' only defense against conflict preemption is another straw man. They say the NGA does not conflict with the KCPA because the KCPA regulates an area traditionally reserved for the States—consumer protection. Blue Br. 30. And so, according to them, even if Plaintiffs assert state-law claims specifically targeted at Defendants' wholesale prices, there can be no conflict because the KCPA is "directed at actors or transactions that fall outside of FERC's limited jurisdiction." Blue Br. 34 (citing *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 514 (1989)). This argument misses the mark. Again, Defendants do not argue every KCPA claim is conflict preempted. Nor do Defendants suggest Kansas cannot constitutionally legislate in the area of consumer protection. Blue Br. 30. Rather, it is Plaintiffs' specific use of the KCPA here to attack the reasonableness of FERC-regulated wholesale prices that is conflict preempted.

*Northwest Central Pipeline* is inapposite. The State there sought to regulate conduct that had only an incidental relationship to matters within FERC's exclusive jurisdiction: the state regulation *might* have resulted in pipelines making purchasing

decisions that *could* have influenced their cost structures, which, in turn, *could* have affected wholesale rates. 489 U.S. at 494-95.

Here, Plaintiffs seek to use the KCPA to challenge *directly* Defendants' *wholesale* natural-gas prices. Because FERC deemed (and still deems) the prices Plaintiffs challenge to be just and reasonable, conflict preemption bars Plaintiffs' claims seeking the opposite conclusion under state law.[27]

## III.  Plaintiffs Do Not Plead A Cognizable KCPA Claim.

Even beyond federal preemption, Plaintiffs' claims under the KCPA fail on that statute's own terms. Each Complaint asserts only KCPA claims. As a consumer-

---

[27] Plaintiffs' claims in *Mehl*, *Rebein*, and *Rice* are also separately barred by the filed-rate doctrine (which, contrary to Plaintiffs' suggestion, is distinct from preemption, Blue Br. 42 n.23) because they challenge retail rates set by—and within the exclusive jurisdiction of—the KCC. *Amundson & Assocs. Art Studio. v. Nat'l Council on Comp. Ins.*, 26 Kan. App. 2d 489, 503-04, 988 P.2d 1208, 1216-17 (1999) (doctrine bars claims "ultimately challenging the rates as established by the [KCC]"). Plaintiffs challenge monthly charges that their local distributors are collecting to recoup costs incurred during Winter Storm Uri. *See* App. 1:178, (*Mehl* ¶¶78-79) ($5.64 per month)), 2:380 (*Rice* ¶71) ($6.49 per month)), 2:338 (*Rebein* ¶¶64-65) ($11.47 per month)). But the KCC expressly authorized those charges under its exclusive jurisdiction to regulate in-state consumer utility rates when it approved the underlying settlement agreements and financing orders. *See* K.S.A. § 66-101; *Farmland Indus.*, *v. KCC*, 29 Kan. App. 2d 1031, 1039, 37 P.3d 640, 646 (2001). Even Plaintiffs acknowledge that the KCC process "resolve[d] how ratepayers would ultimately pay" for the utilities' excess charges. Blue Br. 16-17. This ends their claims. *See SWKI-Seward W. Cent.*, *v. KCC*, 2018 WL 385692, at *9 (Kan. Ct. App. Jan. 12, 2018) ("[C]ourts lack authority to impose or enforce a different rate than that approved by the regulatory agency because the agency possesses primary jurisdiction to resolve such issues.").

protection statute, the KCPA applies to *suppliers* that engage in *unconscionable conduct* in connection with a *consumer transaction*. K.S.A. § 50-627.

Plaintiffs' claims fail to satisfy any of those statutory elements: (i) Defendants did not engage in any conduct "in connection with" a consumer transaction, (ii) Defendants are not "suppliers" under the KCPA, and (iii) Defendants did not engage in "unconscionable conduct" in their transactions with distributors. Each of these purely legal questions provides an alternative ground for affirmance. *Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223, 1240 (10th Cir. 2022).

### A. Plaintiffs Allege No Conduct By Defendants "In Connection With" A Consumer Transaction.

The KCPA applies only to conduct "in connection with" a consumer transaction. K.S.A. § 50-627(a). Plaintiffs concede as much, stating that "[t]he KCPA governs conduct *in connection with* retail consumer transactions." Blue Br. 24 (emphasis added). A "consumer transaction" is "a sale, lease, assignment or other disposition for value of property or services within this state … *to a consumer*." K.S.A. § 50-624(c) (emphasis added). A "consumer," in turn, is "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. § 50-624(b).

By its terms, then, the KCPA does not apply to the upstream, wholesale transactions between Defendants and distributors, transactions to which no Plaintiff

or any other consumer was a party. Kansas caselaw affirms this reading of the KCPA. It is well-settled that consumers must be a party to the transactions they challenge. *See Krause v. Nationstar Mortg.*, 2015 WL 4041662, at *2 (D. Kan. July 1, 2015) (widow could not sue based on transaction between husband and lenders); *Kastner v. Intrust Bank*, 2011 WL 2149432, at *3-4 (D. Kan. June 1, 2011) (trust beneficiary could not sue based on transaction between trustee bank and grantor), *aff'd*, 569 F. App'x 593, 599 (10th Cir. 2014); *Berry v. Nat'l Med. Servs.*, 41 Kan. App. 2d 612, 621, 205 P.3d 745, 752 (2009) (nurse could not sue based on transaction between licensing board and drug-testing vender). The only conduct challenged here occurred in connection with Defendants' wholesale transactions with sophisticated, nonparty intermediaries.[28] Because no Plaintiffs or any other consumer was a party to those transactions, they are not consumer transactions subject to challenge under the KCPA.

Courts have rejected KCPA claims where the plaintiff lacked a connection with the challenged transaction. In *Hayes v. Find Track Locate*, 60 F. Supp. 3d 1144, 1152 (D. Kan. 2014), for example, the court held that the son of a truck buyer who contributed $500 toward the purchase of a truck could not sue under the KCPA "because he was not a party to the contract for the purchase of the truck." *See also*

---

[28] As to Concord, Plaintiffs fail to identify any transaction at all, which is yet another ground for affirmance. *Supra* n. n.4.

*Kestrel Holdings I v. Learjet*, 316 F. Supp. 2d 1071, 1076-77 (D. Kan. 2004) (allegation that plaintiffs "wrote checks from their individual bank accounts to pay for [an] aircraft" did "not change the fact" that plaintiffs were not parties to the "purchase agreement" and therefore could not bring a KCPA claim). Similarly, in *Luttrell v. Brannon*, 2018 WL 3032993, at *12-14 (D. Kan. June 19, 2018), the court held that the plaintiff could not bring a KCPA claim for unconscionable pricing against the manufacturer of a medical device unless "the device was sold directly to" the plaintiff by the manufacturer and not sold to the hospital "for use in his surgery."[29]

To avoid this caselaw, Plaintiffs took the untenable position below that the KCPA applies to the "entire supply chain." App. 2:544. Under Plaintiffs' reading of the KCPA, even a purely wholesale transaction between two corporate entities is "in connection with" a consumer transaction if the product is later resold to a consumer. App. 2:550-551. But no court has ever held that "the KCPA reaches every supplier"

---

[29] The Kansas Court of Appeals likewise has rejected attempts by plaintiffs to bring KCPA claims challenging transactions in which they were not involved. *See Berry*, 41 Kan. App. 2d at 622, 205 P.3d at 752 (no KCPA claim where "factual allegations disclose transactions between [a third party] and the defendants but not a consumer transaction between [the plaintiff] and the defendants"); *Ellibee v. Aramark Corr. Servs.*, 37 Kan. App. 2d 430, 433, 154 P.3d 39, 41 (2007) (motion to dismiss properly granted where "[defendant] made no representations to [plaintiff] or engaged in any negotiations with him").

whose product eventually finds its way into a consumer's hands. App. 2:544. In fact, as demonstrated above, courts have reached the opposite conclusion.

To satisfy the KCPA's requirement of an act "in connection with" a consumer transaction, the defendant must have had some direct involvement in the consumer transaction. *See In re Forta File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1275 (S.D. Fla. 2024) (plausible KCPA claim where defendant "engaged with and made representations to Plaintiffs"); *Moral v. PHH Mortg. Co.*, 2022 WL 4016583, at *9 (D. Kan. Sept. 2, 2022) (same, where defendant "was enforcing Plaintiffs' mortgage agreement").

Although the defendant need not itself be a party to the underlying consumer transaction, simply selling a product that is eventually resold to a consumer is not enough to supply the necessary "connection" with a consumer transaction. *See Price v. Lambert Ford*, 1992 WL 103746, at *1 (Ohio Ct. App. May 13, 1992) (dealer's upstream sale of defective car to second dealer was only "a business transaction with another Ford dealer, not a consumer transaction with" plaintiff); *Hahn v. Doe*, 1995 WL 127863, at *1–2, *9 (Ohio Ct. App. Mar. 23, 1995) (drywall manufacturer not liable for retailer's sale to plaintiffs with which manufacturer "had no contact whatsoever").[30]

---

[30] These decisions are persuasive because Ohio's consumer protection statute is nearly identical to the KCPA. Both were patterned on the Uniform Law

Plaintiffs do not allege they had any contact with any Defendant. Defendants sold natural gas to sophisticated intermediaries in wholesale transactions to which Plaintiffs were not parties and had no involvement. Blue Br. 6-7. Plaintiffs concede that they "buy natural gas from KGS, KMGA, Black Hills, Midwest, and Atmos," *not* Defendants. Blue Br. 6. Nor are Defendants alleged to have marketed their natural gas to Plaintiffs or otherwise solicited or even communicated with Plaintiffs.

In opposing dismissal, Plaintiffs relied on KCPA cases in which the defendant, unlike Defendants here, was *directly involved* in the relevant consumer transaction. Plaintiffs' principal authority—*Stair v. Gaylord*—involved a hose manufacturer, Goodyear, that assured the consumer "that the hose would be 'free from defects in material and workmanship,'" issued a "Return Goods Authorization" number directly to the consumer, "received the [returned] hose" directly from the consumer, and "shipped the replacement hose" directly to the consumer, allegedly resulting in injury when the hose arrived late. 232 Kan. 765, 767-68, 659 P.2d 178, 181-82 (1983). Although Goodyear did not sell the product to the consumer, it acted "in connection with" a consumer transaction by communicating directly with the

---

Commission's Consumer Sales Practices Act, and both proscribe "supplier[s]" from engaging in an "unconscionable act or practice in connection with a consumer transaction." *Compare* K.S.A. § 50-627(a), *with* OHIO REV. CODE § 1345.03(A). The Kansas Supreme Court has noted the parallel language and cited Ohio decisions with approval. *State ex rel. Miller v. Midwest Serv. Bureau*, 229 Kan. 322, 325, 623 P.2d 1343, 1346 (1981).

consumer. The court held that Goodyear could be liable under the KCPA if its "alleged assurances that the hose would be returned by a certain date"—*i.e.*, the challenged conduct in connection with a consumer transaction—"were made knowing there was no way this could be done." *Id.* at 776, 659 P.2d at 187. Plaintiffs here, by contrast, do not allege Defendants ever communicated directly with them or had any similar involvement in a consumer transaction.

Plaintiffs also cited *Cole v. Hewlett Packard Co.*, 2004 WL 376471 (Kan. Ct. App. Feb. 27, 2004). But in that case, the manufacturer, Hewlett Packard, also was directly involved in the underlying consumer transaction. Plaintiff alleged that Hewlett Packard's "advertisements, marketing materials, and labelling" of its printers misled consumers by stating "that consumers are to receive ink cartridges that were full." *Id.* at *1. Although Hewlett Packard did not sell the printer to consumers, it communicated directly with them through its advertisements, marketing materials, and labeling. No such communications with consumers are alleged here.

And in *Kucharski-Berger v. Hill's Pet Nutrition*, 60 Kan. App. 2d 510, 521, 494 P.3d 283, 292 (2021), another of Plaintiffs' cases, the defendant (a pet food manufacturer) was subject to suit under the KCPA because it "label[ed] and market[ed] its products" in a way that allegedly misled consumers by falsely suggesting the products had health benefits, medicinal qualities, and FDA approval.

*See also Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1174 (D. Kan. 1999) (plaintiff read manufacturer's literature). Again, similar allegations are entirely lacking here.

Plaintiffs do not allege that Defendants advertised their products to consumers, solicited consumers, labeled their products to consumers, or otherwise communicated with consumers. Indeed, Plaintiffs cannot identify any act by any Defendant in connection with a consumer transaction. Selling a product in an upstream, wholesale transaction does not become an act "in connection with" a consumer transaction simply because the product is later resold to a consumer. If Plaintiffs were correct, then every manufacturer, distributor, or dealer of a product— no matter how far removed from the ultimate consumer—could be sued under the KCPA. As described above, courts have declined to apply the KCPA to an upstream manufacturer or wholesaler that played no role whatsoever in the underlying consumer transaction.[31]

_____

[31] The lone exception is *City of Mulberry v. BP Energy Co.*, No. 2021-CV-000031 (Kan. Dist. Ct. Feb. 9, 2022), App. 2:511-526, where the Crawford County Court denied a motion to dismiss KCPA claims brought against BP for sales to the City of Mulberry during Winter Storm Uri. *Mulberry* is an unpublished state district court decision that "is not binding precedent" under Kansas rules, Kan. Sup. Ct. R. 7.04. *Mulberry* is also distinguishable on its facts for all the reasons Defendants explained below. App. 2:443-444. Plaintiffs appear to agree that the decision is distinguishable because they never once cited *Mulberry* either in their briefs in the District Court or in their opening brief in this Court.

**B.    Defendants Are Not "Suppliers" Under The KCPA Because They Do Not Solicit, Engage In, Or Enforce Consumer Transactions In The Ordinary Course Of Their Business.**

Plaintiffs also fail to state a claim under the KCPA because they do not allege Defendants were "suppliers" under the statute. The KCPA defines a "supplier" as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, *in the ordinary course of business*, *solicits*, *engages in or enforces consumer transactions*, whether or not dealing directly with the consumer." K.S.A. § 50-624(l) (emphasis added). Unable to point to any allegations in the Complaints that might satisfy that definition, Plaintiffs attempt to rewrite it, arguing that "Defendants are 'suppliers' because they sold the lion's share of the natural gas that Plaintiffs ultimately bought in a 'consumer transaction.'" Blue Br. 26. This assertion is both irrelevant and unavailing.

Under the KCPA, a defendant is a "supplier" only if, "in the ordinary course of business," it "solicits, engages in or enforces consumer transactions." K.S.A. § 50-624(l). Because the statute does not define those terms, they must be given their ordinary meaning. *See State v. Dooley*, 308 Kan. 641, 656, 423 P.3d 469, 479 (2018) ("When [the] Legislature does not define a term or phrase, [courts] ascertain legislative intent by giving common words their ordinary meanings.").

To "solicit" means to advertise a product or otherwise seek to encourage consumers to purchase it. *Alexander v. Certified Master Builders Corp.*, 268 Kan.

812, 826, 1 P.3d 899, 909 (2000) ("advertising and distribution of brochures" to customers qualify as solicitations); *see also Solicitation*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act or an instance of requesting or seeking to obtain something; a request or petition."); *cf. Anderson v. Barclay's Cap. Real Est.*, 136 Ohio St. 3d 31, 38, 989 N.E.2d 997, 1003 (Ohio 2013) (applying Ohio law and concluding that "suppliers" are "those that cause a consumer transaction to happen or that seek to enter into a consumer transaction"). To "engage in" means "[t]o employ or involve oneself; to take part in; to embark on." *Engage*, BLACK'S LAW DICTIONARY (12th ed. 2024). And to "enforce" means "[t]o give force or effect to" something, such as a contract, or to "compel obedience." *Enforce*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Applying the ordinary meaning of these terms, liability under the KCPA is limited to defendants that, in the ordinary course of their business, advertise their products to consumers, encourage consumers to buy their product, or otherwise involve themselves in consumer transactions, whether that involvement occurs before, during, or after the transactions. This is consistent with the Kansas Supreme Court's decision in *Stair*, which Plaintiffs mistakenly cite to support their claim that all upstream sellers are "suppliers" if their products are eventually sold to consumers. *See* Blue Br. 26. As discussed above, the manufacturer in *Stair*, Goodyear, solicited and engaged in the consumer transaction by assuring the

ultimate consumer that the hose "would be 'free from defects in material and workmanship'" and by involving itself directly in the returns process. 232 Kan. at 770-71, 659 P.2d at 181-84.

Here, Plaintiffs have not alleged, nor can they, that Defendants similarly solicit consumers or involve themselves in consumer transactions in the ordinary course of their business. Defendants are wholesalers in the business of selling natural gas to sophisticated commercial entities like the distributors. Those commercial entities, in turn, resell the gas. Those resales could be to consumers if the entity is a local distribution company, but also could be to other commercial purchasers (such as electric generation suppliers and agricultural product suppliers). Plaintiffs do not allege Defendants "solicit" consumer transactions by marketing or advertising their product to consumers. Nor do Plaintiffs allege Defendants "engage in" or "enforce" consumer transactions, such as by making and honoring express warranties to consumers as Goodyear did in *Stair*. Plaintiffs thus do not allege Defendants are "suppliers" within the meaning of the KCPA, which provides an independent basis to affirm the dismissal of their claims.

### C. Plaintiffs Do Not Allege That Any Defendant Engaged In An Unconscionable Act Under The KCPA.

To state a KCPA claim, Plaintiffs also must plead that Defendants acted unconscionably. K.S.A. § 50-627(a). Plaintiffs attempt to invoke both the general prohibition against unconscionable acts, *id.*, as well as the specific example of

"profiteer[ing] from a disaster," K.S.A. § 50-6,106. Neither is alleged here. Plaintiffs' failure to allege that any Defendant engaged in an unconscionable act also defeats their KCPA claims.

### 1. Plaintiffs Fail To Plead An Unconscionable Act Under K.S.A. § 50-627(a).

Although "unconscionable" is not defined in the statute, Kansas courts hold that to allege unconscionable conduct, "there must be '*both* supplier deception *and* unequal bargaining power' between the parties." *Doe v. Lyft*, 756 F. Supp. 3d 1110, 1125 (D. Kan. 2024) (emphasis added) (quoting *Via Christi Reg'l Med. Ctr. v. Reed*, 298 Kan. 503, 524, 314 P.3d 852, 867 (Kan. 2013)). Plaintiffs allege neither deception nor unequal bargaining power.

*First*, Plaintiffs fail to plead anything deceptive about the arm's-length transactions each Defendant supposedly negotiated with the distributors (or the distributors' suppliers) before and during Winter Storm Uri. To the contrary, Plaintiffs allege that the distributors purchased gas "at the prevailing spot price" published by an independent third party, Platts, and that the distributors continued to make purchases at the spot price even as Winter Storm Uri worsened. App. 1:169-170 (*Mehl* ¶¶50-52), 1:198 (*Stoneberger* ¶¶44-46), 2:331-332 (*Rebein* ¶¶38-40), 2:354 (*Deutscher* ¶¶36-37), 2:374 (*Rice* ¶¶46-48). In fact, many of the deals pursuant to which the distributors acquired additional gas from Defendants in February 2021, including those based on daily index prices, were negotiated well before the storm.

By using index prices, *both* sides to these transactions assumed risks depending on how the index prices fluctuated and, in Defendants' case, what price they would pay to their upstream suppliers.

Nor do Plaintiffs allege any facts to support their assertion that certain Defendants made false *force majeure* declarations or cut supply to avoid complying with fixed-price contracts with the distributors in favor of higher-priced spot sales. The Complaints do not identify which Defendants supposedly engaged in this conduct but instead refer to "suppliers" generally. App. 1:172 (*Mehl* ¶59), 1:200 (*Stoneberger* ¶¶53-54); 2:333 (*Rebein* ¶¶44-46), 2:355-356 (*Deutscher* ¶¶41-43), 2:376 (*Rice* ¶56). The Complaints also do not provide the date, location, or any other details about the supposedly false *force majeure* declarations or supply cuts. Nor do they explain how this unspecified conduct by certain unidentified Defendants is even connected to a particular transaction between a specific Defendant and a specific distributor, much less to any consumer transaction involving Plaintiffs. Such general allegations and group pleading do not meet the fair-notice standard under Rule 8(a), let alone the heightened standard that applies to allegations of deceptive conduct under Rule 9(b). *See Doe*, 756 F. Supp. 3d at 1125 (holding that similarly vague KCPA allegations required dismissal under either Rule); *Matthews v. Bergdorf*, 889 F.3d 1136, 1148 (10th Cir. 2018) (group pleading); *see also State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, 1323, 38 P.3d 707, 714 (2002) (holding that

without allegations of specific deceptive conduct, "there is no claim under the KCPA" and quoting *Gonzales v. Assocs. Fin. Serv. Co. of Kan.*, 266 Kan. 141, 167, 967 P.2d 312, 328 (1998)).

*Second*, Plaintiffs fail to allege unequal bargaining power between the parties to the wholesale transactions. The challenged transactions were negotiated between Defendants and the distributors (or the distributors' suppliers), and some were negotiated months before Winter Storm Uri. App. 1:161-165 (*Mehl* ¶¶32-39), 1:192-195 (*Stoneberger* ¶¶27-33), 2:337 (*Rebein* ¶¶54-60), 2:360 (*Deutscher* ¶¶23, 72), 2:381-384 (*Rice* ¶¶73-84). The Complaints recognize that Defendants' commercial counterparties are sophisticated entities with extensive experience negotiating natural-gas transactions. Nothing in the Complaints suggests unequal bargaining power.

Because Plaintiffs do not allege either "deceptive bargaining or unequal bargaining power in negotiating the contract at issue," *Dana v. Heartland Mgmt. Co.*, 48 Kan. App. 1048, 1066, 301 P.3d 772, 784-85 (2013), they fail to plead a claim for unconscionable conduct under K.S.A. § 50-627(a).

## 2. Plaintiffs Fail To Plead Profiteering From A Disaster Under K.S.A. § 50-6,106.

To state a claim for unlawful profiteering, Plaintiffs must allege that Defendants "unjustifiably increas[ed]" the prices they charged in transactions during Winter Storm Uri. K.S.A. § 50-6,106. Plaintiffs' own allegations defeat this theory.

Plaintiffs do not allege that Defendants unilaterally increased their wholesale prices to the distributors during a time of disaster. Instead, they allege that the challenged wholesale transactions were priced according to floating daily index prices. *See* App. 1:158-161 (*Mehl* ¶¶19, 27, 28, 32), 1:190-192 (*Stoneberger* ¶¶17, 25, 26, 29), 2:325-327 (*Rebein* ¶¶18, 26-27), 2:349-351 (*Deutscher* ¶¶15, 22-23), 2:368-370 (*Rice* ¶¶19, 29, 32). Those index prices are not set by Defendants but rather are determined and published by Platts based on Platts's survey of natural gas trades at the relevant locations throughout the midcontinent region. *See* App. 1:158-160 (¶¶19-27).

Nor do Plaintiffs allege that Defendants' prices exceeded those at which similar products were "readily obtainable by other consumers in the trade area" as required by K.S.A. § 50-6,106(b)(1)(B). In fact, Plaintiffs allege the opposite—that "[m]ost producers and marketers … tie the price that they charge for natural gas to S&P Global's Platts market index." App. 1:158 (¶19).

## CONCLUSION

For any of the forgoing reasons, the Court should affirm the dismissal of the Complaints.

# STATEMENT ON ORAL ARGUMENT

Appellees respectfully request oral argument because this case presents important issues of federal preemption and the proper interpretation of the Kansas Consumer Protection Act that are likely to arise again. 10TH CIR. R. 28.2(C)(2).

/s/ Stephen R. McAllister
Stephen R. McAllister
Megan M. Carroll
DENTONS US LLP
4520 Main Street Suite 1100
Kansas City, Missouri 64111
Phone: (816) 460-2400
Fax: (816) 531-7545
stephen.mcallister@dentons.com
megan.carroll@dentons.com

William R. H. Merrill
Alexandra Foulkes Grafton
Megan E. Griffith
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Phone: (713) 615-9366
Fax: (713) 654-6666
bmerrill@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com
mgriffith@susmangodfrey.com

Beatrice C. Franklin
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001-8602
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

/s/ Alan R. Pfaff
Alan R. Pfaff
WALLACE SAUNDERS
200 West Douglas, Suite 400
Wichita, Kansas 67202
Phone: (316) 219-8308
Fax: (316) 316-269-2479
apfaff@wallacesaunders.com

Richard C. Pepperman II
Amanda F. Davidoff
Michael P. Devlin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
peppermanr@sullcrom.com
davidoffa@sullcrom.com
devlinm@sullcrom.com

**ATTORNEYS FOR DEFENDANTS-APPELLEES BP ENERGY COMPANY AND BP CANADA ENERGY MARKETING CORP.**

Michael Yuffee
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC  20001
Phone:  (202) 639-7700
Fax:  (202) 639-7890
michael.yuffee@bakerbotts.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE MACQUARIE
ENERGY LLC**

/s/ *Casey L. Jones*
Casey L. Jones
HINKLE LAW FIRM LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, Kansas  67206
Phone:  (316) 660-6200
Fax:  (316) 660-6024
cjones@hinklaw.com

Andrew Zeve
Kyle A. Mason
WHITE & CASE LLP
609 Main Street, Suite 2900
Houston, Texas  77002
Phone:  (713) 496-9700
Fax:  (713) 496-9701
andrew.zeve@whitecase.com
kyle.mason@whitecase.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE SOUTHWEST
ENERGY L.P.**

/s/ *Jeffrey D. Morris*
Jeffrey D. Morris,
BERKOWITZ OLIVER, LLP - KCMO
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
Phone:  (913) 649-7007
Fax:  (816)561-1888
jmorris@berkowitzoliver.com

Stephen Crain (*pro hac vice*)
Bradley J. Benoit (*pro hac vice*)
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas  77002
Phone:  (713) 223-2300
Fax:  (800) 404-3970
stephen.crain@bracewell.com
brad.benoit@bracewell.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE TENASKA
MARKETING VENTURES**

/s/ *Matthew D. Moderson*
Matthew D. Moderson
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Phone:  (816) 691-2736
Fax:  (816) 412-8123
matt.moderson@stinson.com

/s/ *Chantale Fiebig*
Chantale Fiebig
Claire L. Chapla
Laurel Zigerelli
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, D.C. 20036
Phone: (202) 682-7000
chantale.fiebig@weil.com
claire.chapla@weil.com
laurel.zigerelli@weil.com
**ATTORNEYS FOR DEFENDANT-
APPELLEE ETC MARKETING,
LTD.**

/s/ *Shane A. Rosson*
Shane A. Rosson,
Tyler E. Heffron
TRIPLETT WOOLF GARRETSON
LLC
2959 N. Rock Road, Suite 300
Wichita, Kansas 67226
Phone: (316) 630-8100
Fax: (316) 630-8101
sarosson@twgfirm.com
theffron@twgfirm.com

Johanna Spellman
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Phone: (312) 777-7039
Fax: (312) 993-9767
johanna.spellman@lw.com

Louis Layrisson
Liam O'Rourke
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Phone: (713) 229-1421
Fax: (713) 229-7721
louie.layrisson@bakerbotts.com
liam.orourke@bakerbotts.com

Michael Yuffee
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
Phone: (202) 639-7700
Fax: (202) 639-7890
michael.yuffee@bakerbotts.com
**ATTORNEYS FOR DEFENDANT-
APPELLEE CIMA ENERGY, LP**

/s/ *Casey O. Housley*
Casey O. Housley
SANDERS WARREN & RUSSELL,
LLP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, Kansas 66210
Phone: (913) 234-6100
Fax: (913) 234-6199
c.housley@swrllp.com

Nathan M. Saper
LATHAM & WATKINS LLP
355 S. Grand Avenue, Suite 100
Los Angeles, California 90071
Phone: (213) 891-7485
Fax: (213) 891-8763
nathan.saper@lw.com

Nicholas J. Boyle
Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Phone: (202) 637-2200
Fax: (202) 637-2201
nicholas.boyle@lw.com
melissa.sherry@lw.com

Robert J. Malionek
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Phone: (212) 906-1816
Fax: (212) 751-4864
robert.malionek@lw.com

**ATTORNEYS FOR DEFENDANT-APPELLEE ROCKPOINT GAS STORAGE LLC**

/s/ *William Perry Brandt*
William Perry Brandt
SANDBERG PHOENIX & VON GONTARD, PC
4600 Madison Avenue, Suite 1000
Kansas City, Missouri 64112
Phone: (314) 779-1380
Fax: (816) 627-5532
pbrandt@sandbergphoenix.com

David T. McDowell
Mary E. Green
William B. Thomas
MCDOWELL HETHERINGTON LLP
1001 Fannin, Suite 2400
Houston, Texas 77002
Phone: (713) 337-5580
Fax: (713) 337-8850
david.mcdowell@mhllp.com
mary.green@mhllp.com
william.thomas@mhllp.com

**ATTORNEYS FOR DEFENDANT-APPELLEE MERCURIA ENERGY AMERICA, INC.**

/s/ *Todd E. Shadid*
Todd E. Shadid
KLENDA AUSTERMAN LLC
301 North Main, Suite 1600
Wichita, Kansas 67202
Phone: (316) 267-0331
Fax: (316) 267-0333
tshadid@klendalaw.com

David E. Harrell, Jr.
Deanna Markowitz Willson
TROUTMAN PEPPER LOCKE
600 Travis Street, Suite 2800
Houston, TX 77022
Telephone: (713) 226-1200
david.harrell@troutman.com
deanna.willson@troutman.com

**ATTORNEYS FOR DEFENDANT-APPELLEE SPOTLIGHT ENERGY, LLC**

John F. Bash, III
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 W. 6th Street, Suite 2010
Austin, Texas 78701
Phone: (737) 667-6117
Fax: (737) 667-6110
johnbash@quinnemanuel.com
Seth E. Montgomery
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 Figueroa St., 10th Floor
Los Angeles, California 90017
Phone: (213) 443-3000
Fax: (213) 443-3100
sethmontgomery@quinnemanuel.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE NEXTERA ENERGY
MARKETING, LLC**

/s/ *Tristan L. Duncan*
Tristan L. Duncan
Steven D. Soden
Holly Pauling Smith
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri 64108
Phone: (816) 474-6550
Fax: (816) 421-5547
hpsmith@shb.com
ssoden@shb.com
tlduncan@shb.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE WILLIAMS ENERGY
RESOURCES LLC**

/s/ *Torsten M. Kracht*
Torsten M. Kracht
HUNTON ANDREWS KURTH LLP
Torsten M. Kracht
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Phone: (202) 368-4823
tkracht@hunton.com

Christopher M. Pardo
60 State Street, Ste. 2400
Boston, MA 02109
Phone: (617) 413-2315
cpardo@hunton.com

Leah Nommensen
600 Travis, Suite 4200
Houston, Texas 77002
Phone: (713) 220-3935
leahnommensen@hunton.com

**ATTORNEYS FOR DEFENDANT-
APPELLEE CONCORD ENERGY
LLC**

# CERTIFICATE OF COMPLIANCE

As required by FED. R. APP. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 12,920 words. I relied on my word processor to obtain the count and it is Microsoft Word, 2025, version 16.99.1.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

Dated: August 1, 2025                                    */s/ Alexandra Foulkes Grafton*

# ADDENDUM

# TABLE OF CONTENTS
# ADDENDUM

15 U.S.C.A. § 717 .................................................................. ADD-1

15 U.S.C.A. § 717c ................................................................ ADD-3

15 U.S.C.A. § 717c-1 ............................................................. ADD-6

15 U.S.C.A. § 717d ................................................................ ADD-7

18 C.F.R. § 284.402 .............................................................. ADD-8

68 F.E.R.C. ¶ 66,332 (Nov. 26, 2003) ......................................... ADD-10

179 F.E.R.C. ¶ 61, 1036 (Aug. 18, 2022) .................................... ADD-62

K.S.A. § 50-627 .................................................................. ADD-95

K.S.A. § 50-6,106 ............................................................... ADD-97

K.S.A. § 60-101 .................................................................. ADD-99

OHIO REV. CODE § 1345.03(A) ................................................. ADD-100

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717

§ 717. Regulation of natural gas companies

Currentness

**(a) Necessity of regulation in public interest**

As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

**(b) Transactions to which provisions of chapter applicable**

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**(c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence**

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

**(d) Vehicular natural gas jurisdiction**

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is--

  **(1)** not otherwise a natural-gas company; or

ADD-1

**(2)** subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

### CREDIT(S)

(June 21, 1938, c. 556, § 1, 52 Stat. 821; Mar. 27, 1954, c. 115, 68 Stat. 36; Pub.L. 102-486, Title IV, § 404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub.L. 109-58, Title III, § 311(a), Aug. 8, 2005, 119 Stat. 685.)

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

### PROCLAMATIONS

### PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

### PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

Notes of Decisions (320)

15 U.S.C.A. § 717, 15 USCA § 717
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

ADD-2

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717c

§ 717c. Rates and charges

Currentness

**(a) Just and reasonable rates and charges**

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**(b) Undue preferences and unreasonable rates and charges prohibited**

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Filing of rates and charges with Commission; public inspection of schedules**

Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Changes in rates and charges; notice to Commission**

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Authority of Commission to hold hearings concerning new schedule of rates**

ADD-3

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Storage services**

**(1)** In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that--

**(A)** market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

**(B)** customers are adequately protected.

**(2)** The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

**(3)** If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

**CREDIT(S)**

(June 21, 1938, c. 556, § 4, 52 Stat. 822; Pub.L. 87-454, May 21, 1962, 76 Stat. 72; Pub.L. 109-58, Title III, § 312, Aug. 8, 2005, 119 Stat. 688.)

ADD-4

Notes of Decisions (867)

15 U.S.C.A. § 717c, 15 USCA § 717c
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-5

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717c-1

§ 717c-1. Prohibition on market manipulation

Currentness

It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of this title) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action.

**CREDIT(S)**

(June 21, 1938, c. 556, § 4A, as added Pub.L. 109-58, Title III, § 315, Aug. 8, 2005, 119 Stat. 691.)

Notes of Decisions (13)

15 U.S.C.A. § 717c-1, 15 USCA § 717c-1
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-6

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717d

§ 717d. Fixing rates and charges; determination of cost of production or transportation

Currentness

**(a) Decreases in rates**

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

**(b) Costs of production and transportation**

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

**CREDIT(S)**

(June 21, 1938, c. 556, § 5, 52 Stat. 823.)

Notes of Decisions (703)

15 U.S.C.A. § 717d, 15 USCA § 717d
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-7

Code of Federal Regulations
   Title 18. Conservation of Power and Water Resources
      Chapter I. Federal Energy Regulatory Commission, Department of Energy
         Subchapter I. Other Regulations Under the Natural Gas Policy Act of 1978 and Related Authorities
            Part 284. Certain Sales and Transportation of Natural Gas Under the Natural Gas Policy Act of 1978 and Related Authorities (Refs & Annos)
               Subpart L. Certain Sales for Resale by Non-Interstate Pipelines (Refs & Annos)

18 C.F.R. § 284.402

§ 284.402 Blanket marketing certificates.

Currentness

(a) Authorization. Any person who is not an interstate pipeline is granted a blanket certificate of public convenience and necessity pursuant to section 7 of the Natural Gas Act authorizing the certificate holder to make sales for resale at negotiated rates in interstate commerce of any category of gas that is subject to the Commission's Natural Gas Act jurisdiction. A blanket certificate issued under Subpart L is a certificate of limited jurisdiction which will not subject the certificate holder to any other regulation under the Natural Gas Act jurisdiction of the Commission, other than that set forth in this Subpart L, by virtue of the transactions under this certificate.

(b) The authorization granted in paragraph (a) of this section will become effective on January 7, 1993 except as otherwise provided in paragraph (c) of this section.

(c)(1) The authorization granted in paragraph (a) of this section will become effective for an affiliated marketer with respect to transactions involving affiliated pipelines when an affiliated pipeline receives its blanket certificate pursuant to § 284.284.

(2) Should a marketer be affiliated with more than one pipeline, the authorization granted in paragraph (a) of this section will not be effective for transactions involving other affiliated interstate pipelines until such other pipelines' meet the criterion set forth in paragraph (c)(1) of this section. The authorization granted in paragraph (a) of this section is not extended to affiliates of persons who transport gas in interstate commerce and who do not have a tariff on file with the Commission under part 284 of this subchapter with respect to transactions involving that person.

(d) Abandonment of the sales service authorized in paragraph (a) of this section is authorized pursuant to section 7(b) of the Natural Gas Act upon the expiration of the contractual term or upon termination of each individual sales arrangement.

**Credits**

[Order 581, 60 FR 53074, Oct. 11, 1995; Order 644, 68 FR 66337, Nov. 26, 2003]

SOURCE: 44 FR 52184, Sept. 7, 1979; 51 FR 9186, March 18, 1986; 52 FR 28467, July 30, 1987; 53 FR 14923, April 26, 1988; 53 FR 50938, Dec. 19, 1988; 54 FR 52394, Dec. 21, 1989; 55 FR 6631, Feb. 26, 1990; 56 FR 14851, April 12, 1991; 56 FR 50245, Oct. 4, 1991; 57 FR 36217, Aug. 12, 1992; 57 FR 46495, 46501, Oct. 9, 1992; 57 FR 57959, Dec. 8, 1992; Order 637, 65 FR 10220, Feb. 25, 2000; Order 756, 77 FR 4894, Feb. 1, 2012, unless otherwise noted.



ADD-8

AUTHORITY: 15 U.S.C. 717–717z, 3301–3432; 42 U.S.C. 7101–7352; 43 U.S.C. 1331–1356.

Current through July 25, 2025, 90 FR 35240. Some sections may be more current. See credits for details.

---

**End of Document** <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

ADD-9



**Incorporation by Reference**

(g) Unless otherwise specified in this AD, the actions shall be done in accordance with CRJ 700/900 Series Regional Jet (Bombardier) Alert Service Bulletin A670BA–30–007, Revision A, dated April 15, 2003, including Appendices A and B, dated March 18, 2003. This incorporation by reference was approved previously by the Director of the Federal Register as of June 27, 2003 (68 FR 35152, June 12, 2003). Copies may be obtained from Bombardier, Inc., Canadair, Aerospace Group, P.O. Box 6087, Station Centre-ville, Montreal, Quebec H3C 3G9, Canada. Copies may be inspected at the FAA, Transport Airplane Directorate, 1601 Lind Avenue, SW., Renton, Washington; or at the FAA, New York Aircraft Certification Office, 10 Fifth Street, Third Floor, Valley Stream, New York; or at the Office of the Federal Register, 800 North Capitol Street, NW., suite 700, Washington, DC.

**Note 2:** The subject of this AD is addressed in Canadian airworthiness directive CF–2003–07, effective on March 25, 2003.

**Effective Date**

(h) This amendment becomes effective on December 31, 2003.

Issued in Renton, Washington, on November 20, 2003.

**Kalene C. Yanamura,**

*Acting Manager, Transport Airplane Directorate, Aircraft Certification Service.*

[FR Doc. 03–29532 Filed 11–25–03; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF ENERGY**

**Federal Energy Regulatory Commission**

**18 CFR Part 284**

**[Docket No. RM03–10–000; Order No. 644]**

**Amendments to Blanket Sales Certificates**

November 17, 2003.

**AGENCY:** Federal Energy Regulatory Commission.

**ACTION:** Final rule.

**SUMMARY:** The Federal Energy Regulatory Commission (Commission) is amending its regulations regarding the blanket certificates for unbundled gas sales services held by interstate natural gas pipelines and the blanket marketing certificates held by persons making sales for resale of gas at negotiated rates in interstate commerce to require that pipelines and all sellers for resale adhere to a code of conduct with respect to gas sales. The purpose of the revisions to the current regulatory framework is to ensure the integrity of the gas sales market that remains within the Commission's jurisdiction. The rule

is another part of the Commission's continuing effort to restore confidence in the nation's energy markets.

**EFFECTIVE DATE:** The rule will become effective December 26, 2003.

**FOR FURTHER INFORMATION CONTACT:** Robert D. McLean, Office of the General Counsel, Federal Energy Regulatory Commission, 888 First Street, NE., Washington, DC 20426, (202) 502–8156.

Frank Karabetsos, Office of the General Counsel, Federal Energy Regulatory Commission, 888 First Street, NE., Washington, DC 20426, (202) 502–8133.

**SUPPLEMENTARY INFORMATION:**

Table of Contents

I. Introduction
II. Background
  A. Changes in the Natural Gas Industry
  B. Events in Western Energy Markets in 2000
III. Comment Analysis
  A. Application of Code of Conduct to Jurisdictional Sellers
  B. Limited Jurisdiction of Blanket Certificates
  C. Code of Conduct
  1. General Language Prohibiting Manipulation
  2. Wash Trades
  3. Collusion
  4. Reporting to Gas Index Publishers
  5. Three-Year Data and Information Retention Requirement
  6. Prohibition on Reporting Transaction with Affiliates
  D. Remedies
  1. General Issues
  2. 90-Day Time Limit on Complaints
IV. Administrative Finding and Notices
  A. Information Collection Statement
  B. Environmental Analysis
  C. Regulatory Flexibility Act Certification
  D. Document Availability
  E. Effective Date and Congressional Review
Regulatory Text
Appendix—Entities Filing Intervening and Reply Comments

Before Commissioners: Pat Wood, III, *Chairman;* William L. Massey, and Nora Mead Brownell.

**I. Introduction**

1. The Federal Energy Regulatory Commission (Commission) is amending the blanket certificates for unbundled gas sales services held by interstate natural gas pipelines and the blanket marketing certificates held by persons making sales for resale of gas at negotiated rates in interstate commerce to require that pipelines and all sellers for resale adhere to a code of conduct with respect to gas sales. The purpose of the revisions is to ensure the integrity of the gas sales market that remains within the Commission's jurisdiction. This rule is another part of the Commission's continuing effort to restore confidence in the nation's energy

markets. Contemporaneously with this rule, the Commission is also issuing a rule to require wholesale sellers of electricity at market-based rates to adhere to certain behavioral rules when making wholesale sales of electricity. In an order dated June 26, 2003,[1] the Commission, acting under the authority of Section 7 of the Natural Gas Act, proposed to revise Section 284.288 of its regulations, which is currently reserved, to require that pipelines providing unbundled sales service adhere to a code of conduct when making gas sales. The Commission also proposed to add a new Section 284.403 to Part 284, Subpart L to require persons holding blanket marketing certificates under Section 284.402 to adhere to a code of conduct when making gas sales.[2]

2. The need for this code of conduct, we stated, was informed by the types of behavior that occurred in the Western markets during 2000 and 2001, by Commission Staff's Final Report concerning these markets,[3] and by our experience in other competitive markets. We stated that in formulating our proposed code of conduct rules, we were required to strike a careful balance among a number of competing interests. We noted, for example, that while customers must be given an effective remedy in the event anticompetitive behavior or other market abuses occur, sellers should be provided rules of the road that are clearly-delineated. We noted that while regulatory certainty was important for individual market participants and the marketplace in general, the Commission must not be impaired in its ability to provide remedies for market abuses whose precise form and nature cannot be envisioned today. We specifically sought comments on whether our proposed code of conduct rules had achieved the appropriate balance among these competing interests.

3. Here, based on the extensive comments received by the entities listed in the Appendix to this order and based on our further consideration of the issues presented, we will adopt the code of conduct rules proposed in the June 26 NOPR subject to certain modifications discussed below. These rules, as revised, are set forth below in, 18 CFR §§ 284.288 and 284.403.

---

[1] 103 FERC ¶ 61,350 (2003) (June 26 NOPR).

[2] Section 284.5 of the Commission's regulations also states that "[t]he Commission may prospectively, by rule or order, impose such further terms and conditions as it deems appropriate on transactions authorized by this part."

[3] Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, Docket No. PA02–2–000 (March 2003) (Final Report).

4. Under Sections 284.288 and 284.403 of the new codes of conduct, a pipeline providing unbundled natural gas sales service under Section 284.284, or any person making natural gas sales for resale in interstate commerce pursuant to Section 284.402, is prohibited from engaging in actions without a legitimate business purpose that manipulate or attempt to manipulate market conditions, including wash trades and collusion.

5. New Sections 284.288 and 284.403 also contain various reporting obligations. To the extent a pipeline providing service under Section 284.284, or any person making natural gas sales for resale in interstate commerce pursuant to Section 284.402, engages in reporting of transactions to publishers of gas price indices, the pipeline or blanket marketing certificate holder shall provide complete and accurate information to any such publisher. Further, such entities must retain all relevant data and information upon which they billed the prices they charged for natural gas they sold pursuant to their market based sales certificate or the prices they reported for use in price indices for three years. Moreover, such entities that engage in reporting must do so consistent with the *Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003) (*Policy Statement*), which provides that a data provider should only report each bilateral, arm's-length transaction between non-affiliated companies. Violation of the preceding provisions may result in disgorgement of unjust profits, suspension or revocation of a pipeline's blanket certificate or other appropriate non-monetary remedies. Finally, any person filing a complaint for a violation of the preceding provisions must do so no later than 90 days after the end of the calendar year in which the alleged violation occurred unless that person could not have known of the alleged violation, in which case the 90-day time limit will run from the discovery of the alleged violation.

6. This code of conduct is designed to provide market participants adequate opportunities to detect, and the Commission to remedy, market abuses. This code is clearly defined so that it does not create uncertainty, disrupt competitive commodity markets or simply prove ineffective. However, since competitive markets are dynamic, it is important that we periodically evaluate the impact that these regulations have on the energy markets. We direct our office of Market Oversight and Investigation to evaluate the effectiveness and consequences of these

regulations on an annual basis and to include this analysis in the State of the Markets Report.

## II. Background

### A. Changes in Natural Gas Industry

7. A decade ago, as a result of changes in the natural gas industry, Congressional legislation and various Commission rulemaking proceedings restructuring the gas industry, the Commission issued blanket certificates to allow pipelines and other persons selling natural gas to make sales for resale of natural gas at market-based or negotiated rates. These certificates were granted in two final rules issued by the Commission: Order No. 636[1] and Order No. 547.[2]

8. In Order No. 636, the Commission required all pipelines that provide open-access transportation to offer their sales services on an unbundled basis. To this end, the Commission issued to pipelines holding a blanket transportation certificate under subpart G of part 284 of the Commission's regulations, or performing transportation under subpart B, a blanket certificate authorizing firm and interruptible sales for resale.[3] The Commission required that all firm and interruptible sales services be provided as unbundled services under the blanket sales certificate. The Commission found that this form of regulation would enable the pipelines to compete directly with other gas sellers on the same terms at prices determined in a competitive market. The unbundled sales services were also afforded pregranted abandonment authority.

9. In Order No. 636, the Commission authorized pipelines to make unbundled sales at market-based rates because it concluded that, after unbundling, sellers of short-term or long-term firm gas supplies (whether they be pipelines or other sellers) would not have market power over the sale of natural gas. The Commission's determination was also based on

Congress' express finding that a competitive market exists for gas at the wellhead and in the field. The Commission indicated that it was instituting light-handed regulation, relying upon market forces at the wellhead or in the field to constrain unbundled pipeline sales for resale gas prices within the Natural Gas Act's "just and reasonable" standard. In addition, the requirement that pipelines provide open access transportation from the wellhead to the market also permitted the Commission to exercise light-handed regulation over jurisdictional gas sales. Finally, the Commission stated that it would be regulating the pipeline sales in the same manner as it had done for sales for resale by marketers.

10. The Commission also determined that a pipeline as a gas merchant would be the functional equivalent of a pipeline's marketing affiliate. The Commission concluded that standards of conduct set forth by Order No. 497 would apply to the relationship between the pipeline transportation function and its merchant function.[4] Accordingly, the regulations issuing pipelines blanket sales certificates included standards of conduct and reporting requirements. The purpose of imposing the requirements set forth in Order No. 497 was to ensure that the pipeline did not favor itself as a merchant over other gas suppliers in performing its transportation function.

11. In Order No. 547, as part of the industry restructuring begun by Order No. 636, the Commission issued blanket certificates to all persons who are not interstate pipelines authorizing them to make jurisdictional gas sales for resale at negotiated rates with pregranted abandonment authority.[5] The blanket certificates were issued by operation of

---

[1] Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, FERC. Stats. & Regs. ¶ 30,939 (1992), order on reh'g, Order No. 636–A, FERC. Stats. & Regs. ¶ 30,950 (1992), order on reh'g, Order No. 636–B, 61 FERC. ¶ 61,272 (1992), aff'd in part, rev'd in part, *United Distribution Cos. v. FERC*, 88 F.3d 1105 (DC Cir. 1996), cert. denied, 137 L. Ed. 2d 845, 117 S. Ct. 1723, 117 S. Ct. 1724 (1997), on remand, Order No. 636–C, 78 FERC. ¶ 61,186 (1997), order on reh'g, Order No. 636–D, 83 FERC ¶ 61,210 (1998).

[2] Regulations Governing Blanket Marketer Sales Certificates, FERC Stats. & Regs. ¶ 30,957 (1992), order on reh'g and clarification, 62 FERC ¶ 61,239 (1993).

[3] 18 CFR 284.281–287 (2003).

[4] Inquiry into Alleged Anticompetitive Practices Related to Marketing Affiliates of Interstate Pipelines, Order No. 497, 53 FR 22139 (June 14, 1988), FERC Statutes and Regulations, Regulation Preambles 1986–1990 ¶ 30,820 (1988), order on rehearing, Order No. 497–A, 54 FR 52781 (Dec. 22, 1989), FERC Statutes and Regulations, Regulation Preambles 1986–1990 ¶ 30,868 (1989), order extending sunset date, Order No. 497–B, 55 FR 53291 (Dec. 28, 1990), FERC Statutes and Regulations, Regulation Preambles 1986–1990 ¶ 30,908 (1990), order extending sunset date and amending final rule, Order No. 497–C, 57 FR 9 (Jan. 2, 1992), FERC Statutes and Regulations ¶ 30,934 (1991), reh'g denied, 57 FR 5815, 58 FERC ¶ 61,139 (1992), aff'd in part and remanded in part, Tenneco Gas v. Federal Energy Regulatory Commission, 969 F.2d 1187 (DC Cir. 1992), order on remand, Order No. 497–D, 57 FR 58978 (Dec. 14, 1992), FERC Statutes and Regulations ¶ 30,958 (1992), order on reh'g and extending sunset date, Order No. 497–E, 59 FR 243 (Jan. 4, 1994), FERC Statutes and Regulations ¶ 30,987 (Dec. 23, 1994), order on reh'g, Order No. 497–F, 59 FR 15336 (Apr. 1, 1994), 66 FERC ¶ 61,347 (1994).

[5] 18 CFR § 284.401–402 (2003).

the rule itself and there was no requirement for persons to file applications seeking such authorization. The Commission determined that the competitive gas commodity market would lead all gas suppliers to charge rates that are sensitive to the gas sales market and cognizant of the variety of options available to gas purchasers. The Commission further stated that, in a competitive market, the basis for the rate to be negotiated between a willing buyer and seller is a commercial, not a regulatory, matter. The requirement that pipelines provide open access transportation from the wellhead to the market also permitted the Commission to exercise light-handed regulation over jurisdictional gas sales. The Commission also determined that marketing certificates issued by the final rule are of a limited jurisdiction. The Commission held that the holders of marketing certificates are not subject to any other regulation under the Natural Gas Act jurisdiction of the Commission by virtue of transactions under the certificates.

*B. Events in Western Energy Markets*

12. In March 2003, in Docket No. PA02–2–000, the Commission Staff concluded its Fact Finding Investigation of Potential Manipulation of Electric and Gas Prices and issued a Final Report on Price Manipulation in Western Markets (Final Report). A key conclusion of the Final Report is that markets for natural gas and electricity in California are inextricably linked, and that dysfunctions in each fed off one another during the California energy crisis. Staff found that spot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market. The Final Report found that dysfunctions in the natural gas market appear to stem, at least in part, from efforts to manipulate price indices compiled by trade publications. The Final Report stated that reporting of false data and wash trading are examples of efforts to manipulate published price indices.

13. While the Final Report contained numerous recommendations which will not be discussed here, the Staff did recommend that Sections 284.284 and 284.402 of the Commission's regulations be amended to provide explicit guidelines or prohibitions for trading natural gas under Commission blanket certificates. The specific recommendations include: (1) Conditioning natural gas companies' blanket certificates on providing accurate and honest information to entities that publish price indices; (2) conditioning blanket certificates on

retaining all relevant data for three years for reconstruction of price indices; (3) establishing rules banning any form of prearranged wash trading; and (4) prohibiting the reporting of trades between affiliates to industry indices.

**III. Comment Analysis**

*A. Application of Code of Conduct to Jurisdictional Sellers*

14. As an initial matter, the Commission will clarify the extent of its jurisdiction over resales of natural gas. As stated above, the Commission's NGA jurisdiction to regulate the prices charged by sellers of natural gas has been substantially narrowed by the Natural Gas Policy Act of 1978 (NGPA) and Congress' subsequent enactment of the Natural Gas Wellhead Decontrol Act of 1989. As a result of these statutory provisions first sales of natural gas were deregulated. Under the NGPA, first sales of natural gas are defined as any sale to an interstate or intrastate pipeline, LDC or retail customer, or any sale in the chain of transactions prior to a sale to an interstate or intrastate pipeline or LDC or retail customer. NGPA Section 2(21)(A) sets forth a general rule stating that all sales in the chain from the producer to the ultimate consumer are first sales until the gas is purchased by an interstate pipeline, intrastate pipeline, or LDC.[4] Once such a sale is executed and the gas is in the possession of a pipeline, LDC, or retail customer, the chain is broken, and no subsequent sale, whether the sale is by the pipeline, or LDC, or by a subsequent purchaser of gas that has passed through the hands of a pipeline or LDC, can qualify under the general rule as a first sale on natural gas. In addition to the general rule, NGPA Section 2(21)(B) expressly excludes from first sale status any sale of natural gas by a pipeline, LDC, or their affiliates, except when the pipeline, LDC, or affiliate is selling its own production.

15. Therefore, the Commission's jurisdiction under the NGA includes all sales for resale by interstate and intrastate pipelines and LDCs and their affiliates, other than their sales of their own production. The Commission's jurisdiction also includes a category of sales by entities that are not affiliated

with any pipeline or LDC. Such entities are those making sales for resale of gas that was previously purchased and sold by an interstate or intrastate pipeline or LDC or retail customer.

16. Given that the Commission does not have jurisdiction over the entire natural gas market, several commenters raise concerns regarding the potential adverse effect of imposing the proposed code of conduct only on the portion of the natural gas market under the Commission's jurisdiction.[5] Commenters assert that the proposed rules could tilt capital markets against those subject to the code of conduct because they would be viewed as a riskier proposition than those entities selling gas that do not have the same regulatory risk. Commenters argue that to impose these regulations on a portion of the market causes an uneven playing field and amounts to undue discrimination because those under the rules would be: (1) Subject to sanctions such as loss of certificate authority and disgorgement of profits; (2) hesitant to engage in legitimate transactions due to uncertainty imposed by vague and inconsistent standards developed in different proceedings; (3) subject to the increased risk of private enforcement actions by gas purchasers before the Commission; (4) subject to the shifting of investment to non-jurisdictional marketers, and; (5) subject to increased recordkeeping costs for jurisdictional entities.

17. Commenters argue that the proposed regulations are duplicative because other government agencies such as the Federal Trade Commission, the Department of Justice, and various state agencies already exercise jurisdiction over anticompetitive behavior.[6] Further, commenters argue that in addition to stifling innovation, the proposed regulations will erode regulated marketer participation, and thereby reduce the efficiency of the markets and deprive the customers of the benefits of deregulation. Furthermore, since this code regulates only a small portion of the market,[7] they argue that the rules will be ineffective in achieving uniform compliance.

18. Finally, commenters maintain that before imposing these potentially

---

[4] NGPA Section 2(21)(A) states: General Rule.— The term "first sale" means any sale of any volume of natural gas—(i) To any interstate pipeline or intrastate pipeline; (ii) to any local distribution company; (iii) to any person for use by such person; (iv) which precedes any sale described in clauses (i),(ii), (iii); and (v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this Act.

[5] *See e.g.,* AGA, Peoples, NiSource, Nicor, Cinergy, Sempra, FPL Group, Reliant, Coral, NJR Companies, EPSA, ProLiance, Duke Energy, Questar, Western.

[6] Coral at 5.

[7] *See* NiSource at 9 (stating that the sales for resale by interstate pipelines and off-system sales by LDCs constitute a small portion of the gas sales transactions in the market, in contrast to producers and independent marketers that account for a very substantial portion of gas sold, which are not subject ot the proposed regulations).

burdensome compliance conditions, the Commission should ascertain critical information on its effects, including the percentage of the natural gas sellers that would be required to comply with the proposed rule or the amount of the gas affected. Commenters argue that uncertainty caused by the proposed rules would be particularly damaging in light of the current need for additional supplies and the current need to regain investor confidence.

19. However, several commenters support the Commission's action in imposing a code of conduct.[8] These commenters state that if jurisdictional gas sellers seek to avoid a requirement that they do business honestly by restructuring their business to escape the Commission's jurisdiction, Congress might be interested in broadening the Commission's jurisdiction to prevent such outcomes. Moreover, they assert that the only way that jurisdictional certificate holders could be at a competitive disadvantage is if they are competing against companies that are engaging in the very illegal acts that the Commission's code of conduct is proscribing. Finally, commenters argue that the proposed regulations should not harm any market participant and should not have a negative impact on natural gas prices, but will only require action consistent with a competitive market.

20. The Commission has reviewed the comments setting forth possible problems in placing a code of conduct regulations over the portion of the natural gas marketplace within its jurisdiction. In the Commission's view, implementing these regulations designed to prevent manipulation of market prices and prevent abusive behavior which distorts the competitive marketplace for natural gas will not present an undue burden for gas sellers under the Commission's jurisdiction or disrupt the competitive gas market.

21. As stated above, the Commission retains jurisdiction of sales of domestic gas for resale by pipelines, local distribution companies and affiliated entities, if the seller does not produce the gas it sells. The fact that the Commission does not regulate the entire natural gas market does not compel the Commission to refrain from exercising its authority over that portion of the gas market which is within its jurisdiction to prevent the manipulation of prices. By its action here, the Commission will maintain and protect the competitive marketplace within its jurisdiction. On balance, the Commission finds that its statutory responsibility to ensure just and reasonable rates for the sales over

which it does have jurisdiction outweighs concerns that a portion of the market will not be subject to these regulations and the potential resulting market disruptions.[9]

22. This finding is based upon a balancing of factors raised by the commenters against the Commission's duty to maintain the competitive marketplace for natural gas within its jurisdiction. Although all sellers of natural gas will not be under the same set of regulations, this does not by itself place an undue burden, or for that matter, a competitive disadvantage of any consequence upon the sellers of natural gas within the Commission's jurisdiction. This is because the regulations to be placed upon jurisdictional natural gas sellers only prevent such market participants from distorting the competitiveness of the marketplace by engaging in abusive or manipulative acts in the marketplace. For instance, commenters argue that the increased regulatory risk could shift capital markets against those subject to the new regulations. This argument is speculative and it appears to the Commission that it is at least equally likely that investors and gas buyers would gain confidence in the knowledge that the jurisdictional seller of natural gas was required to engage in business practices that do not abuse or manipulate the marketplace.

*B. Limited Jurisdiction of Blanket Certificates*

23. In its June 26 NOPR, the Commission proposed to delete the last sentence of 18 CFR 284.402(a) (2003) from its regulations. That sentence reads, "[a] blanket certificate issued under Subpart L is a certificate of limited jurisdiction which will not subject the certificate holder to any other regulation under the Natural Gas Act jurisdiction of the Commission by virtue of the transactions under the certificate."

24. Several commenters raise concerns regarding this deletion.[10] Commenters argue that the statement of limited jurisdiction for the subject blanket certificates should remain in the regulations in order to relieve blanket holders of market sales certificates from any aspect of the Commission's jurisdiction which does not apply to market based rates such as the filing of

tariff rates and various forms. Retaining this statement of limited jurisdiction is of particular concern to LDCs that are comprehensively regulated at the state level.[11] Commenters argue that the Commission should clarify that blanket certificate holders are not subject to any other regulations except as provided in Subpart L of Part 284. Finally, commenters argued that the new rules and burdens are inappropriate for affiliates of small pipelines, particularly where the pipeline is non-major and serves few customers and the affiliated seller is selling supplies for the primary purpose of balancing its purchases with its manufacturing needs.[12] These commenters argue that the Commission should establish a procedure to exempt such affiliates of small pipelines.

25. The Commission has reviewed the comments and has determined that it will not delete the affirmative statement of limited jurisdiction from its regulations; rather, in keeping with the points raised by the comments it will modify the sentence to read, "[a] blanket certificate issued under Subpart L is a certificate of limited jurisdiction which will not subject the certificate holder to any other regulation under the Natural Gas Act jurisdiction of the Commission, other than that set forth in this Subpart L, by virtue of the transactions under this certificate." Because the regulations adopted by the instant rulemaking will be placed in Subpart L, this action will maintain the original intent of the limited market based blanket certificate while allowing for the new conditions found necessary by the Commission.

26. Further, the Commission will not grant a generic exception to these regulations for small entities. In the Commission's view, entities with a small number of customers making few, or low volume, transactions should incur only minimal administrative or financial burden by virtue of these regulations.

*C. Code of Conduct*

1. General Language Prohibiting Manipulation

27. As revised Section 284.288(a) of the Commission's regulations provides that:

A pipeline that provides unbundled natural gas service under § 284.284 is prohibited from engaging in actions or transactions that are without a legitimate business purpose and that are intended to or foreseeably could manipulate market prices,

---

[8] *See, e.g.,* BP, EMIT, CPUC, NASUCA.

[9] We note that the Commission also does not have jurisdiction over all sales for resale in electric markets. The Commission nevertheless exercises its authority to prevent manipulation of the market by those sellers over whom it does have jurisdiction.

[10] *See e.g.,* Peoples, TXU, NiSource, USG, AGA, NGSA, NJR Companies, Shell Offshore, BP, Western.

[11] *See* NiSource.

[12] *See* USG.

market conditions, or market rules for natural gas.[13]

28. As discussed above, several commenters raise concerns regarding the general language prohibiting manipulation.[14] Commenters contend that the regulation contains too many ambiguous terms such as "legitimate business purpose," "manipulation," and "legitimate forces of supply and demand." NJR Companies assert that the proposal violates due process requirements, and that parties must receive fair notice before being deprived of their property. NJR Companies suggest that the Commission replace vague language with straightforward requirements.

29. Sempra recommends that the Commission take a cue from the jurisprudence of the CFTC and SEC by adopting a standard for manipulation that includes ability, intent, and effect as required elements of an offence. Reliant, Select, Merrill Lynch and Morgan Stanley assert that the Commission should establish four essential elements to prove manipulation: (1) The ability to move market prices, (2) the specific intent to create an artificial price, (3) the existence of an artificial price, and (4) causation of the artificial price by the accused.

30. Coral contends that adoption of the proposed regulation could have the effect of deterring blanket certificate holders from aggressively or creatively marketing their gas or developing new products that may benefit competitive gas markets. NASUCA argues that the Commission should clarify what types of manipulative behavior is prohibited. It adds that manipulation that results from inadequate planning, inept design, incompetent personnel, or poor supervision should not be exempted from enforceable action.

31. Hess believes that the Commission should not adopt this measure, asserting that, among other things, it has not sufficiently explained how it intends to enforce the standard. EnCana and Mirant question the necessity of the rule since the Commission and other agencies have already shown an ability

to police allegedly manipulative behavior.

32. We find that our rules, including specifically the prohibitions set forth relating to market manipulation, are not unduly vague as asserted by some commenters. While constitutional due process requirements mandate that the Commission's rules and regulations be sufficiently specific to give regulated parties adequate notice of the conduct they require or prohibit,[15] this standard is satisfied "[i]f, by reviewing [our rules] and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." [16] The Commission's rules will be found to satisfy this due process requirement "so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." [17]

33. As applied by the courts, this due process standard has been held to allow for flexibility in the wording of an agency's rules and for a reasonable breadth in their construction.[18] The courts have recognized, in this regard, that specific regulations cannot begin to cover all of the infinite variety of cases to which they may apply and that "[b]y requiring regulations to be too specific, [courts] would be opening up large loopholes allowing conduct which should be regulated to escape regulation." [19]

34. The Supreme Court has further noted that the degree of vagueness tolerated by the Constitution, as well as the relative importance of fair notice and fair enforcement, depend in part on

the nature of the rules at issue.[20] In *Hoffman*, for example, the Court held that in the case of economic regulation (as opposed to criminal sanctions), the vagueness test must be applied in less strict manner because, among other things, "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." [21]

35. Applying these standards here, we find that our rules satisfy the requirement of due process. It cannot be said that the prohibitions against market manipulation, as set forth in the rules, are unclear in their intent. For example, our requirement that a seller's actions must have a "legitimate business purpose" is clearly intended to give sellers some latitude in determining their business actions, while safeguarding market participants against market manipulation for which there can be no legitimate business purpose. Sellers will not be required to guess at the meaning of the above-referenced term because it can only have meaning with specific reference to seller's own business practices and motives. In other words, if the seller has a legitimate business purpose for its actions, it cannot be sanctioned under this rule.

36. In establishing these rules, we have worked to strike a necessary balance. On the one hand, this prohibition allows the Commission to protect market participants from market abuses that cannot be precisely envisioned at the present time. At the same time, we have attempted to set forth with sufficient specificity the class of behaviors prohibited in a manner that will inform market-based rate sellers of the type of activities that are consistent with just and reasonable rates. This provides the Commission the ability to codify these requirements and provide a regulatory vehicle for their prospective enforcement. Thus, our rules have been designed to meet these twin objectives—to be specific in order to inform sellers as to the type of behavior that is prohibited today, while containing enough breadth and flexibility to address new and unanticipated activities, as they may arise down the road.

---

[13] Section 284.403(a) of the Commission's regulation provides that:

Any person making natural gas sales for resale in interstate commerce pursuant to § 284.402 is prohibited from engaging in actions or transactions that are without a legitimate business purpose and are intended to or foreseeably could manipulate market prices, market conditions, or market rules for natural gas.

[14] *See e.g.,* TXU, NGSA, Shell, NJR Companies, NEMA, EMIT, Cinergy, Sempra, Reliant, Select, Merrill Lynch and Morgan Stanley, Coral, Hess, Peoples, EnCana, Mirant, NASUCA.

[15] *See Freeman United Coal Mining Company v. Federal Mine Safety and Health Review Commission,* 108 F.3d 358, 362 (DC Cir. 1997) (*Freeman*).

[16] *See General Electric Co. v. EPA,* 53 F.3d 1324, 1329–30 (DC Cir. 1995) (holding that the agency's interpretation of its rules was "so far from a reasonable person's understanding of the regulations that [the regulations] could not have fairly informed GE of the agency's perspective.").

[17] *See Freeman,* 108 F.3d at 362. *See also Faultless Division, Bliss & Laughlin Industries, Inc. v. Secretary of Labor,* 674 F.2d 1177, 1185 (7th Cir. 1982) ("[T]he regulations will pass constitutional muster even though they are not drafted with the utmost precision; all that due process requires is a fair and reasonable warning.").

[18] *See Grayned v. City of Rockford,* 408 U.S. 104, 110 (1971) (holding that an anti-noise ordinance was not vague when the words of the ordinance "are marked by flexibility and reasonable breadth, rather than meticulous specificity.").

[19] *See Ray Evers Welding Co. v. OSHRC,* 625 F.2d 726, 730 (6th Cir. 1980).

[20] *See Village of Hoffman Estates, et al. v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1981) (*Hoffman*).

[21] *Id. See also Texas Eastern Products Pipeline Co. v. OSHRC,* 827 F.2d 46, 50 (7th Cir. 1987) ("Texas Eastern, as a major pipeline company, in which trenching and excavation are a part of its routine, had ample opportunity to know of the earlier interpretation, should have been able to see the sense of the regulations on their face, and if still in doubt Texas Eastern should have taken the safer position both for its employees and for itself.").

37. Nonetheless, we are committed to making our rules as specific as possible and thus, we are adopting a number of the revisions proposed by commenters in order to clarify the scope and application of our rules.

38. We clarify that we are focusing on behavior undertaken without an appropriate commercial underpinning for the purpose of distorting prices from those that would otherwise occur in the competitive market. However, the proposed term that would have characterized as manipulative behavior an act resulting in "market prices which do not reflect the legitimate forces of supply and demand" has resulted in confusion. While we do not believe that our use of this term was inappropriate or unjustified (as we intended it), many commenters appear to have misunderstood its purpose, suggesting that causes other than manipulation may explain a given dysfunction in the interplay between supply and demand. To avoid confusion on this point, then, and because our objectives with respect to this rule can be satisfied under the surviving clause, discussed above, we have eliminated this term from our rule. We clarify that this rule is not meant to say that we will identify prices that properly reflect supply and demand and then take action against sellers whose prices (however they may be established) differ. Rather, our rule is designed to prohibit market-based rate sellers from taking actions without a legitimate business purpose that are intended to or foreseeably could interfere with the prices that would be set by competitive forces.[22] One such action would be a wash trade. As discussed below, wash trades have no economic risk or substance, and create a false price for use in indices or in the market in general.

39. Commenters have also raised questions regarding how the Commission will determine whether this rule has been violated. In determining whether an activity is in violation of our rule, we will examine all relevant facts and circumstances surrounding the activity to evaluate whether there is a legitimate business purpose attributable to the behavior. We will evaluate whether the activity was designed to lead to (or could foreseeably lead to) a distorted price that is not reflective of a competitive market. Our approach will be to consider the facts and circumstances of the activity to determine its purpose and its intended

or foreseeable result. However, the Commission recognizes that manipulation of energy markets does not happen by accident. We also recognize that intent often must be inferred from the facts and circumstances presented. Therefore, a violation of the instant rule must involve conduct which is intended to, or would foreseeably distort prices.[23]

40. Some ambiguity necessarily arises from the fact that we cannot expressly identify all behaviors that are precluded by the instant rule. However, in the Commission's view, the rule and its implementation provide sufficient clarity for market-based rates sellers to understand the scope of precluded behaviors. The rule clearly prohibits behaviors that are undertaken without a legitimate business purpose which are designed to, or foreseeably would, distort prices for jurisdictional natural gas sales.

41. Many commenters have raised concerns with the Commission's inclusion of the phrase "legitimate business purpose." The Commission's inclusion of the phrase is to assure sellers that transactions with economic substance in which a seller offers or provides service to a willing buyer where value is exchanged for value will not be considered prohibited by our rule. While several commenting sellers have raised concerns regarding the inclusion of the phrase "legitimate business purpose" in the rule, we believe that not only is the inclusion of the phrase necessary, it acts to ensure that such sellers acting in a pro-competitive manner will be able to show that their actions were not designed to distort prices or otherwise manipulate the market. Behaviors and transactions with economic substance in which a seller offers or provides service to a willing buyer where value is exchanged for value will be recognized as reflecting a legitimate business purpose consistent with just and reasonable rates. However, an action or transaction which is anticompetitive (even though it may be undertaken to maximize seller's profits), could not have a legitimate business purpose attributed to it under our rule.[24]

42. Prices for transactions undertaken in the competitive marketplace where value is exchanged for value should be

disciplined by market forces. On the other hand, all gas transactions may not be constrained by market forces. For example, if a gas merchant bought natural gas at a location typically used as an index reference point in a manner that drives prices higher (and promptly thereafter sold such gas at the market prevailing price at a loss) while also possessing a derivative position at a notional quantity significantly in excess of its physical gas position, that benefits from the increase in the market price of natural gas at this index reference point, these physical purchases may be interpreted as a component of a broader manipulative scheme and the cash market transactions may be found to be without a legitimate business purpose.[25]

43. We recognize that we are establishing a general rule that will become more clear and concrete after we have had the opportunity to consider actual cases. As with all new requirements of this nature, with caselaw comes further clarity. This reflects the fact that we oversee a dynamic and evolving market where addressing yesterday's concerns may not address tomorrow's. Nevertheless, experience in applying this rule should be instructive to both the Commission and market-based rates sellers. As we apply the rule, we will be mindful of the fact that we are not only taking steps to assure just and reasonable rates for a specific transaction but also providing guidance to sellers in general. As such, in determining the appropriate remedy for violations of this rule, we will take into account factors such as how self evident the violation is and whether such violation is part of a pattern of manipulative behavior.

44. The Commission rejects arguments that it should identify and prohibit only expressly-defined acts of manipulation. For all the reasons discussed above, it is essential and appropriate that we have a prohibition designed to prohibit all forms of manipulative conduct. In sum, we believe our rules, as modified, explained and adopted herein, put sellers and all market participants on fair notice regarding the conduct we seek to encourage and the conduct we seek to prohibit. Stripped to their essentials, these guidelines amount to the following: (i) Act consistently

---

[22] Our rules are designed to cover actions that are intended to manipulate prices regardless of whether such actions actually resulted in distorted prices. We note, however, that in most such cases there will be no unjust profits to disgorge.

[23] When deciding how best to allocate our enforcement resources, we intend to focus our efforts primarily on those actions or transactions that have, in fact, caused distorted market prices.

[24] See Enron Power Marketing, Inc., 103 FERC ¶ 61,343 (2003) (revoking Enron's blanket marketing certificate authorization based on Enron's participation in wash trades having "no legitimate business purpose").

[25] Although the instant example focused upon gas market prices manipulated upward in order to benefit the merchant derivative position, the transactions implementing any manipulation of the natural gas market will not be considered legitimate. For further discussion of several manipulative strategies *see* the Commission Staff's Final Report on Price Manipulation in Western Markets, Chapter IX, p. IX–9 through IX–24.

within the Commission's established rules; (ii) do not manipulate or attempt to manipulate natural gas markets; (iii) be honest and forthright with the Commission and the institutions it has established to implement open-access transportation and entities publishing indices for the purpose of price transparency; and (iv) retain associated records. Viewed in this context, there can be no reasonable uncertainty over the underlying objectives embodied in our rules or their requirements going forward.

45. Our code of conduct rules would not supercede or replace parties' rights under Section 5 of the NGA to file a complaint contending that a contract should be revised by the Commission (pursuant to either the "just and reasonable" or "public interest" test as required by the contract). Rather, any party seeking contract reformation or abrogation based on a violation of one or more of these regulations would be required to demonstrate that such a violation had a direct nexus to contract formation and tainted contract formation itself. If a jurisdictional seller enters into a contract without engaging in behavior that violates these regulations with respect to the formation of such contract, we do not intend to entertain contract abrogation complaints predicated on our instant code of conduct rules.

### 2. Wash Trades

46. Proposed Section 284.288(a)(1) provides that:

Prohibited actions and transactions include but are not limited to pre-arranged offsetting trades of the same product among the same parties, which involve no economic risk, and no net change in beneficial ownership (sometimes called "wash trades").[26]

47. TXU comments that wash trades should be more precisely defined, contending that the present definition does not explicitly limit the applicable transaction to one involving the same location, price, quantity, and term, and can be interpreted to prohibit legitimate exchange transactions that occur through displacement or backhauls.

48. Merrill Lynch and Morgan Stanley request that the Commission modify the definition of wash trades to clarify that it applies to parties who intended to enter into simultaneous offsetting trades to effectuate a wash trade. They request that the Commission further clarify its definition by specifying that wash trades must involve: (1) A deliberately pre-arranged pair of trades, (2) trades made at the same time, at the same price, and at the same delivery points, and (3) trades made between the same legal entities. NGSA submits that the proposed ban on wash trades should be narrowed to encompass only simultaneous offsetting trades that are intended to manipulate market prices or rules. It explains that parties may enter into legitimate business arrangements that may appear as wash trades, for example, trades made to correct a scheduling or nomination error, or to liquidate a position at a pricing point based on subsequent changes in market conditions. NGSA suggests that the proposed regulation regarding wash trades be rewritten as: "knowingly pre-arranged simultaneous offsetting trades of the same product among the same parties, which involve no economic risk, and no net change in beneficial ownership (sometimes called 'wash trades')."

49. Reliant recommends the definition of wash trades be refined to eliminate the possibility that multiple traders within the same company who are trading with multiple traders in another company do not stand accused of engaging in wash trades by the mere coincidence that their trades offset one another. Reliant suggests that the regulation be re-written as: "trades of the same product among the same parties, which trades are pre-arranged to be offsetting and involve no economic risk, and no net change in beneficial ownership (sometimes called 'wash trades').

50. The Oversight Board asserts that the definition of wash trade is unduly narrow, because it limits wash trades to transactions involving the same parties, the same quantity, and no economic risk whatsoever. The Oversight Board joins NASCUA in contending the proposed definition would permit a party to evade the wash trade prescription by engaging in transactions that result in the net financial position near to, but not equal to, zero. The Oversight Board contends that the Commission should qualify its wash trade definition to ensure that the codes of conduct can effectively react to unforeseen, novel attempts to circumvent the regulatory process. The Oversight Board requests that the Commission clarify that it will define wash trades as those necessarily affecting market prices or modify the definition to include pre-arranged multi-party trades.

51. Commenters such as Select, Duke and NEMA suggest that the Commission's definition of a "wash trade" is too broad and may encompass transactions not intended to be wash trades such as "sleeving" and "bookout" transactions. Select explains that "sleeving" is a commonly performed trading practice in which a creditworthy party agrees to act as an intermediary in transactions between two parties who do not have a credit relationship. Duke recommends that legitimate trades may include the so-called "bookout" transactions, in which companies with offsetting delivery obligations resulting from heavy trading activity agree not to deliver to one another the offsetting amounts of energy. In the same vein, NEMA submits that there may be instances where legitimate business purposes appear to be wash trades (*e.g.*, when traders "book out" or "test the waters"), and that the Commission should not deem such trade to be illegal. Sempra request that the wash trade prohibition to only apply to trades that affect the market and asks that the Commission clarify the definition accordingly.

52. Other commenters such as Shell Offshore, NEMA, and Coral question whether the Commission has provided adequate definitions for the terms used in its regulations. For example, Shell Offshore questions what the regulations mean by a "pre-arranged" trade, and how it differs from any other negotiation leading to a trade. It also questions how to define an "offsetting trade," and how the value is measured. It also asks what constitutes the "same product" (*i.e.*, does an exchange of gas among the same parties constitute the same product, and thus qualify as an illegal wash trade). It also notes that there are legitimate transactions that involve "no economic risk," such as a transaction providing a guaranteed supply at a guaranteed price. NEMA also requests additional clarification of the terms "wash trades" and "pre-arranged deals" and requests that the Commission investigate the meanings of the terms "intentional manipulation" and "wash trades" as they apply to securities and commodity futures trading.

53. The Commission will adopt Section 284.288(a)(1) as proposed. Thus, the regulation will state that:

Prohibited actions and transactions include but are not limited to pre-arranged offsetting trades of the same product among the same parties, which involve no economic risk and no net change in beneficial ownership (sometimes called "wash trades").[27]

54. The Commission disagrees with the comments that its definition of wash trades is ill conceived or vague. The

---

[26] Proposed Section 284.403(a)(1) applies these same prohibited actions and transactions to "[a]ny person making natural gas sales for resale in interstate commerce pursuant to § 284.402 * * *."

[27] The Commission also adopts Section 284.403(a)(1) as proposed, which will apply the same prohibited actions and transactions to "[a]ny person making natural gas sales for resale in interstate commerce pursuant to § 284.402 * * *."

definition of wash trades states the two key elements that the Commission sees as the fundamentally manipulative aspects of wash trading: (1) that the transaction or transactions are prearranged to cancel each other out; and (2) that they involve no economic risk. As such, the prohibition against wash trades is illustrative of the Commission's prohibition against the manipulation of market conditions.

55. Transactions such as "sleeving" or "bookouts" as described by the commenters do not fall with the key elements of the Commission's definition and therefore would not be prohibited by the regulation. Further, trades made to correct scheduling or nomination errors, or trades that do not result from an attempt to manipulate the market would not be prohibited by the Commission's regulation. Moreover, displacement or backhauls are not wash trades as they are transportation services obtained from a pipeline if operationally feasible and simply do not meet the definition of wash trades as set forth herein. A sleeve is not an off-setting trade but rather a mechanism to accomplish a gas sale among parties that have not established a credit relationship by including a third party seller that has acceptable credit in the transaction chain. The two resulting sales (which are only offsetting to the "sleeving" seller) are each with economic risk with a change in beneficial ownership, and, usually at slightly different prices to reflect the use of the "sleeving" seller's credit. A "bookout" is not a pre-arranged trade but rather a subsequent arrangement to financially close out trades that were not prearranged and executed (and, in fact, closed out) with economic risk.

56. Commenters argue that the Commission should impose an "intent" standard relating to wash trading. The language, as proposed and finalized in this order, does include the element of intent. We recognize that buyers and sellers trade the same products with the same counterparties over the course of a trading day. Entering into a set of trades that happen to offset each other is not market manipulation. Wash trades are by their nature manipulative. By definition, parties must purposefully create prearranged off-setting trades with no economic risk to engage in a wash trade. We know of no legitimate business purpose to such behavior and no commenter has suggested one. Accordingly, as opposed to many other behaviors which would not, standing alone, violate Sections 284.288(a) or 284.403(a), wash trades will constitute a *per se* violation.

57. The Commission finds that its definition of wash trading, as explained here, satisfies the requirements that parties will generally know what is expected of them and what actions are prohibited. Therefore, the Commission will not further define its regulations at this point.

### 3. Collusion

58. As revised Section 284.288(a)(2) of the Commission's regulations provides that prohibited actions and transactions include but are not limited to:

collusion with another party for the purpose of manipulating market prices, market conditions, or market rules for natural gas.[28]

59. Several commenters argue that the Commission should better define the term collusion.[29] For instance, TXU recommends that the Commission and market participants rely on federal and state antitrust laws specifically defining collusion in order to ensure certainty concerning the conduct that is prescribed. Sempra argues that the Commission's prohibition of collusion is unconstitutionally vague, as well as unnecessary since such conduct is already proscribed under other statutory and regulatory schemes administered by other federal agencies with specialized expertise in those areas of law.

60. NEMA argues that for conduct to constitute collusion, there must be an element of intent to manipulate prices in the marketplace as well as an actual impact on commodity prices. Shell asks what standard the Commission would rely upon to determine whether or not there was collusion to "create" prices at levels that differ from those set by market forces.

61. While commenters such as Sempra are correct in their observation that the prohibition set forth in Sections 284.288(a)(1) and 284.403(a)(1) may be similar, in certain respects, to the prohibitions set forth in federal antitrust laws, our authority, as it relates to Sections 284.288(a)(1) and 284.403(a)(1), is not derived from federal antitrust law. Rather, our authority comes from the NGA itself and its requirement that all rates and charges made, demanded, or received by any natural gas company selling natural gas subject to the jurisdiction of the Commission and all rules and regulations affecting or pertaining to such rates and charges be just and reasonable.[30] Although our regulatory

approach includes elements of anti-trust law, it is not limited to the structure of those laws. For example, our regulatory approach encompasses "partnerships" whose existence does not implicate anti-trust concerns that may, nonetheless, undertake manipulative behavior. Therefore, these regulations will be interpreted and enforced by the Commission consistent with our own policies and precedents. As such, we need not be concerned here whether, or to what extent, federal antitrust law may be broader in scope or more narrow in scope.[31] These regulations are expressly tailored to our statutory duties and our competitive goals with respect to the natural gas market.[32]

62. To avoid possible confusion regarding the interpretation and scope from our originally proposed language which prohibited collusion for the purpose of creating market prices differing from those set by market forces, we have replaced this term with language consistent with our prohibition against manipulation set forth above. Therefore, the instant regulation prohibits collusion with another party for the purpose of manipulating market prices, market conditions or market rules for natural gas. We find such collusive acts to be illustrative of our prohibition against the manipulation of market prices and clarify that Sections 284.288(a)(2) and 284.403(a)(2) merely expand our general manipulation standard set forth in subparagraphs (a) of these rules to include acts taken in concert with another party. In other words, these regulations prohibit market manipulation undertaken by one market participant acting alone and market manipulation undertaken collectively by more than one market participant.

### 4. Reporting to Gas Index Publishers

63. Proposed Regulation Section 284.288(b) states that:

To the extent a pipeline that provides unbundled natural gas sales service under § 284.284 engages in reporting of transactions to publishers of gas price indices, the pipeline shall provide complete, accurate and factual information to such publisher. The pipeline shall notify the Commission of whether it engages in such reporting for all sales. In addition, the pipeline shall adhere

---

[28] Section 284.403(a)(2) of the Commission's regulations contains an identical prohibition.

[29] *See e.g.*, Merrill Lynch and Morgan Stanley, Duke, TXU, Sempra, NGSA, NEMA, Shell, EnCana, Hess, Mirant.

[30] Section 4(a) of the NGA, 15 U.S.C. 717c.

[31] Similarly, we need not revise our rule so that violations of the antitrust laws are also prohibited by our rule. Federal antitrust law will continue to apply where it is found to apply, with or without our rule.

[32] *See Pennsylvania Water & Power Co.* v. *FPC,* 193 F.2d 230, 236 (D.C. Cir. 1951) ("A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the regulatory statute." [cit. omit.]).

to such other standards and requirements for price reporting as the Commission may order.[33]

64. Commenters argue that the Commission should not prescribe reporting requirements that might prevent innovation of better long-term solutions to the industry's evolving future needs for price information.[34] Others argue that the proposed penalties may discourage market participants from voluntarily reporting price data.

65. Commenters also argue that the confidential treatment of reported data, as required by the *Policy Statement,* is critical to the voluntary reporting process.[35] Moreover, several commenters recommend that the Commission articulate specific reporting requirements, consistent with the *Policy Statement.* Commenters submit that many aspects of the reporting process remain unclear. For instance, they argue that it is unclear what data must be reported, the format for the data, the policy for confirming the accuracy of the data, and to which entities the seller must report. BP seeks clarification of this rule, contending that it does not mandate reporting, but simply requires that any information reported be "complete." Specifically, BP asks the Commission to clarify that where an entity voluntarily reports, that entity should not be required to report all sales at all locations. Coral suggests that general reviews followed by spot checks should be all that is required to assure a reasonable level of accuracy in reported trade price information.[36] Other commenters argue that the Policy Statement obviates the need for a reporting rule.[37]

66. Several other commenters assert that the rule does not go far enough.[38] They recommend that the Commission require that all entities holding blanket certificates report all of their trades to the data collectors. They assert that only reporting occasional bits of information could lead to inaccuracies.

67. Moreover, several commenters request clarification as to whether the

Commission notification requirement is a one-time or ongoing obligation.[39] BP argues that the Commission should clarify that it is only necessary to indicate to the Commission that the entity engages in reporting. Merrill Lynch and Morgan Stanley requests that the Commission clarify that if new entrants or entities that currently do not report to indices subsequently initiate reporting, such entities must notify the Commission within 30 days from the first date they initiated reports.

68. As part of the reporting provisions, numerous parties recommend that the Commission incorporate a safe harbor provision into its proposal so that an industry participant who, in good faith, provides trade data to index developers, will not be subject to penalties for inadvertent mistakes in reporting the information. Several commenters ask that the safe harbor provisions mirror the one adopted in the Commission's *Policy Statement.*[40] Commenters submit that incorporation of a safe harbor provision will encourage the voluntary reporting of information. Commenters also request the Commission to clarify the proposed false reporting prohibition so that it only applies to information that is known to be false at the time it is reported, as opposed to false reports based on inadvertent mistakes or human error.[41] Nicor and NGSA add that the Commission should expressly state that the safe harbor protections in the *Policy Statement* are not eliminated or negated by the subject reporting requirements.

69. Calpine contends that any safe harbor provision must be adopted into the proposed code without the burden on industry participants to self-audit and self-correct errors not otherwise discovered in the ordinary course of business. Given the volumes of data to be reported, Calpine believes it a certainty that inadvertent errors that do no harm to the overall integrity of the indices will be made. NEMA urges that the safe harbor be extended to index prices published by parties that meet the Commission's protocols.

70. The Commission proposed this regulation to assure that to the degree

that a market-based rates seller reports its transactions to publishers of natural gas price indices, such seller must do so honestly and accurately. The Commission also proposed to require sellers to inform it if they undertook such reporting. Based upon the comments received, we have modified Sections 284.288(b) and 284.403(b) to read as follows:

To the extent Seller engages in reporting of transactions to publishers of electricity or natural gas indices, Seller shall provide accurate and factual information and not knowingly submit false or misleading information or omit material information to any such publisher, by reporting its transactions in a manner consistent with the procedures set forth in the *Policy Statement on Natural Gas and Electric Price Indices,* issued by the Commission in Docket No. PL03–3–000 and any clarifications thereto. Seller shall notify the Commission within 15 days of the effective date of this tariff provision of whether it engages in such reporting of its transactions and update the Commission within 15 days of any subsequent change to its transaction reporting status. In addition, Seller shall adhere to such other standards and requirements for price reporting as the Commission may order.

71. In our June 26 NOPR, we referred to our on-going proceeding investigating price index formation. As many commenters have pointed out, since our proposal regarding these rules was issued we have also issued a *Policy Statement* addressing standards we believe appropriate for the formation of price indices that will be robust and accurate in the context of a voluntary reporting regime.[42] Included in the *Policy Statement* is a "Safe Harbor" under which reporting errors will not be subject to Commission sanction. Here, we explicitly adopt the standards set forth in the *Policy Statement* for transaction reporting. Further, we also adopt the "Safe Harbor" set forth therein as a component of our enforcement policy with respect to this rule.

72. The Commission clarifies that the requirement that entities notify the Commission of any change in status with regard to price reporting to indices is an ongoing obligation. As such, the entities must, upon the implementation of these regulations, inform the Commission of whether they report to the index publishers. As shown above, the Commission will modify the text of Sections 284.288(b) and 284.403(b) of its proposed regulations to provide that the blanket marketing certificate holder shall, after the initial notification to the Commission, inform the Commission of

---

[33] Proposed regulation Section 284.403(b) provides a similar requirement stating:

To the extent that blanket marketing certificate holder engages in reporting of transactions to publishers of gas price indices, the blanket certificate holder shall provide complete, accurate and factual information to any such publisher. The blanket marketing certificate holder shall notify the Commission of whether it engages in such reporting for all sales. In addition, the blanket marketing certificate holder shall adhere to such other standards and requirements for price reporting as the Commission may order.

[34] *See e.g.,* Western.

[35] *See e.g.,* PSCNY, NEMA, NGSA, Reliant, TXU.

[36] *See* Coral at 7.

[37] *See e.g.,* Mirant, Hess, Coral.

[38] *See e.g.,* EMIT, Platts, NASUCA.

[39] *See e.g.,* AGA, BP (recommending a one-time obligation), Peoples.

[40] *See e.g.,* Select; *see also* AGA (recommending that rather than incorporating a safe harbor provision into the subject proceeding, the Commission should clarify that the safe harbor announced in the *Policy Statement* applies specifically to a blanket marketing certificate holder's obligation, to the extent it engages in reporting of transactions to publishers of gas price indices, to provide complete, accurate, and factual information to any publisher).

[41] *See e.g.,* Merrill Lynch and Morgan Stanley, Select, Mirant.

[42] *Policy Statement,* 104 FERC ¶ 61,121 (2003).

ADD-18

its reporting status within 15 days of the effective date of these regulations and within 15 days of any subsequent change in reporting status.

73. Finally, some commenters have asked that we require mandatory reporting while others contend that we have created requirements that will have a chilling effect on reporting. We believe that we have struck an appropriate balance in these rules. For the moment, we are attempting to work within the framework of voluntary reporting. We are awaiting our staff's review of the comprehensiveness of reporting in the wake of our *Policy Statement*. At this time, we are not mandating reporting. However, we have engaged in a comprehensive investigation of transaction reporting and related issues and believe that the practices set forth in our *Policy Statement* represent the necessary minimum for those entities that choose to report. Accordingly, we will not require reporting, but will seek to learn which sellers are reporting and set forth standards for those that do.

### 5. Three-Year Data and Information Retention Requirement

74. Proposed Section 284.288(c) of the Commission's regulations provides that:

A pipeline that provides unbundled natural gas sales service under § 284.284 shall retain all relevant data and information necessary for the reconstruction of price indices for three years.[43]

75. Several entities comment on the Commission's proposed three-year data and information retention requirement.[44] Other commenters request clarification as to what constitutes "relevant data", and suggest that the Commission specify what types of data and information must be retained, and in what format (*e.g.*, paper or electronic).[45] Commenters are concerned that the required documentation will prove too burdensome due to both the time and the money required to store and retrieve information. NJR Companies argues that the proposal may create a new set of business records that could lead to decreased market activity, and a slow-

down or elimination of certain transactions.

76. BP asserts that relevant data should be limited to accounting data that records the details of each reported transaction, along with a record of the data transmitted to the index developer, if applicable. BP adds that requiring data maintained in the accounting records would be consistent with the Commission's proposed requirement for price reporting in its recent *Policy Statement*, which requires that price, volume, buy/sell indicator, delivery/receipt point, transaction date and time, term, and any counterparty name be maintained. It argues that negotiation materials and other ancillary data should not be required to be maintained.

77. Several commenters argue that the three-year retention period is too long, and that the burden may dissuade blanket marketing certificate holders from reporting data.[46] Other commenters argue that the three-year retention period is too short, and that with current computer technology, a longer retention period should not result in additional costs to market participants.[47] Finally, some commenters argue that the three-year record retention period is consistent with the commercial practices of many natural gas sellers.[48]

78. Several commenters argue that the record retention requirement will only be meaningful if the Commission makes reporting of all trade data mandatory.[49] At the same time, other commenters argue that if an entity does not report, then documentation is not necessary to verify the accuracy of price indices.[50] Other commenters submit that only relevant data should be retained and not peripheral documents that may have been generated in association with a transaction, but which have no bearing on the data reported to index publishers.[51]

79. This proposed rule requires that sellers maintain relevant records regarding their sales for three years. After review of the comments received, we revise Section 284.288(c) to read:

A pipeline that provides unbundled natural gas sales service under 284.284 must retain, for a period of three years, all data and information upon which it billed the prices

it charged for the natural gas it sold pursuant to this certificate or the prices it reported for use in price indices for a period of three years.[52]

80. In revising the proposed rule, we clarify that we are not seeking retention of "cost-of service" or analytical data related to sellers' sales as some commenters perceived from our suggestion that entities retain all relevant data "necessary for the reconstruction of price indices" in our original proposal. Rather, we are requiring that sellers retain the complete set of contractual and related documentation upon which such entities billed their customers for sales. The Commission is indifferent as to whether this material is retained in paper form or in an electronic medium as long as the data can be made accessible in a reasonable fashion if its review is required. In addition, commenters raise several issues in regard to the three-year retention period. On balance, the Commission does not believe that requiring sellers to retain records for a three-year period constitutes an undue burden given the fact that the Commission is prepared to allow the records to be kept in electronic or paper form. To permit a shorter retention period may not allow sufficient time for the investigations into possible violations.

### 6. Prohibition on Reporting Transactions With Affiliates

81. Proposed section 284.288(d) of the Commission's regulations provides that:

A pipeline that provides unbundled natural gas sales transactions under § 284.284 is prohibited from reporting any natural gas sales transactions between the pipeline and its affiliates to industry indices.[53]

82. Commenters generally agree with this restriction.[54] NASUCA agrees to the prohibition of affiliate transactions from price indices calculations, but contends that other non-price information, such as the number of trades and the volumes associated with each trade, is important information that will help determine the liquidity at various hubs for which prices are calculated. It recommends that the regulation be modified to state that pipelines and certificate holders should separately report other non-price

---

[43] Similarly, proposed Section 284.403(c) provides:

A blanket marketing certificate holder shall retain all relevant data and information necessary for the reconstruction of price indices for three years.

[44] *See e.g.*, BP, NJR Companies, NEMA, NGSA, EMIT, Western, Sempra, Reliant, Coral, Hess, Peoples, Mirant, EnCana, NASUCA, ProLiance, Merrill Lynch and Morgan Stanley, PG&E, Duke.

[45] *See e.g.*, BP, NJR Companies, NEMA, Coral, Peoples, Mirant, EnCana, ProLiance, Merrill Lynch and Morgan Stanley, PG&E.

[46] *See e.g.*, ProLiance (requesting a 2-year retention period), NEMA (requesting a 1-year retention period), Coral.

[47] *See e.g.*, NASUCA (requesting a 6-year retention period).

[48] *See e.g.*, Western.

[49] *See e.g.*, EMIT.

[50] *See e.g.*, Sempra.

[51] *See e.g.*, BP, Hess, Mirant, Merrill Lynch and Morgan Stanley.

[52] The Commission will modify Section 284.403(c), applying to blanket marketing certificate holders, in a like manner.

[53] Proposed Section 284.403(d) of the Commission's regulations provides that:

A blanket marketing certificate holder is prohibited from reporting any natural gas sales transactions between the blanket market certificate holder and its affiliates to industry indices.

[54] *See* ProLiance, NASUCA, EnCana, Hess, NEMA.

data associated with affiliate transactions.

83. Although the separate reporting of other non-price data associated with affiliate transactions may provide additional information regarding liquidity at certain points, the Commission finds that this information is not necessary for the purposes of these rules.

84. Although commenters generally agree with reporting restrictions on transactions between affiliates in the June 26 NOPR, new Sections 284.288(b) and 284.403(b) of the Final Rule provide that to the extent a Seller engages in the reporting of transactions to publishers of price indices, the Seller shall do so in a manner consistent with the procedures set forth in the *Policy Statement*. The *Policy Statement* states that "a data provider should report each bilateral, arm's length transaction between non-affiliated companies in the physical (cash) markets at all trading locations." [55] Therefore, an entity filing consistent with the *Policy Statement* will not include sales to affiliates in its report. Accordingly, the Commission believes the addition of these two regulations (Sections 284.288(d) and 284.403(d) of the June 26 NOPR) is redundant, and shall be deleted.

*D. Remedies*

1. General Issues

85. Several commenters responded to the Commission's proposal that the violations of its code of conduct may result in various remedial actions by the Commission including the disgorgement of unjust profits, suspension or revocation of the blanket sales certificates or other appropriate remedies.

86. In regard to the Commission's inclusion of disgorgement as a potential remedy various commenters argue that the Commission does not have authority to condition NGA Section 7 certificates with such a retroactive refund obligation. [56] Commenters argue that the courts have held that the Commission's power to condition certificates cannot be permitted to diminish an entity's rights under NGA Sections 4 and 5. [57] These commenters argue the proposed disgorgement remedy is a refund condition that is not permitted under Section 5 of the NGA and that such disgorgement of unjust profits from a

just and reasonable rate is tantamount to retroactive ratemaking because NGA Section 5 provides only for prospective relief. [58] The commentors argue the Commission is attempting to expand its authority to order retroactive refunds, or, change retroactively the filed rate. They argue that courts have been clear that the Commission cannot (i) use its conditioning authority to circumvent other provisions of the NGA and (ii) do indirectly what it may not do directly and therefore the Commission cannot condition rates as it proposes to do so here, and subject them to retroactive refunds because Congress did not include such authority in the NGA.

87. Several commenters express concern that the term "unjust profits" is vague and subjective, the calculation of which would necessitate a review of all market conditions. [59] AGA recommends that the Commission limit the disgorgement of unjust profits to all illegal activity and not impose penalties for violation of those regulatory provisions associated with reporting activities. [60] NJR Companies object to the disgorgement remedy when the violation is inadvertent. [61]

88. Several commenters argue that the Commission should consider additional remedies such as a remedy that would require the offending entity to make the market whole for losses incurred because of its actions. [62] They argue that if an entity must simply disgorge unjust profits, even if is caught for every infraction of the code, it is no worse off than if it had followed the rules in the first place. Therefore, they argue that disgorgement of unjust profits does not serve as a penalty or deterrent to future, similar actions. In sum, they argue that the failure to comply with the filed rate by engaging in prohibited manipulative behavior should include a potential remedy that is greater than disgorgement, such as a make the market whole remedy.

89. Regarding the issue of appropriate non-monetary penalties, PSCNY states that all violations of the regulations should be publicly disclosed in a public file that may be accessed by buyers and the public. A list of bad actors and dates could be maintained on the Commission's Web site. Such public disclosure, PSCNY argues, would provide an additional deterrent for companies to avoid the stigma associated with engaging in anticompetitive behavior. PSCNY states that in the event of a particularly blatant and serious violation, or multiple violations, the Commission should place parties on notice that appropriate remedies could include revocation of market-based rate authority. NASUCA recommends that the Commission clarify that revocation of market-based rate authority will be for a specified minimum period of time that depends on the severity of the violation.

90. In Order No. 636, the Commission determined that after gas services were unbundled, sellers of gas supplies would not have market power over the sale of natural gas. This determination was based in large part upon Congress' finding that a competitive market exists for gas at the wellhead and in the gas field. The Commission determined that it would institute light-handed regulation and would rely on market forces at the wellhead to constrain sales for resale of natural gas within the just and reasonable standard set forth by the NGA. In implementing its findings in Order No. 636 and Order No. 547, the Commission issued blanket certificates to all persons who are not interstate pipelines which authorized such persons to make jurisdictional gas sales for resale at negotiated rates with pre-granted abandonment. [63] In issuing these certificates the Commission determined that the competitive natural gas market would lead all gas suppliers to charge rates that are sensitive to the gas sales market.

91. The Commission has determined that in order to protect and maintain the competitive natural gas market and to continue its light-handed regulation of the gas sales within its jurisdiction, it is necessary to place additional conditions on its grant of market-based sales certificates. In formulating such conditions to the market based rate certificates the Commission is fulfilling its obligation to appropriately monitor markets and to ensure that market-based

---

[55] *See Policy Statement*, 104 FERC ¶ 61,121 at P 34 (2003).

[56] *See e.g.*, Comments of AGA, the FPL Group, NGSA, Duke, NGSA and Cinergy.

[57] *Citing Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C. Cir. 1979): *Cf. Northern Natural Gas Co. v. FERC*, 827 F.2d 779 (D.C. Cir. 1987).

[58] Several commenters such as EnCana, Hess and Mirant argue that the term "unjust profits" is vague and subjective and therefore difficult to calculate. Hess requests that the Commission either adopt a more workable formula for calculating monetary remedies or clarify how the unjust profits standard will be applied. Mirant and EnCana suggest that the Commission adopt a presumption that unjust profits will be defined as the difference between a reported transaction's fixed price and a then-existing published index price for the market and time period in question. Mirant asserts that it would oppose any Commission proposal to recreate or somehow adjust previously reported index prices based on an after-the-fact review of reported data.

[59] *See e.g.*, Mirant, Cinergy, EnCana, Hess.

[60] *See* AGA at 10.

[61] NJR Companies at 19.

[62] *See e.g.*, CPUC, NASUCA, EMIT, PG&E, PSCNY and the Oversight Board.

[63] *See* 18 CFR 284.401–402 (2003).

rates remain within the zone of reasonableness required by the NGA.[64]

92. In order to find the market based sales service to be in the public convenience and necessity the Commission finds that the conditions herein must be met. Once the sales service is so conditioned, in the Commission's view adequate safeguards are in place so that the Commission may grant market based sales authority to jurisdictional sellers of natural gas. In so conditioning this service, the Commission is not prohibiting a jurisdictional seller of natural gas from requesting a certificate for a different form of service or filing pursuant to Section 4 of the NGA for a different rate or conditions of service. Neither does the Commission prohibit a customer of such a seller from raising objections under Section 5 of the NGA.

93. Moreover, if the conditions of service are not met, the Commission has the authority to impose the appropriate remedy for the violation.[65] In particular, the Commission does not agree with the comments that a violation of an existing condition of service may not be remedied by the Commission from the time the violation occurred. The Commission has the authority to remedy violations of certificate conditions.[66] Moreover, the courts have held that the Commission has a great deal of discretion when imposing remedies devised to arrive at maximum reinforcement of Congressional objectives in the NGA.[67] In devising its remedy the Commission is required to exercise its discretion to arrive at an appropriate remedy,[68] and to explore all

the equitable considerations, and practical consequences of its action and the purposes of the NGA.[69]

94. This action of remedying a violation of a certificate condition is not the same as the Commission's action in finding an existing rate unjust and unreasonable after hearing under Section 5 of the NGA. At the initiation of an NGA Section 5 proceeding the existing condition has not yet been found to be unjust and unreasonable. In contrast, in a remedial proceeding the issue is whether the entity has violated an existing condition of the tariff or the regulations. Therefore, in a remedial proceeding, unlike an NGA section 5 proceeding, the regulated entity has notice of the conditions required for service at the time of the implementation of the service condition and the Commission may, at its discretion, fashion an appropriate remedy.

95. In appropriate circumstances these remedies may include disgorgement of unjust profits, suspension or revocation of the blanket sales provision or other appropriate non-monetary remedies. Which of these remedies is appropriate will depend on the circumstances of the case before it and the Commission will not determine here which remedy or remedies it will utilize.[70]

## 2. 90-Day Time Limit on Complaints

96. Several commenters raise concerns about the 60-day time limit on complaints proposed in the June 26 NOPR.[71] Most of the commenters argue that the 60-day time period is unreasonably too short. Some commenters suggest a limit of six months.[72] Many commenters suggest modification of the provision's discovery exception, by adopting a "reasonableness" standard, i.e., a reasonable person exercising due diligence could not have known of the wrongful conduct.

97. Several commenters argue that the Commission errs in not applying the 60-day deadline to itself. They argue that

if the Commission is allowed to initiate unlimited retroactive investigations, this vitiates any time constraints the rule otherwise places on private complainants. Commenters recommend that the scope of any investigation that might stem from a complaint, or the Commission's own motion, be narrowly defined, and require the demonstration and quantification of the individual harm resulting from the prohibited conduct.[73] These commenters are concerned about the lack of finality for transactions under the proposed discovery exception to the 60-day requirement. Merrill Lynch and Morgan Stanley suggest either a hard and fast deadline of 60 days from the event with no exceptions or a rebuttable presumption the complainant knew about the alleged violation within the 60-day time period.

98. Upon consideration of the comments received concerning our 60-day proposal, in the Commission's view the 60-day time period may be insufficient time for parties to discover and act upon violations of these regulations. Accordingly, the Commission will modify its original proposal to allow 90 days from the end of the quarter from which a violation occurred for a party to bring a complaint based on these regulations. A 90-day time period provides a reasonable balance between encouraging due diligence in protecting one's rights, discouraging stale claims, and encouraging finality in transactions. Furthermore, the Commission clarifies that the language in Sections 284.288(e) and 284.403(e), "unless that person could not have known of the alleged violation", incorporates a reasonableness standard, i.e., the 90-day time period to file a complaint does not begin to run until a reasonable person exercising due diligence should have known of the alleged wrongful conduct. Rather than being impermissibly vague, this safeguard ensures a sufficient time-period for complainants to discover hidden wrongful conduct and submit a claim.

99. We will also place a time limitation on Commission enforcement action for potential violations of these regulations. The Commission, unlike the market participants who may be buyers or otherwise directly affected by a transaction, may not be aware of actions or transactions that potentially may violate our rules. Thus, the Commission will act within 90 days from the date it knew of an alleged violation of these

---

[64] The Court of Appeals for the D.C. Circuit has held that, while the Commission "enjoys substantial discretion in ratemaking determinations * * * * by the same token, this discretion must be bridled in accordance with the statutory mandate that the resulting rates be 'just and reasonable.'" *Farmers Union Cent. Exch. Inc.* v. *FERC*, 734 F.2d 1486 at 1501 (D.C. Cir. 1984). In addition, the regulatory regime itself must contain some form of monitoring to ensure that rates remain within a zone of reasonableness and to check rates that depart from this zone. *Id.* at 1509. *See also Louisiana Energy and Power Authority* v. *FERC*, 141 F.3d 364 (D.C. Cir. 1998); *Elizabethtown Gas Co.* v. *FERC*, 10 F.3d 866 (D.C. Cir. 1993).

[65] *See e.g.,* Coastal Oil & Gas Corp. v. FERC, 782 F.2d 1249 (1986).

[66] Consolidated Gas Transmission Corp., et al., 771 F.2d 1536 (D.C. Cir. 1985) (holding that the Commission has the authority under section 16 of the Natural Gas Act to order retroactive refunds to enforce conditions in certificates).

[67] The courts have held that "the breadth of agency discretion is, if anything, at its zenith when the action assailed relates * * * to the fashioning of policies, remedies and sanctions." *Columbia Gas Transmission Corp.,* v. *FERC,* 750 F.2d 105, 109 (D.C. Cir. 1984), *quoting, Niagara Mohawk Power Corp.* v. *FPC,* 379 F.2d 153, 159 (D.C. Cir.1967).

[68] *Gulf Oil Corp.* v. *FPC,* 536 F.2d 588 (3rd. Cir. 1977), *cert. denied,* 4344 U.S. 1062 (1978), *reh'g denied,* 435 U.S. 981 (1978).

[69] *See Continental Oil Co.* v. *FPC,* 378 F.2d 510 (5th Cir. 1967) and *FPC* v. *Tennessee Gas Transmission Co.,* 371 U.S. 145 (1962).

[70] Moreover, if Congress grants the Commission additional remedial power, including the authority to levy civil penalties, the Commission will, in addition to the remedies set forth herein, implement such authority and utilize it when appropriate for violations of these code of conduct regulations.

[71] The Oversight Board, Mirant, NiSource, Cinergy, Sempra, Reliant, EMIT, EnCana, Hess, Coral, NGSA, CPUC, NASUCA, PG&E, Merrill Lynch and Morgan Stanley, ProLiance.

[72] See the Oversight Board, EMIT, Coral, NASUCA (suggesting 6 months), and ProLiance (suggesting a two-year limit).

[73] *See also* EPSA (arguing that the Commission should clarify that it will act quickly to review and discourage frivolous complaints).

code of conduct regulations or knew of the potentially manipulative character of an action or transaction. Commission action in this context means a Commission order or the initiation of a preliminary investigation by Commission Staff pursuant to 18 CFR section 1b. If the Commission does not act within this time period, the seller will not be exposed to potential liability regarding the subject action or transaction. Knowledge on the part of the Commission will take the form of a call to our Hotline alleging inappropriate behavior or communication with our enforcement Staff.

100. We also clarify that in this context the Commission's action will have reference to a Commission order or to the initiation to a preliminary investigation by Commission Staff. If the Commission does not act within this period, the Seller will not be exposed to

potential liability regarding the subject transaction. In such a proceeding, knowledge on the part of the Commission must take the form of a call to our Hotline alleging inappropriate behavior or communication with our enforcement staff.

## VI. Administrative Finding and Notices

### A. Information Collection Statement

101. The code of conduct rules adopted herein would require jurisdictional gas sellers to retain certain records for three years and also require them to notify the Commission whether or not they engage in the reporting of natural gas sales transactions to publishers of gas indices.[74]

102. The Office of Management and Budget's (OMB) regulations require that OMB approve certain information collection requirements imposed by agency rule.[75] This final rule does not

make any substantive or material changes to the information collection requirements specified in the NOPR, which was previously submitted to OMB for approval on July 14, 2003. OMB has elected to take no action on the NOPR. Thus, the information collection requirements in this rule are pending OMB approval. Comments were solicited and received on the need for this information, whether the information will have practical utility, the accuracy of the provided burden estimates, ways to enhance the quality, utility, and clarity of the information to be collected, and any suggested methods for minimizing respondents' burden, including the use of automated information techniques. The Commission addressed these issues in sections III(C)(4)–(5) of this order. The burden estimates for complying with this proposed rule are as follows:

| Data collection | Number of respondents | Number of responses | Hours per response | Total annual hours |
|---|---|---|---|---|
| FERC–549: | | | | |
| (Reporting) .................................................. | 222 | 222 | 1 | 222 |
| (Recordkeeping) ......................................... | 222 | 222 | 2 | 444 |
| Totals ................................................. | ................ | ................ | 3 | 666 |

Total annual hours for Collection (reporting + recordkeeping) = 666.

*Information Collection Costs:* The Commission seeks comments on the cost to comply with these requirements. It has projected the average annualized cost of all respondents to be: Annualized Capital Startup Costs: 666 + 2080 × $117,041 = $37,475. This is one time cost for the implementation of the proposed requirements.

103. OMB's regulations require it to approve certain information collection requirements imposed by agency rule. The Commission is submitting a copy of this order to OMB.

104. *Title:* FERC–549, Gas Pipeline Rates: Natural Gas Policy Act, Section 311.

105. *Action:* Proposed Data Collection.

106. *OMB Control No.:* 1902–0086.

107. *Respondents:* Businesses or other for profit.

108. *Frequency of Responses:* On occasion.

109. *Necessity of Information:* The code of conduct rules approved herein would revise the Commission's regulations to require that pipelines that provide unbundled sales service or persons holding blanket marketing

certificates adhere to a code of conduct when making gas sales. In addition, the Commission will require blanket sales certificate holders to maintain certain data for a period of three years. The addition of the codes of conduct, retention of data and standards for accuracy are efforts by the Commission to ensure the integrity of the natural gas market that remains within its jurisdiction.

110. *Internal review:* The Commission has reviewed the requirements pertaining to blanket sales certificates and has determined the proposed revisions are necessary to ensure the integrity of the gas sales market that remains within its jurisdiction. These requirements conform to the Commission's plan for efficient information collection, communication, and management within the natural gas industry. The Commission has assured itself, by means of internal review, that there is specific, objective support for the burden estimates associated with the information requirements.

111. Interested persons may obtain information on the information requirements by contacting the

following: Federal Energy Regulatory Commission, 888 First Street, NE., Washington, DC 20426 [Attention: Michael Miller, Office of the Executive Director, Phone: (202) 502–8415, fax: (202) 273–0873, e-mail: *Michael.Miller@ferc.gov.*]

112. For submitting comments concerning the collection of information(s) and the associated burden estimate(s), please send your comments to the contact listed above and to the Office of Management and Budget, Office of Information and Regulatory Affairs, Washington, DC 20503, [Attention: Desk Officer for the Federal Energy Regulatory Commission, phone: (202) 395–7856, fax: (202) 395–7285].

### B. Environmental Analysis

113. The Commission is required to prepare an Environmental Assessment or an Environmental Impact Statement for any action that may have a significant adverse effect on the human environment.[76] The Commission has categorically excluded certain actions from these requirements as not having a significant effect on the human

---

[74] *See* Sections 284.288(b)–(c), and 284.403(b)–(c).

[75] 5 CFR 1320 (2003).

[76] Order No. 486, Regulations Implementing the National Environmental Policy Act, 52 FR 47897

(Dec. 17, 1987], FERC Stats. & Regs. Preambles 1986–1990 ¶ 30,783 (1987].

environment.[77] The actions proposed to be taken here fall within categorical exclusions in the Commission's regulations for rules that are clarifying, corrective, or procedural, for information gathering, analysis, and dissemination, and for sales, exchange, and transportation of natural gas that requires no construction of facilities.[78] Therefore, an environmental assessment is unnecessary and has not been prepared in this rulemaking.

### C. Regulatory Flexibility Act Certification

114. The Regulatory Flexibility Act of 1980 (RFA)[79] generally requires a description and analysis of final rules that will have significant economic impact on a substantial number of small entities. The Commission is not required to make such analyses if a rule would not have such an effect.[80]

115. The Commission does not believe that this rule would have such an impact on small entities. Most of the entities required to comply with the proposed regulations would be pipelines, LDCs or their affiliates who do not meet the RFA's definition of a small entity whether or not they are under the Commission's jurisdiction. It is likely that any small entities selling natural gas would be making gas sales that are no longer subject to the Commission's jurisdiction. Therefore, the Commission certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### D. Document Availability

116. In addition to publishing the full text of this document in the **Federal Register**, the Commission provides all interested persons an opportunity to view and/or print the contents of this document via the Internet through FERC's Home Page (*http://www.ferc.gov*) and in FERC's Public Reference Room during normal business hours (8:30 a.m. to 5 p.m. Eastern time) at 888 First Street, NE., Room 2A, Washington DC 20426

117. From FERC's Home Page on the Internet, this information is available using the eLibrary link. The full text of this document is available on eLibrary in PDF and Microsoft Word format for viewing, printing, and/or downloading. To access this document in eLibrary, type the docket number excluding the last three digits of this document in the docket number field.

118. User assistance is available for eLibrary and the FERC's Web site during normal business hours at *FERCOnLineSupport@ferc.gov* or by calling (866) 208–3676 or for TTY, contact (202) 502–8659.

### E. Effective Date and Congressional Review

119. These regulations are effective December 26, 2003. The Commission has determined, with the concurrence of the administrator of the Office of Information and Regulatory Affairs of OMB, that this Final Rule is not a "major rule" as defined in Section 351of the Small Business Regulatory Enforcement Fairness Act of 1996. The Commission will submit the Final Rule to both houses of Congress and the General Accounting Office.

### List of Subjects in 18 CFR Part 284

Continental Shelf; Incorporation by reference; Natural gas; Reporting and recordkeeping requirements.

By the Commission. Commissioners Massey and Brownell concurring in part with separate statements attached.

**Linda Mitry,**

*Acting Secretary.*

■ In consideration of the foregoing, the Commission is amending part 284, Chapter I, Title 18, *Code of Federal Regulations,* as follows.

## PART 284—CERTAIN SALES AND TRANSPORTATION OF NATURAL GAS UNDER THE NATURAL GAS POLICY ACT OF 1978 AND RELATED AUTHORITIES

■ 1. The authority citation for part 284 continues to read as follows:

**Authority:** 15 U.S.C. 717–717w, 3301–3432; 42 U.S.C. 7101–7532; 43 U.S.C. 1331–1356.

■ 2. Section 284.288 is added to read as follows:

### § 284.288   Code of conduct for unbundled sales service.

(a) A pipeline that provides unbundled natural gas sales service under § 284.284 is prohibited from engaging in actions or transactions that are without a legitimate business purpose and that are intended to or foreseeably could manipulate market prices, market conditions, or market rules for natural gas. Prohibited actions and transactions include but are not limited to:

(1) Pre-arranged offsetting trades of the same product among the same parties, which involve no economic risk and no net change in beneficial ownership (sometimes called "wash trades"); and

(2) collusion with another party for the purpose of manipulating market prices, market conditions, or market rules for natural gas.

(b) To the extent Seller engages in reporting of transactions to publishers of electricity or natural gas indices, Seller shall provide accurate and factual information, and not knowingly submit false or misleading information or omit material information to any such publisher, by reporting its transactions in a manner consistent with the procedures set forth in the *Policy Statement on Natural Gas and Electric Price Indices,* issued by the Commission in Docket No. PL03–3–000 and any clarifications thereto. Seller shall notify the Commission within 15 days of the effective date of this regulation of whether it engages in such reporting of its transactions and update the Commission within 15 days of any subsequent change to its transaction reporting status. In addition, Seller shall adhere to such other standards and requirements for price reporting as the Commission may order.

(c) A pipeline that provides unbundled natural gas sales service under § 284.284 shall retain, for a period of three years, all data and information upon which it billed the prices it charged for natural gas it sold pursuant to its market based sales certificate or the prices it reported for use in price indices.

(d) Any violation of the preceding paragraphs may subject Seller to disgorgement of unjust profits from the date when the violation occurred. Seller may also be subject to suspension or revocation of its blanket certificate under § 284.284 or other appropriate non-monetary remedies.

(e) Any person filing a complaint against a pipeline for violation of paragraphs (a) through (c) must do so no later than 90 days after the end of the calendar quarter in which the alleged violation occurred unless that person could not have known of the alleged violation, in which case the 90-day time limit will run from the discovery of the alleged violation. The Commission will act within 90 days of an alleged violation of these code of conduct regulations or knew of the potentially manipulative character of an action or transaction. Commission action in this context means a Commission order or the initiation of a preliminary investigation by Commission Staff pursuant to 18 CFR section 1b. If the Commission does not act within this time period, the seller will not be exposed to potential liability regarding the subject action or transaction. Knowledge on the part of

---

[77] 18 CFR 380.4 (2003).

[78] *See* 18 CFR 380.4(a)(2)(ii), 380.4(a)(5), 380.4(a)(27) (2003).

[79] 5 U.S.C. 601–612.

[80] 5 U.S.C. 605(b).

the Commission will take the form of a call to our Hotline alleging inappropriate behavior or communication with our enforcement Staff.

■ 3. In § 284.402, the second sentence of paragraph (a) is revised to read as follows:

### § 284.402 Blanket Marketing Certificates.

* * * A blanket certificate issued under Subpart L is a certificate of limited jurisdiction which will not subject the certificate holder to any other regulation under the Natural Gas Act jurisdiction of the Commission, other than that set forth in this Subpart L, by virtue of the transactions under this certificate.

■ 4. Section 284.403 is added to read as follows:

### § 284.403 Code of conduct for persons holding blanket marketing certificates.

(a) Any person making natural gas sales for resale in interstate commerce pursuant to § 284.402 is prohibited from engaging in actions or transactions that are without a legitimate business purpose and that are intended to or foreseeably could manipulate market prices, market conditions, or market rules for natural gas. Prohibited actions and transactions include but are not limited to:

(1) Pre-arranged offsetting trades of the same product among the same parties, which involve no economic risk and no net change in beneficial ownership (sometimes called "wash trades"); and

(2) Collusion with another party for the purpose of manipulating market prices, market conditions, or market rules for natural gas.

(b) To the extent Seller engages in reporting of transactions to publishers of electricity or natural gas indices, Seller shall provide accurate and factual information, and not knowingly submit false or misleading information or omit material information to any such publisher, by reporting its transactions in a manner consistent with the procedures set forth in the *Policy Statement on Natural Gas and Electric Price Indices,* issued by the Commission in Docket No. PL03–3–000 and any clarifications thereto. Seller shall notify the Commission within 15 days of the effective date of this regulation of whether it engages in such reporting of its transactions and update the Commission within 15 days of any subsequent change to its transaction reporting status. In addition, Seller shall adhere to such other standards and requirements for price reporting as the Commission may order.

(c) A blanket marketing certificate holder shall retain, for a period of three years, all data and information upon which it billed the prices it charged for the natural gas sold pursuant to its market based sales certificate or the prices it reported for use in price indices.

(d) Any violation of the preceding paragraphs may subject Seller to disgorgement of unjust profits from the date when the violation occurred. Seller may also be subject to suspension or revocation of its blanket certificate under § 284.284 or other appropriate non-monetary remedies.

(e) Any person filing a complaint against a blanket marketing certificate holder for violation of paragraphs (a) through (c) must do so no later than 90 days after the end of the calendar quarter in which the alleged violation occurred unless that person could not have known of the alleged violation, in which case the 90-day time limit will run from the discovery of the alleged violation. The Commission will act within 90 days from the date it knew of an alleged violation of these code of conduct regulations or knew of the potentially manipulative character of an action or transaction. Commission action in this context means a Commission order or the initiation of a preliminary investigation by Commission Staff pursuant to 18 CFR Section 1b. If the Commission does not act within this time period, the seller will not be exposed to potential liability regarding the subject action or transaction. Knowledge on the part of the Commission will take the form of a call to our Hotline alleging inappropriate behavior or communication with our enforcement Staff.

**Note:** This appendix will not appear in the Code of Federal Regulations.

## Appendix

### List of Commenters

Amerada Hess Corporation (Hess)
American Gas Association (AGA) *
Atmos Energy Corp.
BP America Production Company and BP Energy Company (BP)
California Electricity Oversight Board (Oversight Board)
Calpine Corporation
Cinergy Marketing & Trading, LP (Cinergy) *
Coalition for Energy Market Integrity and Transparency (EMIT)
Coral Energy Resources, L.P. (Coral)
Duke Energy Corporation (Duke)
Electric Power Supply Association (EPSA)
EnCana Marketing (USA) Inc. (EnCana)
FPL Group, Inc. (FPL Group)
Intercontinental Exchange, Inc. (ICE)

Merrill Lynch Capital Services, Inc. and Morgan Stanley Capital Group, Inc. (Merrill Lynch and Morgan Stanley) *
Mirant Americas Energy Marketing, LP (Mirant)
Missouri Public Service Commission (Missouri PSC)
National Association of State Utility Consumer Advocates (NASUCA)
National Energy Marketers Association (NEMA)
Natural Gas Supply Association (NGSA)
New Jersey Resources Corporation (NJR Companies)
Nicor Gas (Nicor)
NiSource, Inc. (NiSource)
Pacific Gas and Electric Company (PG&E)
Peoples Gas Light and Coke Company, North Shore Gas Company, and Peoples Energy Resources Corp. (Peoples)
Piedmont Natural Gas Co., Inc.
Platts
ProLiance Energy, LLC (ProLiance)
Public Service Electric and Gas Co., PSEG Power LLC and PSEG Energy Resources & Trade LLC (collectively, PSEG Companies)
Public Service Commission of the State of New York (PSCNY)
Public Utilities Commission of the State of California (CPUC)
Questar Energy Trading Company (Questar)
Reliant Energy Power Generation, Inc. and Reliant Energy Services, Inc. (Reliant)
Select Energy, Inc. (Select)
Sempra Energy (Sempra)
Shell Offshore Inc. (Shell Offshore)
TXU Portfolio Management Company LP (TXU)
USG Pipeline Company, B–R Pipeline Company, and United States Gypsum Company (USG)
Virginia Industrial Gas Users' Association (VIGUA)
Virginia Natural Gas, Inc.**
Western Gas Resources, Inc. (Western)

* Entities filing reply comments in addition to initial comments.
** Entity filing reply comments only.

Massey, Commissioner, *concurring in part:* The tariff conditions that the Commission approves today send a clear message to market-based rate sellers: Don't lie, don't manipulate market conditions, don't violate market rules and don't collude with others. For sellers who choose to behave otherwise, the Commission now has the tools to sanction such bad behavior and we give notice of what some of those sanctions could be. This action should help to restore the faith in energy markets that has been lost in the last few years.

There is one aspect of today's order, however, that I would have written differently. I would not limit the monetary penalty for tariff violations to disgorgement of unjust profits. Market manipulation can raise the market prices paid by all market participants and collected by all sellers. In such a case, the appropriate remedy may be that the manipulating seller makes the market whole. I would prefer to not take this or any monetary remedy off of the table, but instead to allow the Commission the flexibility to tailor the remedy to the circumstances of each case.

This one concern with today's order should not be interpreted, however, as diminishing in any way my enthusiastic support for this otherwise excellent order. I commend my colleagues for taking this important and much needed step.

For these reasons, I concur in part with today's order.

William L. Massey,
*Commissioner.*

Brownell, Commissioner, *concurring:*

1. We are adopting behavioral rules for market participants in the electric and natural gas markets. No one can question the good intention behind these behavioral rules. As I have stated before, if there are violations of our rules, regulations or policies, we must be willing to punish and correct. Concurrently, if there is misconduct by market participants that is intended to be anticompetitive, we must have the ability to remedy those market abuses.

2. Conversely, when we originally proposed behavioral rules, I had a number of concerns. I was concerned that the use of vague terms would create uncertainty and, thereby, undermine the good intentions of the rules. I feared that subsequent applications of the proposed behavior rules to real world actions could result in overly proscriptive "rules of the road" that will dampen business innovation and creative market strategies. The net effect would be less competition and the associated higher costs to consumers. I was concerned that we may be proposing a model that simply does not fit with the larger lessons we have learned in fostering competition over the past two decades, particularly in the gas market.

3. It is difficult to strike the right balance. I have carefully weighed the comments and believe the revisions and clarifications to the proposed behavioral rules achieve the appropriate balance. We clarify that these rules do not impose a "must offer" requirement. We revise the definition of manipulation to relate to actions that are "intended to or foreseeably could" manipulate markets. We add the exclusion that action taken at the direction of an RTO or ISO does not constitute manipulation.

4. Commenters also challenge the sufficiency of the term "legitimate business purpose" in distinguishing between prohibited and non-prohibited behavior. We clarify that transactions with economic substance, in which a seller offers or provides a service to a buyer where value is exchanged for value, are not prohibited behavior. Behavior driven by legitimate profit maximization or that serves important market functions is not manipulation. Moreover, I think it is important to recognize that scarcity pricing is the market response to a supply/demand imbalance that appropriately signals the need for infrastructure. For example, the high prices of 2000–2001 that reflected supply/demand fundamentals resulted in the first new power plants being constructed in California in ten years; price risk being hedged through the use of long-term contracting; and renewed efforts to correct a flawed market design.

5. We have also adopted measures that require accountability. A complaint must be brought to the Commission within 90 days after the calendar quarter that the manipulative action was alleged to have occurred. The 90-day time limit strikes an appropriate balance between providing sufficient opportunity to detect violations and the market's need for finality. The Order also places a similar time limit on Commission action. As a matter of prosecutorial policy, the Commission will only initiate a proceeding or investigation within 90 days from when we obtained notice of a potential violation through either a hotline call or communications with our enforcement staff.

6. While these rules are designed to provide adequate opportunity to detect, and the Commission to remedy, market abuses and are clearly defined so that they do not create uncertainty, disrupt competitive commodity markets or prove simply ineffective, competitive markets are dynamic. We need to periodically evaluate the impact of these rules on the electric and gas markets. We have directed our Office of Market Oversight and Investigation to evaluate the effectiveness and consequences of these behavioral rules on an annual basis and include their analysis in the State of the Market Report.

Nora Mead Brownell.

[FR Doc. 03–29300 Filed 11–25–03; 8:45 am]
BILLING CODE 6717–01–P

---

# DEPARTMENT OF TRANSPORTATION

## Federal Highway Administration

## Federal Transit Administration

## 23 CFR Part 476

**RIN 2125–AF00**

## Interstate Highway System

**AGENCIES:** Federal Highway Administration (FHWA) and Federal Transit Administration (FTA), DOT.

**ACTION:** Final rule.

---

**SUMMARY:** This final rule removes regulations that prescribed policies and procedures for implementation of section 103(e)(4) of title 23, United States Code, which permitted the withdrawal of Interstate System segments and the substitution of public mass transit or highway projects or both. The Congress recognized the expiration of this program by eliminating the underlying statutory authority for this regulation. Therefore, the Federal Highway Administration and the Federal Transit Administration remove the regulations.

**EFFECTIVE DATE:** November 26, 2003.

**FOR FURTHER INFORMATION CONTACT:** For FHWA: Donald J. West, Office of Program Administration, HIPA–10, (202) 366–4652, or Steve Rochlis, Office of the Chief Counsel, (202) 366–1395,

Federal Highway Administration, 400 Seventh Street, SW., Washington, DC 20590–0001. Office hours are from 7:45 a.m. to 4:15 p.m., e.t., Monday through Friday, except Federal holidays. For FTA: Rhoda Shorter, Office of Program Management, TPM–10, (202) 366–0206, and Scott Biehl, Office of the Chief Counsel, (202) 366–4063, 400 Seventh Street, SW., Washington, DC 20590–0001. Office hours for the FTA are 8:30 a.m. to 5 p.m., e.t., Monday through Friday, except Federal holidays.

**SUPPLEMENTARY INFORMATION:**

### Electronic Access

An electronic copy of this document may be downloaded by using a computer, modem and suitable communications software from the Government Printing Office's Electronic Bulletin Board Service at (202) 512–1661. Internet users may also reach the Office of the Federal Register's home page at: *http://www.archives.gov* and the Government Printing Office's Web page at: *http://www.access.gpo.gov/nara.*

### Background

In 1973, the Interstate System was about 83 percent complete; however, due to changed social, economic, and environmental conditions, many States realized it would be impracticable or unnecessary to construct some uncompleted segments of the Interstate, particularly in urbanized areas. But these States were reluctant to give up these segments for fear of losing substantial amounts of Federal-aid funds. Therefore, the Federal-Aid Highway Act of 1973 (Pub. L. 93–87, 87 Stat. 250, August 13, 1973), amended title 23, United States Code, by adding section 103(e)(4) to allow uncompleted or planned highways on the Interstate System in urbanized areas to be withdrawn and their funding entitlements to be transferred to mass transit projects. This became known as the "Interstate withdrawal and substitution program" (also known as the "Interstate Transfer program") and it provided States with the opportunity to request withdrawal of a non-essential segment of the Interstate System, and the substitution of transit projects to serve the area that would have been served by the withdrawn segment. As a result of this Act, the Federal Highway Administration together with the Federal Transit Administration (known as the Urban Mass Transit Administration at that time) promulgated 23 CFR Part 476, Interstate Highway System.[1] Subpart D of this

---

[1] *See* final rule published on June 12, 1974, at 39 FR 20658.

139 FERC ¶ 61,132
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

18 CFR Part 35

[Docket No. RM10-23-001; Order No. 1000-A]

Transmission Planning and Cost Allocation by Transmission
Owning and Operating Public Utilities

(Issued May 17, 2012)

AGENCY:  Federal Energy Regulatory Commission.

ACTION:  Order on Rehearing and Clarification

SUMMARY:  The Federal Energy Regulatory Commission affirms its basic

determinations in Order No. 1000, amending the transmission planning and cost

allocation requirements established in Order No. 890 to ensure that Commission-

jurisdictional services are provided at just and reasonable rates and on a basis that is just

and reasonable and not unduly discriminatory or preferential.  This order affirms the

Order No. 1000 transmission planning reforms that:  (1) require that each public utility

transmission provider participate in a regional transmission planning process that

produces a regional transmission plan; (2) provide that local and regional transmission

planning processes must provide an opportunity to identify and evaluate transmission

needs driven by public policy requirements established by state or federal laws or

regulations; (3) improve coordination between neighboring transmission planning regions

for new interregional transmission facilities; and (4) remove from Commission-approved

tariffs and agreements a federal right of first refusal.  This order also affirms the Order

ADD-26

No. 1000 requirements that each public utility transmission provider must participate in a regional transmission planning process that has: (1) a regional cost allocation method for the cost of new transmission facilities selected in a regional transmission plan for purposes of cost allocation and (2) an interregional cost allocation method for the cost of new transmission facilities that are located in two neighboring transmission planning regions and are jointly evaluated by the two regions in the interregional transmission coordination process required by this Final Rule. Additionally, this order affirms the Order No. 1000 requirement that each cost allocation method must satisfy six cost allocation principles.

<u>FOR FURTHER INFORMATION CONTACT</u>:

John Cohen
Federal Energy Regulatory Commission
Office of the General Counsel
888 First Street, NE
Washington, DC 20426
(202) 502-8705

Shiv Mani
Federal Energy Regulatory Commission
Office of Energy Policy and Innovation
888 First Street, NE
Washington, DC 20426
(202) 502-8240

<u>SUPPLEMENTARY INFORMATION</u>:

139 FERC ¶ 61,132
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Jon Wellinghoff, Chairman;
Philip D. Moeller, John R. Norris,
and Cheryl A. LaFleur.

| | | |
|---|---|---|
| Transmission Planning and Cost Allocation by | Docket No. | RM10-23-001 |
| Transmission Owning and Operating Public Utilities | | |

ORDER NO. 1000-A

ORDER ON REHEARING AND CLARIFICATION

(Issued May 17, 2012)

## TABLE OF CONTENTS

Paragraph Numbers

I. Introduction ................................................................................................. 1.

II. The Need for Reform ................................................................................. 4.
  A. Final Rule ............................................................................................. 4.
  B. Requests for Rehearing and Clarification ......................................... 13.
    1. Arguments Regarding Whether the Commission Provided Substantial Evidence
    for the Transmission Planning and Cost Allocation Reforms ....................... 13.
  C. Commission Determination ................................................................. 50.

III. Transmission Planning ........................................................................... 102.
  A. Regional Transmission Planning Process ......................................... 102.
    1. Legal Authority for Order No. 1000's Transmission Planning Reforms ... 103.
      a. Final Rule ..................................................................................... 103.
      b. Order No. 1000's Interpretation of FPA Section 202(a) ...................... 108.
        i. Requests for Rehearing and Clarification.................................... 108.
        ii. Commission Determination ......................................................... 121.
      c. Role of FPA Section 217(b)(4)............................................................ 159.
        i. Requests for Rehearing and Clarification.................................... 159.
        ii. Commission Determination ......................................................... 168.

ADD-28

    d.  Effect on Integrated Resource Planning and State Authority Over
Transmission Siting, Permitting, and Construction ................................................180.
       i.  Requests for Rehearing and Clarification ........................................180.
       ii.  Commission Determination ................................................................186.
    e.  Legal Authority Related to Consideration of Transmission Needs Driven by
Public Policy Requirements ...................................................................................195.
       i.  Requests for Rehearing and Clarification ........................................195.
       ii.  Commission Determination ................................................................203.
    f.  Legal Issues Related to Order No. 1000's Interregional Transmission
Coordination Reforms ............................................................................................217.
       i.  Requests for Rehearing and Clarification ........................................217.
       ii.  Commission Determination ................................................................222.
    g.  Other Legal Issues Related to Regional Transmission Planning Requirements......228.
       i.  Requests for Rehearing and Clarification ........................................228.
       ii.  Commission Determination ................................................................230.
  2.  Regional Transmission Planning Requirements .........................................232.
    a.  Final Rule .............................................................................................232.
    b.  Requests for Rehearing and Clarification ............................................235.
    c.  Commission Determination ..................................................................263.
  3.  Consideration of Transmission Needs Driven by Public Policy Requirements...........302.
    a.  Final Rule .............................................................................................302.
    b.  Requests for Rehearing and Clarification ............................................304.
    c.  Commission Determination ..................................................................317.
B.  Nonincumbent Transmission Developers ........................................................340.
  1.  Legal Authority ...........................................................................................341.
    a.  Final Rule .............................................................................................341.
    b.  Requests for Rehearing and Clarification ............................................345.
       i.  Arguments That the Commission Does Not Have the Authority To
Eliminate a Federal Right of First Refusal ..........................................................345.
         (a)  Commission Determination ..................................................357.
       ii.  Arguments That the Commission Is Inappropriately Regulating the
Construction of Transmission .................................................................................371.
         (a)  Commission Determination ..................................................377.
       iii.  Arguments That the Commission Must Meet the Mobile-Sierra Public
Interest Standard Before Requiring Federal Rights of First Refusal To Be
Removed From Agreements .....................................................................................383.
         (a)  Commission Determination ..................................................388.
  2.  Requirement To Remove a Federal Right of First Refusal from Commission-
Jurisdictional Tariffs and Agreements, and Limits on the Applicability of That
Requirement...............................................................................................................392.

ADD-29

     a. Final Rule ................................................................................................[392.](#)
     b. Requests for Rehearing and Clarification ............................................[395.](#)
     c. Commission Determination..................................................................[415.](#)
  3. Framework To Evaluate Transmission Projects Submitted for Selection in the
  Regional Plan for Purposes of Cost Allocation..........................................[431.](#)
     a. Qualification Criteria To Submit a Transmission Project for Selection in the
     Regional Transmission Plan for Purposes of Cost Allocation....................[432.](#)
       i. Final Rule..................................................................................[432.](#)
       ii. Requests for Rehearing and Clarification................................[433.](#)
       iii. Commission Determination......................................................[439.](#)
     b. Evaluation of Proposals for Selection in the Regional Transmission Plan for
     Purposes of Cost Allocation....................................................................[445.](#)
       i. Final Rule..................................................................................[445.](#)
       ii. Requests for Rehearing and Clarification................................[446.](#)
       iii. Commission Determination......................................................[452.](#)
     c. Reevaluation of Regional Transmission Plans When There Is a Project Delay
     and Reliability Compliance Obligations of Transmission Developers ......................[457.](#)
       i. Final Rule..................................................................................[457.](#)
       ii. Requests for Rehearing and Clarification................................[460.](#)
       iii. Commission Determination ......................................................[477.](#)
     d. Recovery of Abandoned Plant Costs and Backstop Authority .............................[484.](#)
       i. Final Rule..................................................................................[484.](#)
       ii. Requests for Rehearing......................................................[485.](#)
       iii. Commission Determination ......................................................[489.](#)
C. Interregional Transmission Coordination ........................................................[493.](#)
  1. Interregional Transmission Coordination Requirements ...........................[493.](#)
     a. Interregional Transmission Coordination Procedures and Geographical Scope......[493.](#)
       i. Final Rule..................................................................................[493.](#)
       ii. Requests for Rehearing and Clarification................................[495.](#)
       iii. Commission Determination ......................................................[500.](#)
  2. Implementation of the Interregional Transmission Coordination Requirements.........[506.](#)
     a. Procedure for Joint Evaluation ...........................................................[506.](#)
       i. Final Rule..................................................................................[506.](#)
       ii. Requests for Rehearing and Clarification................................[507.](#)
       iii. Commission Determination ......................................................[509.](#)
     b. Stakeholder Participation ....................................................................[513.](#)
       i. Final Rule..................................................................................[513.](#)
       ii. Requests for Rehearing and Clarification................................[514.](#)
       iii. Commission Determination ......................................................[518.](#)

IV. Cost Allocation.................................................................................................[523.](#)

A. Legal Authority for Cost Allocation Reforms ............................................. 525.
    1. Final Rule ......................................................................................... 525.
    2. Requests for Rehearing or Clarification ........................................... 530.
        a. Petitioners' Arguments That The FPA Requires a Contract before Costs Are
        Allocated .......................................................................................... 530.
        b. Arguments That Order No. 1000's Cost Allocation Reforms Are Inconsistent
        With the Cost Causation Principle .................................................... 548.
        c. Arguments That The Commission Did Not Show That Existing Rates Are
        Unjust and Unreasonable ................................................................. 551.
    3. Commission Determination ............................................................... 555.
B. Cost Allocation Method for Regional Transmission Facilities...................... 593.
    1. Final Rule ......................................................................................... 593.
    2. Requests for Rehearing and Clarification ......................................... 597.
    3. Commission Determination ............................................................... 613.
C. Cost Allocation Method for Interregional Transmission Facilities................ 626.
    1. Final Rule ......................................................................................... 626.
    2. Requests for Rehearing or Clarification............................................ 631.
    3. Commission Determination ............................................................... 634.
D. Principles for Regional and Interregional Cost Allocation .......................... 638.
    1. Use of a Principles-Based Approach ................................................ 638.
        a. Arguments That Principles-Based Cost Allocation Methods Are Unfair and
        Arguments Related to Commission Determination of Cost Allocation Method
        Pursuant to the Compliance Process................................................ 640.
            i. Commission Determination ....................................................... 647.
    2. Cost Allocation Principle 1—costs allocated in a way that is roughly
    commensurate with benefits ................................................................. 654.
        a. Requests for Rehearing or Clarification......................................... 658.
            i. Commission Determination ....................................................... 674.
    3. Cost Allocation Principle 2—no involuntary allocation of costs to non-
    beneficiaries ......................................................................................... 684.
        a. Final Rule ..................................................................................... 684.
        b. Requests for Rehearing or Clarification ......................................... 686.
        c. Commission Determination ........................................................... 689.
    4. Cost Allocation Principle 3—benefit to cost threshold ratio ............... 692.
        a. Final Rule ..................................................................................... 692.
        b. Request for Rehearing or Clarification ........................................... 694.
        c. Commission Determination ........................................................... 695.
    5. Cost Allocation Principle 4—allocation to be solely within transmission
    planning region(s) unless those outside voluntarily assume costs ................. 696.
        a. Final Rule ..................................................................................... 696.

      b.  Requests for Rehearing or Clarification ............................................... 697.
      c.  Commission Determination ............................................................... 707.
   6.  Whether To Establish Other Cost Allocation Principles ......................... 715.
      a.  Final Rule ...................................................................................... 715.
      b.  Requests for Rehearing ................................................................... 716.
      c.  Commission Determination ............................................................... 717.
  E.  Application of Cost Allocation Principles .................................................. 718.
   1.  Participant Funding ................................................................................ 718.
      a.  Final Rule ...................................................................................... 718.
      b.  Requests for Rehearing or Clarification ........................................... 719.
      c.  Commission Determination ............................................................... 726.
  F.  Other Cost Allocation Issues .................................................................. 738.
   1.  Final Rule ............................................................................................. 738.
   2.  Requests for Rehearing or Clarification .................................................. 739.
   3.  Commission Determination ..................................................................... 745.

V.  Compliance and Reciprocity ......................................................................... 748.
  A.  Compliance ............................................................................................ 748.
   1.Final Rule .............................................................................................. 748.
   2.Requests for Rehearing or Clarification ................................................... 749.
   3.Commission Determination ...................................................................... 751.
  B.  Reciprocity ............................................................................................ 754.
   1.  Final Rule ............................................................................................. 754.
   2.  Requests for Rehearing or Clarification .................................................. 755.
   3.  Commission Determination ..................................................................... 771.

VI.  Information Collection Statement ................................................................. 779.

VII.  Document Availability ................................................................................ 784.

VIII.  Effective Date and Congressional Notification............................................ 787.

Appendix A:  Abbreviated Names of Petitioners
Appendix B:  *Pro Forma* Open Access Transmission Tariff Attachment K

I.     **Introduction**

1.     In Order No. 1000, the Commission amended the transmission planning and cost

allocation requirements established in Order No. 890 to ensure that Commission-

jurisdictional services are provided at just and reasonable rates and on a basis that is just

and reasonable and not unduly discriminatory or preferential.  Order No. 1000's

transmission planning reforms require:  (1) each public utility transmission provider to

participate in a regional transmission planning process that produces a regional

transmission plan; (2) that local and regional transmission planning processes must

provide an opportunity to identify and evaluate transmission needs driven by public

policy requirements established by state or federal laws or regulations; (3) improved

coordination between neighboring transmission planning regions for new interregional

transmission facilities; and (4) the removal from Commission-approved tariffs and

agreements of a federal right of first refusal.

2.     Order No. 1000 also requires that each public utility transmission provider must

participate in a regional transmission planning process that has:  (1) a regional cost

allocation method for the cost of new transmission facilities selected in a regional

transmission plan for purposes of cost allocation and (2) an interregional cost allocation

method for the cost of new transmission facilities that are located in two neighboring

transmission planning regions and are jointly evaluated by the two regions in the

interregional transmission coordination process required by this Final Rule.  Order No.

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

1000 also requires that each cost allocation method must satisfy six cost allocation principles.

3.      Taken together, the reforms adopted in Order No. 1000 will ensure that Commission-jurisdictional services are provided at just and reasonable rates and on a basis that is just and reasonable and not unduly discriminatory or preferential.  The Commission therefore rejects requests to eliminate, or substantially modify, the various reforms adopted in Order No. 1000; however, we do make a number of clarifications.[1] We address each of the arguments made by petitioners in turn.[2]

---

[1] No changes are being made to the regulatory text previously adopted, because any reference to Order No. 1000 (as well as to Order Nos. 888 and 890) in the existing regulatory text is meant to include any clarifications or changes made in subsequent orders on rehearing or clarification (e.g., Order Nos. 888-A, 890-A, and the instant Order No. 1000-A, etc.).  The Commission has chosen this convention to help promote readability of the regulatory text.

[2] A list of petitioners filing requests for rehearing and/or clarification is provided in Appendix A.  An untimely request for rehearing was filed by the New Jersey Board of Public Utilities (New Jersey BPU).  Pursuant to section 313(a) of the Federal Power Act (FPA), 16 USC 8251(a) (2006), an aggrieved party must file a request for rehearing within thirty days after the issuance of the Commission's order.  Because the 30-day rehearing deadline is statutory, it cannot be extended, and New Jersey BPU's request for rehearing must be rejected as untimely.  Moreover, the courts have repeatedly recognized that the time period within which a party may file an application for rehearing of a Commission order is statutorily established at 30 days by section 313(a) of the FPA and that the Commission has no discretion to extend that deadline.  *See, e.g., City of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir. 1985); *Boston Gas Co. v. FERC*, 575 F.2d 975, 977-79 (1st Cir. 1978).

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

others from constructing and owning new transmission facilities in that region.[377]  The

Commission stated that, while implementing these reforms may change the package of

benefits and burdens in place for transmission owning members of RTOs/ISOs, such

changes are necessary to correct practices that may be leading to unjust and unreasonable

rates.[378]

344.    Finally, the Commission declined to address the merits of comments arguing that

section 3.09 of the ISO New England Transmission Operating Agreement establishes a

federal right of first refusal that can be modified only if the Commission meets the

*Mobile-Sierra* public interest standard, explaining that it was more appropriate to address

this issue as part of the proceeding on ISO New England's compliance filing.[379]

> **b.** **Requests for Rehearing and Clarification**
>
> > **i.** **Arguments That the Commission Does Not Have the Authority To Eliminate a Federal Right of First Refusal**

345.    Several petitioners argue that the Commission acted outside of its authority by

requiring the removal of the federal right of first refusal from Commission-jurisdictional

---

[377] *Id.* P 261.

[378] *Id.*

[379] *Id.* P 292.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

tariffs and agreements.[380]  Some petitioners assert that section 206 only extends to

behavior that directly affects rates or the provision of jurisdictional service rather than to

any term in a jurisdictional tariff or agreement.[381]  They argue the federal right of first

refusal is not a practice within the meaning of section 206, and therefore is not a behavior

that the Commission can address under that section.[382]  Similarly, Oklahoma Gas and

Electric Company states that the Commission must show a direct and significant effect on

jurisdictional rates before it can regulate actions indirectly affecting activity falling under

state jurisdiction.

346.    Petitioners also analogize the Commission's action in Order No. 1000 with its

failed attempt to regulate corporate governance and structure, which was at issue in

*CAISO v. FERC*.[383]  Petitioners argue that the federal right of first refusal affects a

---

[380] *See, e.g.*, FirstEnergy Service Company; Baltimore Gas & Electric; Southern Companies; Ad Hoc Coalition of Southeastern Utilities; and Sponsoring PJM Transmission Owners.

[381] *See, e.g.*, FirstEnergy Service Company; Sponsoring PJM Transmission Owners; Baltimore Gas & Electric; and Oklahoma Gas and Electric Company.

[382] *See, e.g.*, Southern Companies; Sponsoring PJM Transmission Owners ; Baltimore Gas & Electric; and Oklahoma Gas and Electric Company.

[383] Sponsoring PJM Transmission Owners at 5-6 (citing *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 403 (D.C. Cir. 2004) (*CAISO v. FERC*)); Southern Companies at 60-61 (citing *CAISO v. FERC*, 372 F.3d 395); PSEG Companies; Baltimore Gas & Electric (citing *CAISO v. FERC*, 372 F.3d at 403; *City of Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985)); Oklahoma Gas and Electric Company at 9-10 (*CAISO v. FERC*, 372 F.3d at 403).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

transmission provider's financial relationship with its customers no more than the D.C.

Circuit found governance to in *CAISO v. FERC*.[384]  According to Baltimore Gas &

Electric, the court in *CAISO v. FERC* explained that the Commission cannot regulate

"practices" using its section 206 ratemaking authority unless the practices "affect rates

and services significantly…are realistically susceptible of specification, and…are not so

generally understood in any contractual arrangement as to render recitations

superfluous."[385]  Sponsoring PJM Transmission Owners also note that the *CAISO* court

explained that a more expansive interpretation of "practice" would allow the Commission

to regulate a range of subjects that the court considered to be plainly beyond the

Commission's proper authority.  Sponsoring PJM Transmission Owners add that, while

the costs the transmission provider incurs to construct or procure an upgrade will be

reflected in its rates, the same could be said of a myriad of other decisions the

transmission provider makes, ranging from its hiring of staff to the procurement of

outside services and materials.  Southern Companies also analogize Order No. 1000 to

*CAISO v. FERC*, arguing that the Commission, without evidence or a record of systemic

abuse or actual discrimination or unreasonable decision making, is using sections 205 and

---

[384] Southern Companies at 60-61 (citing *CAISO v. FERC,* 372 F.3d 395); Sponsoring PJM Transmission Owners at 7 (citing *CAISO v. FERC,* 372 F.3d at 403 (quoting *Mich. Wisc. Pipeline Co.,* 34 FPC ¶ 621,626 (1965))).

[385] Baltimore Gas & Electric at 12 (quoting *CAISO v. FERC,* 372 F.3d at 403).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

206 and a theoretical threat of unjust and unreasonable rates or discrimination in the provision of transmission service to replace the existing business investment decision process with its own.[386]

347.    Sponsoring PJM Transmission Owners also point out that the court in *CAISO v. FERC* found that section 305 of the FPA, giving the Commission authority over interlocking directorates, would not have been necessary if it intended that the Commission could regulate corporate governance as a practice affecting rates under sections 205 and 206 of the FPA.  They contend that this same reasoning leads to the conclusion that section 206 does not encompass the assignment of construction responsibility.  Sponsoring PJM Transmission Owners argue that this is clear in looking at the relationship of section 7 of the NGA to sections 4 and 5 of the NGA, which parallel sections 205 and 206 of the FPA.  They assert that section 7 of the NGA, giving the Commission the authority to regulate pipeline construction, would not have been necessary if sections 4 and 5 of the NGA (which parallel sections 205 and 206 of the FPA) already allowed the Commission to regulate such construction.[387]  In addition,

---

[386] Southern Companies at 103-104 (citing *CAISO v. FERC*, 372 F.2d at 395).

[387] Sponsoring PJM Transmission Owners.  Similarly, Sponsoring PJM Transmission Owners assert that section 402 of the Transportation Act of 1920 (superseded by 49 U.S.C. 10901 (2010)), which provided the Interstate Commerce Commission with approval authority for railway extensions, would not have been necessary if practices affecting rates included construction decisions.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

Sponsoring PJM Transmission Owners state that it is significant that, when deliberating on the FPA, Congress rejected provisions that would have given the Commission authority to order a utility to fix the services, equipment, or facilities it is responsible for maintaining upon determining they were improperly maintained.[388]

348.    Sponsoring PJM Transmission Owners also analogize the right of first refusal to *Interstate Commerce Commission v. Pennsylvania*.[389]  They contend that the court in *CAISO v. FERC* looked to this case because the court in *Interstate Commerce Commission v. Pennsylvania* interpreted the Interstate Commerce Act upon which Part II of the FPA is based and which likewise authorized the regulation of practices affecting rates.[390]  Sponsoring PJM Transmission Owners assert the court in *Interstate Commerce Commission v. Pennsylvania* made clear that it was manifestly concerned about practices

---

[388] Sponsoring PJM Transmission Owners at 11 (citing *Duke Power Co. v. Fed. Power Comm'n,* 401 F.2d 930, 943 n.106 (D.C. Cir. 1968)).  They add that, although the statutory interpretations of later Congresses is not determinative of the statutory intent of an earlier Congress, it is informative that when Congress granted backstop siting authority to the Commission in the Energy Policy Act of 2005, it established clear limits that constrain the exercise of that authority.  *Id.* (citing 16 U.S.C. 824p (2010); *Piedmont Envtl. Council v. FERC*, 558 F.3d 304 (4th Cir. 2009). They also state that section 1211 of the EPAct 2005 expressly states that the new electric reliability provisions do not authorize the Commission to order the construction of additional transmission facilities. *Id.* (referencing 16 U.S.C. 824o(i)(2)).

[389] Sponsoring PJM Transmission Owners at 9-10 (citing *Interstate Commerce Commission v. Pennsylvania*, 242 U.S. 208 (1916) (*ICC v. Pennsylvania*)).

[390] Sponsoring PJM Transmission Owners at 9-10 (citing *ICC v. Pennsylvania*, 242 U.S. 208)).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

that directly related to the jurisdictional service provided customers (which was rail service), rather than the railroads' decisions regarding the means to provide such service.[391]

349.   Instead of finding that any rate is unjust and unreasonable, Baltimore Gas & Electric argues that the Commission states that there may be a superior alternative practice to the present federal right of first refusal regime.  Baltimore Gas & Electric asserts that this is contrary to well-settled law, which requires that if the existing method is just and reasonable, then that is the end of the section 206 inquiry even if an alternative method may be better.[392]  Baltimore Gas & Electric asserts that the Commission violated this ratemaking precept by conflating its consideration of the federal right of first refusal mechanism for designating new transmission construction and operation responsibility with its consideration of an alternative selection process that the Commission prefers.

350.   PSEG Companies assert that elimination of the federal right of first refusal was arbitrary and capricious because the "remedy" far exceeded the purported harm.  Similarly, Baltimore Gas & Electric asserts that proportionality between the identified

---

[391] Sponsoring PJM Transmission Owners at 9-10 & n.20 (citing *ICC v. Pennsylvania*, 242 U.S. 208; *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

[392] Baltimore Gas & Electric at 10-11 (citing *Complex Consol. Edison Co. of N.Y. v. FERC*, 165 F.3d 992, 1003 (D.C. Cir. 1999); *Pub. Serv. Comm'n of N.Y. v. FERC*, 642 F.2d 1335 (D.C. Cir. 1980) *cert. denied*, 454 U.S. 879 (1981); *Kern River Gas Transmission Co.*, Opinion No. 486-E, 136 FERC ¶ 61,045 (2011)).

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

problem and the remedy "is the key," and that if the Commission found isolated problems, a market-wide remedy would be inappropriate.[393]  Similarly, Baltimore Gas & Electric asserts that the Commission must adduce hard facts, and that the remedy should be narrowly tailored to fit the facts.

351.    With regard to the Commission's determination that the existence of a federal right of first refusal creates an opportunity for undue discrimination and preferential treatment against nonincumbent transmission developers, several petitioners argue that the Commission cannot rely on the FPA's undue discrimination provisions in sections 205 and 206 because these provisions only protect customers of public utilities, and not nonincumbent transmission developers.[394]  They argue that had Congress intended to

---

[393] PSEG Companies at 33 (quoting *Public Utils. Comm'n of the State of Cal. v. FERC*, 462 F.3d 1027, 1054 (9th Cir. 2006)).

[394] *See, e.g.*, Southern Companies at 62 (citing *Pub. Serv. Co. of Ind., Inc. v. FERC,* 575 F.2d 1204, 1213 (7th Cir. 1978); *see St. Michaels Util. Comm'n v. FPC*, 377 f.2d 912, 915 (4th Cir. 1967)); Sponsoring PJM Transmission Owners at 12 (citing *Maine Pub. Serv. Co. v. FPC*, 579 F.2d 659, 664 (1st Cir. 1978)); *see also, e.g., FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 355 (1956); *Mun. Light Bds. v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971); Baltimore Gas & Electric; Large Public Power Council; Ad Hoc Coalition of Southeastern Utilities at 59 (citing *Pub. Serv. Co. of Ind.. v. FERC*, 575 F.2d 1203, 1213 (7th Cir. 1978); *St. Michaels util. Comm'n v. FPC*, 377 F.2d 912, 915 (4th Cir. 1967); *City of Frankfort, Ind. v. FERC*, 678 F.2d 699, 707 (7th Cir. 1982) (*Frankfort v. FERC*); *Towns of Alexandria, Minn. V. FPC*, 555 F.2d 1020, 1028 (D.C. Cir. 1977)); Oklahoma Gas and Electric Company at 7-8 (citing *St. Michaels Util. Comm'n v. FPC*, 377 F.2d at 915; *Pub. Serv. Co. of Ind., Inc. v. FERC*, 575 F.2d at 1212 (stating that the intent of the statute's undue discrimination protections "is to protect consumers from being placed at a competitive disadvantage with other [similar customers]"); *Frankfort v.*

(continued...)

grant the Commission such authority, it would have done so.[395]  Large Public Power

Council and Ad Hoc Coalition of Southeastern Utilities note that the court, in the *City of*

*Frankfort*, stated that section 205 provisions "regarding unlawful preference or advantage

in setting of public utility rates requires that utility customers be treated fairly."[396]  They

also cite *Public Service Co. of Ind.* where the court stated that "the anti-discrimination

policy in section 205(b) is violated … where one consumer has its rates raised

significantly above what other similarly-situated customers are paying."[397]  Oklahoma

Gas & Electric Company contends that neither of the cases the Commission cites support

a different conclusion, claiming that, in *Gulf States*, the Commission addressed the

narrow question of whether public utilities could "employ tariff provisions to foreclose

wholesale competition,"[398] and that in *Otter Tail*, the Supreme Court held that the FPA

---

*FERC,* 678 F.2d at 707 ; *Towns of Alexandria, Minn. v. FPC*, 555 F.2d 1020, 1028 (D.C. Cir. 1977)).

[395] Oklahoma Gas & Electric at 6 (citing *Dunk v. Penn. Pub. Util. Comm'n*, 252 A.2d 589, 591-92 (Pa. 1969)).  It also contrasts the absence of such language in the FPA with the Natural Gas Act and Part I of the FPA (addressing hydroelectric facilities).

[396] Ad Hoc Coalition of Southeastern Utilities at 59 (quoting *Frankfort v. FERC*, 678 F.2d at 704); Large Public Power Council at 32 (quoting *Frankfort v. FERC*, 678 F.2d at 707).

[397] *See, e.g.*, Ad Hoc Coalition of Southeastern Utilities at 59-60 (quoting *Pub. Serv. Co. of Ind. v. FERC*, 575 F.2d at 1213); Large Public Power Council at 32 (quoting *Pub. Serv. Co. of Ind., Inc. v. FERC*, 575 F.2d at 1213).

[398] *Gulf States Utils. Co.*, 5 FERC ¶ 61,066 at 61,098 (1978).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

was not intended "to be a substitute for, or to immunize Otter Tail from, antitrust

regulation."[399]

352.    Petitioners also argue that the Commission lacks the authority to remedy all

instances of undue discrimination, and only is responsible for promoting competition if

anticompetitive behavior has a direct effect on rates.[400]  In support, Sponsoring PJM

Transmission Owners argue that *CAISO v. FERC* demonstrates that the Commission

could not remedy a discriminatory governance structure of an independent system

operator, and that the Supreme Court has held that the Commission does not have the

authority to remedy racial discrimination in a utility's hiring practices.[401]  Furthermore,

Sponsoring PJM Transmission Owners argue that the Commission cannot rely on the

court's affirmation of Order Nos. 436[402] and 888[403] as support for its asserted authority to

---

[399] *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374-75 (1973) (*Otter Tail v. U.S.*).

[400] Sponsoring PJM Transmission Owners at 14; Ad Hoc Coalition of Southeastern Utilities at n.176 (citing *Entergy Services Inc.*, 64 FERC ¶ 61,001 at ¶ 61,013, n.66 (1993); *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104, 115-117 (1976)).

[401] Sponsoring PJM Transmission Owners at 12 (citing *CAISO. v. FERC*, 372 F.3d 400; *NAACP v. FPC*, 425 U.S. 662 (1976)).

[402] *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, FERC Stats. & Regs. ¶ 30,665, at 31,502 (1985).

[403] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. and Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996), *order on*

(continued…)

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

remedy any and all discrimination.  Furthermore, Sponsoring PJM Transmission Owners, similar to Oklahoma Gas & Electric, assert that the court in *Otter Tail Power Co. v. United States* concluded that the Commission lacked the authority to compel interconnection based on antitrust considerations alone.[404]  Sponsoring PJM Transmission Owners also argue that *Gulf States Utilities Co.*,[405] cited by the Commission, did not assert responsibility to promote competition in the abstract.  Sponsoring PJM Transmission Owners assert that this lack of authority to act solely on antitrust considerations, in the absence of an impact on jurisdictional services, contrasts with the Commission's authority to compel open access as a remedy for undue discrimination in transmission access, a jurisdictional service.[406]

353.   Several petitioners contend that even if the Commission had the authority to address discrimination against nonincumbents, no undue discrimination against

---

*reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002)).

[404] Sponsoring PJM Transmission Owners at 14 (citing 410 U.S. 366 (1973)).

[405] *Gulf States Util. Co.*, 5 FERC ¶ 61,066 at 61,098.

[406] Sponsoring PJM Transmission Owners at 15 (citing *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000)).

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

nonincumbents exists for the Commission to remedy under section 206.[407]  Instead, some

petitioners argue that Order No. 1000 institutionalizes undue discrimination against

incumbent transmission owners in violation of the FPA and APA because it mandates

similar treatment for incumbent transmission owners and nonincumbent transmission

developers when they are not similarly situated.[408]  In support, petitioners argue that the

Commission failed to consider evidence of the full scope of risks faced by incumbent

utilities.[409]  For instance, several petitioners argue that incumbents have an obligation to

serve customers and must comply with state legal and regulatory requirements, while

nonincumbents are free to pick and choose among transmission investment options.[410]

Others argue that incumbents are obligated to build under RTO contracts.[411]

354.    Some petitioners also argue that it is unclear whether nonincumbent developers

will have the same responsibilities as incumbent developers when operating their

facilities.  For instance, petitioners question whether there is a practical enforcement

---

[407] *See e.g.*, Ameren; PSEG Companies; and MISO Transmission Owners Group.

[408] *See, e.g.*, MISO Transmission Owners Group 2; and Ameren.

[409] *See, e.g.*, Ameren; Southern Companies; and MISO Transmission Owners Group 2.

[410] *See, e.g.*, Ameren; PSEG Companies; MISO Transmission Owners Group; and Southern Companies.

[411] *See, e.g.*, MISO Transmission Owners Group 2; and PSEG Companies.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

mechanism to ensure that a nonincumbent developer will build its transmission facility and then safeguard it from threats, such as cyber attacks.[412]  Transmission Dependent Utility Systems argue that even if the nonincumbent developer were to be assessed penalties for reliability violations, NERC penalties may be insufficient for a merchant transmission developer that, in the absence of a franchised service territory obligation, may walk away from its contractual commitments or become financially unable to meet them.

355.    In related arguments, some petitioners disagree with the Commission's conclusion that the federal right of first refusal is not dependent on an obligation to build.[413]  They argue that the obligation to build under an RTO or ISO is not an "option," but rather imposes a duty of diligence in fulfilling construction obligations.  Baltimore Gas & Electric argues that the Commission has misconstrued what a federal right of first refusal is, which it argues is another way of saying that it has a right of notification from PJM whenever PJM determines that transmission needs to be built in Baltimore Gas & Electric's service area since Baltimore Gas & Electric is required to build it.  Baltimore Gas & Electric argues that the Commission's ruling on this issue is invalid because the

---

[412] *See, e.g.*, Baltimore Gas & Electric; and Transmission Dependent Utility Systems.

[413] *See, e.g.*, Baltimore Gas & Electric; and MISO.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

Commission failed to appreciate what a federal right of first refusal is. MISO states that since it does not own any transmission facilities, it needs to rely on the transmission owners' obligation to build under the Transmission Owners Agreement to ensure MISO's ability to fulfill its transmission planning and expansion responsibilities as an RTO. MISO states that its membership could be significantly eroded and its existence could be jeopardized, as well as its rate significantly affected, if the Commission were to modify this fundamental element of MISO's structure as an RTO.

356.   PSEG Companies contend that the elimination of the federal right of first refusal is a taking in violation of the Fifth Amendment to the U.S. Constitution because it renders meaningless the contractually-based consideration transmission owners received when they transferred control of their transmission facilities to ISOs/RTOs. They note that takings may not only be regulatory in nature but could include contractual takings.[414] According to PSEG Companies, language in the PJM Transmission Owners Agreement created the reasonable investment-backed expectation among incumbent transmission owners that they could participate in an RTO arrangement and commit to build everything needed for reliability purposes while still preserving fundamental rights, such as the right to build in their respective zones. PSEG Companies conclude that the

---

[414] PSEG Companies at 36 (citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 332 (2002); *Armstrong v. United Sates*, 364 U.S. 40, 49 (1960)).

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

Commission's impairment of this contractual right of first refusal creates unspecified

economic injuries that, without just compensation, violate the U.S. Constitution.

(a)    <strong><u>Commission Determination</u></strong>

357.    We affirm the decision in Order No. 1000 that the Commission has the legal

authority under section 206 of the FPA to require the elimination of federal rights of first

refusal as practices that have the potential to lead to Commission-jurisdictional rates that

are unjust and unreasonable or unduly discriminatory or preferential.[415]    At the outset, it

is important to emphasize the scope of the Commission's requirement to eliminate federal

rights of first refusal.  In Order No. 1000, the Commission required public utility

transmission providers to remove from Commission-jurisdictional tariffs and agreements

provisions that grant a federal right of first refusal to construct transmission facilities

selected in a regional transmission plan for purposes of cost allocation.[416]  The

Commission did not, however, require public utility transmission providers to remove a

federal right of first refusal for local transmission facilities or upgrades to an incumbent

transmission provider's own transmission facilities, and did not alter an incumbent

transmission provider's use and control of an existing right of way.[417]

---

[415] Order No. 1000, FERC Stats. & Regs. ¶ 31,323 at P 284.

[416] *Id.* P 226.

[417] *Id.*

ADD-48

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

358.   We affirm the decision in Order No. 1000 that a federal right of first refusal is a

practice that falls squarely within the interpretation of a practice affecting rates.[418]  To

this end, contrary to the argument of some petitioners, the Commission affirms that the

*CAISO v. FERC* decision supports the Commission's position.  As discussed in Order No.

1000, the court in *CAISO v. FERC* explained that the Commission is empowered under

section 206 to assess practices that directly affect or are closely related to a public utility's

rates and "not all those remote things beyond the rate structure that might in some sense

indirectly or ultimately do so."[419]  As explained in Order No. 1000, we meet this standard

because here we are focused on the effect that federal rights of first refusal in

Commission-approved tariffs and agreements have on competition and in turn the rates

for jurisdictional transmission services.  For example, as the Commission explained in

Order No. 1000, the selection of transmission facilities in a regional transmission plan for

purposes of cost allocation is directly related to costs that will be allocated to

jurisdictional ratepayers.[420]  The ability of an incumbent transmission provider to

discourage or preclude participation of new transmission developers through

discriminatory rules in a regional transmission planning process, and in particular, the

---

[418] *Id.* P 285.

[419] *CAISO v. FERC*, 372 F.3d at 403.

[420] Order No. 1000, FERC Stats. & Regs. ¶ 31,323 at P 289.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

inclusion of a federal right of first refusal, can have the effect of limiting the

identification and evaluation of potential solutions to regional transmission needs.[421]

This in turn can directly increase the cost of new transmission development that is

recovered from jurisdictional customers through rates.[422]

359.     Sponsoring PJM Transmission Owners argue that section 7 of the NGA, which

gives the Commission authority to regulate pipeline construction, demonstrates that had

Congress desired to give the Commission authority over construction of transmission

lines it would have done so.  However, Sponsoring PJM Transmission Owners

misconstrue the Commission's actions in Order No. 1000.  As the Commission explicitly

stated in Order No. 1000, it is not regulating construction of new transmission facilities

because that is a matter reserved to the states.[423]  Instead, the Commission acted under its

legal authority in section 206 to require the elimination of provisions in federally-

regulated tariffs establishing practices in the regional transmission planning process that

affect rates.  The authority to authorize construction and siting of new transmission

facilities is distinct from the authority to require public utility transmission providers to

---

[421] *Id.* P 284.

[422] *Id.*

[423] *Id.* P 287 ("Eliminating a federal right of first refusal in Commission-jurisdictional tariffs and agreements does not, as some commenters contend, result in the regulation of matters reserved to the states, such as *transmission construction*, ownership or siting." (emphasis added)).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

engage in an open and transparent regional transmission planning process designed to ensure that the more efficient or cost-effective solutions to regional transmission needs are selected in the regional transmission plan for purposes of cost allocation.

360.     Contrary to Baltimore Gas & Electric's arguments, the Commission made a finding in Order No. 1000 that granting an incumbent transmission provider a federal right of first refusal with respect to transmission facilities selected in a regional transmission plan for purposes of cost allocation can lead to rates for Commission-jurisdictional services that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers.[424]  Consistent with section 206, the Commission acted to remedy an unjust and unreasonable or unduly discriminatory or preferential practice by requiring public utility transmission providers to eliminate such provisions from Commission-jurisdictional tariffs or agreements and adopt the nonincumbent transmission developer reforms.  In addition, the Commission's decision to require public utility transmission providers to adopt the nonincumbent transmission developer reforms was an appropriate, and adequately tailored, remedy in light of the Commission's conclusion that it is not in the economic self-interest of public utility transmission providers to permit new entrants to develop transmission facilities.[425]  For

---

[424] *Id.* PP 253, 284.

[425] *Id.* P 256.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

instance, some commenters supported eliminating all federal rights of first refusal. On balance, however, the Commission determined that incumbent transmission providers should be able to maintain an existing federal right of first refusal for certain types of new transmission projects, including a local transmission facility and upgrades to its existing transmission facilities. The Commission clarified that its actions were not intended to diminish the significance of an incumbent transmission provider's reliability or service obligations.[426]

361.    In addition to affirming our decision to act to remedy unjust and unreasonable rates, we affirm, on an independent and alternative basis, the decision in Order No. 1000 that the elimination of any federal rights of first refusal from Commission-jurisdictional tariffs and agreements is necessary to address opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers within regional transmission planning processes.[427]  In Order No. 1000, the Commission explained that "it has a responsibility to consider anticompetitive practices and to eliminate barriers to competition."[428]  We continue to believe, as the Commission found in Order No. 1000,

---

[426] *Id.* P 262.

[427] *Id.* P 286.

[428] *Id.*

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

that we have a duty to consider anticompetitive practices and to eliminate barriers to competition consistent with the FPA.[429]

362.    Petitioners rely on *City of Frankfort* and *Public Service Co. of Ind.* in support of their contention that section 206's prohibition on undue discrimination only protects customers of public utilities.  However, the court did not, as petitioners would imply, set forth limits on who the Commission may, acting under its section 206 authority, protect from unduly discriminatory practices.  Instead, the cases cited by petitioners address the applicability of section 206 in the context of a regulated utility appearing to provide favorable rates or terms to one customer, and the courts in those cases do not address whether section 206 may be used as a basis for eliminating unduly discriminatory or preferential practices between competitors.  In addition, we continue to conclude that the Commission's action is in accordance with its responsibility to eliminate unduly discriminatory or preferential practices in regional transmission planning processes.

363.    While we agree with petitioners that argue that the Commission does not have the authority to remedy every instance of undue discrimination, given the FPA's emphasis on promoting competition, the Commission has a responsibility to eliminate unduly

---

[429] *See Gulf States Utils. Co.*, 5 FERC ¶ 61,066 at 61,098; *Otter Tail v. U.S.*, 410 U.S. at 374 ("the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest.").

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

discriminatory practices that come within the Commission's subject matter jurisdiction under section 201 of the FPA, which includes the transmission of electric energy in interstate commerce.[430]  In Order No. 1000, the Commission found that "federal rights of first refusal create opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers within existing regional transmission planning processes."[431]  Accordingly, the Commission has acted consistent within its authority to eliminate and remedy practices that it found to be unduly discriminatory and anticompetitive.  In any event, the Commission has not based its decision solely on competition concerns because, in the alternative, the Commission acted to remedy the potential for unjust and unreasonable rates for Commission-jurisdictional services in addition to promoting competition among potential transmission developers.

364.   We disagree with petitioners' argument that Order No. 1000 institutionalizes undue discrimination against incumbent transmission providers.  Petitioners argue that the Commission failed to consider the full scope of risks faced by incumbent transmission providers, and thus erroneously concluded that incumbent transmission providers and nonincumbent transmission developers are similarly situated.  For example, some petitioners argue that many incumbent transmission providers have obligations to

---

[430] 16 U.S.C. 824.

[431] Order No. 1000, FERC Stats. & Regs. ¶ 31,323 at P 286.

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

build placed on them under RTO and ISO member agreements. However, as explained in

Order No. 1000, nonincumbent transmission developers that build a transmission facility

in an RTO or ISO and become members of that RTO or ISO will be subject to the same

relevant obligations that apply to incumbent transmission providers that are members of

an RTO or ISO.[432] For instance, nonincumbent transmission developers also will have an

obligation to expand their transmission facilities if directed to by the RTO or ISO

consistent with the RTO's or ISO's tariff or governing agreement.

365.    Other petitioners argue that incumbent transmission providers are not similarly

situated to nonincumbent transmission developers because incumbent transmission

providers, unlike nonincumbent transmission developers, must comply with reliability

standards and have an obligation to serve customers. They further argue that having a

federal right of first refusal is necessary to comply with these standards and obligations.

While public utility transmission providers must comply with reliability standards and

some public utility transmission providers have an obligation to serve,[433] we disagree that

eliminating federal rights of first refusal amounts to discrimination in favor of

nonincumbent transmission developers. Instead, as we stated in Order No. 1000, we are

merely removing barriers to participation by all potential transmission providers in the

---

[432] *Id*. P 265.

[433] *Id*.

Document Accession #: 20120517-3073    Filed Date: 05/17/2012

regional transmission planning process subject to our jurisdiction.  Moreover, as

explained in Order No. 1000, all owners and operators of bulk-power system

transmission facilities, including nonincumbent transmission developers, that

successfully develop a transmission project, are required to be registered as Functional

Entities[434] and must comply with all applicable reliability standards.[435]Similarly,

transmission facilities selected in a regional transmission plan for purposes of cost

allocation owned by a nonincumbent transmission developer would be subject to any

applicable open access requirements.  Accordingly, we continue to believe that the

nonincumbent transmission developer reforms will not result in undue discrimination

against incumbent transmission developers.

366.    Similarly, we disagree with Oklahoma Gas and Electric Company that the

nonincumbent transmission developer reforms materially alter the business of a public

utility that has been responsible for, and entitled to earn a return from, construction of its

own transmission system.  As we explained in Order No. 1000, while public utilities are

entitled to receive a reasonable return on their investment, they will no longer be entitled

---

[434] We use the term Functional Entity to refer to any user, owner or operator of the bulk power system that is responsible for complying with a NERC reliability standard as that term is defined in section 215(a)(3) of the FPA.

[435] Order No. 1000, FERC Stats. & Regs. ¶ 31,323 at P 266 (citing 18 CFR Part 39.2(a) (2011)).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

to receive from the Commission a preferential right to make those investments in new

transmission facilities that are selected in a regional transmission plan for purposes of

cost allocation under the provisions of Order No. 1000.[436]  Inherent in Oklahoma Gas and

Electric Company's argument is that incumbent transmission providers have traditionally

had the opportunity to build transmission facilities for their own transmission systems.

Nothing in Order No. 1000 prohibits an incumbent transmission provider from choosing

to build new transmission facilities that are located solely within its retail distribution

service territory or footprint and that are not selected for selection in a regional

transmission plan for purposes of cost allocation.[437]

367.    We are not persuaded by Baltimore Gas & Electric's argument that a federal right

of first refusal is simply the recognition of an obligation to build.  In Order No. 1000, we

acknowledged that a public utility transmission provider may have accepted an obligation

to build in relation to its membership in an RTO or ISO, but the Commission did not

agree that that obligation is necessarily dependent on the incumbent transmission

provider having a corresponding federal right of first refusal to prevent other entities

from constructing and owning new transmission facilities located in that region.[438]  We

---

[436] *Id.* P 269.

[437] *Id.* P 262.

[438] *Id.* P 261.

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

continue to believe that an obligation to build in relation to membership in an RTO or ISO is not necessarily dependent on an incumbent transmission provider having a corresponding federal right of first refusal to prevent other entities from constructing and owning new transmission facilities located in that region,[439] and Baltimore Gas & Electric has provided no evidence to the contrary.    Moreover, while eliminating a federal right of first refusal may change the benefits and obligations associated with membership in an RTO or ISO, we affirm our finding in Order No. 1000 that changing the benefits and obligations is necessary to correct practices that have the potential to lead to unjust and unreasonable rates for Commission-jurisdictional transmission service.[440]  Similarly, we disagree with MISO that the nonincumbent transmission developer reforms will discourage entities from maintaining membership in an RTO or ISO, because, as explained in Order No. 1000, there are a variety of factors that public utility transmission providers must weight when evaluating the benefits and burdens of RTO/ISO membership.[441]

368.    We also are not convinced by PSEG Companies' argument that requiring public utility transmission providers to eliminate a federal right of first refusal for transmission

---

[439] *Id.*

[440] *Id.*

[441] *Id.* P 265.

Document Accession #: 20120517-3073      Filed Date: 05/17/2012

projects that are selected in the regional plan for purposes of cost allocation violates the

Takings Clause of the Fifth Amendment.  Nor do we agree that Order No. 1000 destroys

or materially impairs PSEG Companies' purported contractual right to build in their

respective service areas or zones.  Although some contractual rights are "property" within

the meaning of the Taking Clause,[442] the Commission has not impaired this alleged

contractual right of first refusal.  Order No. 1000 continues to permit an incumbent

transmission provider, such as PSEG Companies, to meet its reliability needs or service

obligations by choosing to build new transmission facilities that are located solely within

its retail distribution service territory or footprint as long as the transmission provider

does not receive regional cost allocation for the facilities.[443]

369.    Even assuming that Order No. 1000 impinges upon this alleged contractual right,

PSEG Companies have not met their "substantial burden" to show "whether a regulation

'reaches a certain magnitude' in depriving an owner of the use of property."[444]  Just as

"legislation [that] readjust[s] rights and burdens is not unlawful solely because it upsets

---

[442] *Connolly v. Pension Guaranty Corp.*, 475 U.S. 211, 224 (1986) (holding that congressional action that impinged upon employers' contractual rights did not constitute an unconstitutional taking).

[443] Order No. 1000, FERC Stats. & Regs. ¶ 31,323 at P 262.

[444] *District Intown Props. Ltd. Pshp. v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).

Document Accession #: 20120517-3073     Filed Date: 05/17/2012

otherwise settled expectations,"[445] the Order No. 1000 regulations regarding the federal

right of first refusal are not unconstitutional takings solely because the regulations impact

the benefits and burdens of transmission owner agreements.  Furthermore, in arguing that

Order No. 1000 operates to take their property, PSEG Companies have a burden to

demonstrate the economic injury they expect to incur if they are denied the future

exclusive opportunity to build transmission facilities in their service territory.[446]  They

have not met this burden in their rehearing request.

370.    Finally, PSEG Companies also have not argued that Order No. 1000 appropriates

their alleged contractual right of first refusal for public use.  Nor could the Commission

be said to be taking the federal right of first refusal so that another entity could use it for

public purposes.[447]  Rather, we require the elimination of such provisions so that

incumbent transmission providers and nonincumbent transmission developers will have

an opportunity on a comparable basis to propose new transmission facilities for selection

---

[445] *Connolly*, 475 U.S. at 223.

[446] *See Connolly*, 475 U.S. at 225 (to determine whether there is a "taking," the Court evaluates three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental action).

[447] *See Omnia*, 261 U.S. at 508-13 (holding that, while government requisition of steel frustrated a contract for delivery of steel, the government action was not an appropriation for public purposes that required just compensation).

Document Accession #: 20120517-3073          Filed Date: 05/17/2012

in the regional transmission plan for purposes of cost allocation.[448]  For these reasons, we find that the elimination of federal rights of first refusal does not constitute a taking under the Fifth Amendment's Taking Clause.

> ii.    **Arguments That the Commission Is Inappropriately Regulating the Construction of Transmission**

371.    Several petitioners argue that the Commission's reforms impermissibly infringe on state jurisdiction to authorize construction and operation of transmission lines.[449] Ameren states that section 201(a) expressly provides that the Commission does not have authority over matters that are subject to regulation by the states, and that states have historically exercised jurisdiction over siting and construction of transmission facilities. Ameren asserts that had Congress wished to expand the Commission's jurisdiction, it would have done so by adding new sections to the FPA, such as sections 215 and 216, which gave the Commission expanded authority over reliability.  Wisconsin PSC also argues that FPA sections 201 and 206 do not create a federal right to authorize

---

[448] *Accord Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1284 (D.C. Cir. 2007) (finding that anti-discrimination rules commonly burden the obligated parties and that the burden imposed did not create an unconstitutional taking of private property).

[449] *See, e.g.*, Wisconsin PSC; Baltimore Gas & Electric; Ameren; and PSEG Companies.

**179 FERC P 61036 (F.E.R.C.), 2022 WL 1198441**

FEDERAL ENERGY REGULATORY COMMISSION
**\*\*1** Commission Opinions, Orders and Notices

Before Commissioners: Richard Glick, Chairman; James P. Danly, Allison Clements, Mark C. Christie, and Willie L. Phillips.

Actions Regarding the Commission's Policy on Price Index Formation and
Transparency, and Indices Referenced in Natural Gas and Electric Tariffs

[Docket No. PL20-3-000]
REVISED POLICY STATEMENT
(Issued April 21, 2022)

<u>AGENCY</u>: Federal Energy Regulatory Commission.

<u>ACTION</u>: Notice of Policy Statement.

<u>SUMMARY</u>: The Federal Energy Regulatory Commission (Commission) is revising its price index policy set forth in its *Policy Statement on Natural Gas and Electric Price Indices* (*Initial Policy Statement*) to encourage more market participants to report their transactions to price index developers, to provide greater transparency into the natural gas price formation process, and to increase confidence in the accuracy and reliability of wholesale natural gas prices. First, the Commission is revising the price index policy to allow market participants that report transaction data to price index developers (data providers) to report either their non-index based next-day transactions, their non-index based next-month transactions, or both, to price index developers. In addition, the Commission is revising the price index policy to encourage data providers to report transactions to as many Commission-approved price index developers as possible, and to allow data providers to self-audit on a biennial basis. The Commission is also modifying its standards to state that price index developers should indicate whether a published index price is calculated using market information other than the trades at the index's specified location, or a market assessment, in their published price indices and data distributions. Moreover, the Commission is modifying its standards so that each approved price index developer should seek re-approval from the Commission every seven years to demonstrate that it fully or substantially meets the standards set forth in the *Initial Policy Statement*. Beginning six months after the effective date of this Revised Policy Statement, interstate natural gas pipelines and public utilities proposing to use price indices in jurisdictional tariffs will no longer be entitled to the rebuttable presumption that a price index developer's price indices produce just and reasonable rates unless the price index developer has obtained approval or re-approval from the Commission within the last seven years. Finally, the Commission is modifying the review period for assessing the liquidity of natural gas price indices submitted for reference in Commission-jurisdictional tariffs to 180 continuous days out of the most recent 365 days. This will help to ensure that price indices referenced in Commission-jurisdictional tariffs are sufficiently liquid.

<u>DATES</u>: This Policy Statement becomes effective on December 31, 2022.

**\*\*2** FOR FURTHER INFORMATION CONTACT:

Evan Oxhorn (Legal Information)

Office of the General Counsel

Federal Energy Regulatory Commission

888 First Street, NE

ADD-62

Washington, DC 20426

(202) 502-8183

Evan.Oxhorn@ferc.gov

Eric Primosch (Technical Information)

Office of Energy Policy and Innovation

Federal Energy Regulatory Commission

888 First Street, NE

Washington, DC 20426

(202) 502-6483

Eric.Primosch@ferc.gov

SUPPLEMENTARY INFORMATION:

 **\*61353** 1. On December 17, 2020, the Commission issued a proposed revised policy statement on natural gas and electric indices,[1] proposing revisions to the price index policy set forth in the *Policy Statement on Natural Gas and Electric Price Indices*[2] to encourage more market participants to report their transactions to price index developers[3] and to provide greater transparency into the natural gas price formation process. The Commission indicated that the changes would increase confidence in the accuracy and reliability of wholesale natural gas prices. In this Revised Policy Statement, we adopt the proposals in the Proposed Revised Policy Statement.

2. First, we revise the price index policy standards for market participants that report data to price index developers (data providers) to allow them to report either their non-index based next-day transactions, their non-index based next-month transactions, or both, to price index developers. In addition, we encourage data providers to report to as many Commission-approved price index developers as possible. Further, we allow data providers to self-audit on a biennial basis.

3. We also modify the price index policy standards for price index developers to provide that they should indicate when they use a market **\*61354** assessment[4] to calculate an index price. We also modify the standards so that each price index developer should seek approval or re-approval from the Commission every seven years that it meets or continues to meet the standards set forth in the Initial Policy Statement. Beginning six months after the effective date of this Revised Policy Statement, interstate natural gas pipelines and public utilities proposing to use price indices in jurisdictional tariffs will no longer be entitled to the rebuttable presumption that a price index developer's price indices produce just and reasonable rates unless the price index developer has obtained approval or re-approval from the Commission within the last seven years. Finally, we clarify the review period for assessing the liquidity of natural gas price indices submitted for reference in Commission-jurisdictional tariffs.

4. As noted in the Proposed Revised Policy Statement, natural gas price indices play a vital role in the energy industry, as they are used to price billions of dollars of natural gas and electricity transactions annually in both the physical and financial markets. A natural gas price index is a weighted average price derived from a set of fixed-price natural gas transactions[5] within distinct geographical boundaries that market participants voluntarily report to a price index developer.

ADD-63

**\*\*3** 5. Natural gas price indices serve as a proxy for the locational cost of natural gas in the daily and monthly markets and many market participants reference natural gas index prices in their physical and financial transactions. Interstate natural gas pipelines, public utilities, Regional Transmission Organizations (RTO), and Independent System Operators (ISO) reference natural gas price indices in their Commission-jurisdictional tariffs for various terms and conditions of service. State commissions also use natural gas price indices as benchmarks when reviewing the prudence of natural gas or electricity purchases. Finally, many natural gas financial derivative contracts that are used in hedging and speculation settle against natural gas price indices.

6. We find it is important to encourage robust transaction reporting to price index developers for transparent and reliable price index development. We find the revisions to the price index policy that we adopt here will help to encourage more market participants to report natural gas transactions to price index developers and increase the transparency of the natural gas price formation process.

7. The Commission's price index policy applies to both natural gas and electric price index developers and data providers. The Commission's price index policy will continue to apply to natural gas data providers and natural gas price index developers, except to the extent that this Revised Policy Statement revises the provisions in the Commission's price index policy as discussed below. The Commission's price index policy will continue to apply to electric data providers and electric price index developers as it always has.

8. We revise the Commission's price index policy and issue this Revised Policy Statement, with an effective date of December 31, 2022.

## I. Background

### A. Initial Policy Statement and Clarification Orders

9. On July 24, 2003, the Commission issued the Initial Policy Statement, in which it set forth the price index policy. Through that policy, the Commission ""sought to strengthen confidence" in the natural gas and electricity markets "by encouraging comprehensive reporting of energy transactions to price index developers and by encouraging price index developers to provide useful information to the industry on the volumes of transactions and number of participants trading at various trading hubs." [6]

10. Under the Initial Policy Statement, market participants can voluntarily report transactions to price index developers. For those market participants that choose to report to price index developers, i.e., data providers, the Initial Policy Statement set forth the following minimum standards for reporting transactions to price index developers: (1) code of conduct - adopting and making public a code of conduct that employees will follow when buying and selling natural gas or reporting data to price index developers; (2) source of data - having trade data reported by a department of the company that is independent from and not responsible for natural gas trading; (3) data reported - reporting each bilateral transaction between non-affiliated companies which details the price, volume, whether it was a purchase or a sale, the delivery/receipt location, and whether it was a next-day or next-month transaction; (4) error resolution process - cooperating with the error resolution process adopted by the price index developer in a timely manner; and (5) data retention and review - establishing minimum time periods for retaining all relevant data related to reported trades. [7] The Commission designed **\*61355** these standards to create a uniform process of transaction reporting that provides price index developers assurance that the data they receive from data providers is accurate and truthful. If the data provider can demonstrate that it has adopted and followed the standards for reporting set forth in the Commission's Initial Policy Statement, it will benefit from a rebuttable presumption that it has submitted its transactions accurately, timely, and in good faith (Safe Harbor Policy). [8]

**\*\*4** 11. Under the Initial Policy Statement, becoming a Commission-approved price index developer is also voluntary. In the Initial Policy Statement, the Commission set forth minimum standards for publishing price indices that, if met, establish a



ADD-64

presumption that a price index developer's index at a defined location will result in just and reasonable charges. These standards for price index developers include: (1) a code of conduct and confidentiality - publicly disclosing how it will obtain, treat, and maintain price data, including how it calculates its indices while also entering into confidentiality agreements with its data providers; (2) completeness - publishing all available trade information for each hub including: total volume, the number of transactions, the high/low range of prices, and the weighted average price; (3) data verification, error correction, and monitoring - verifying its data by matching purchases with sales and contacting data providers over any discrepancies as well as publishing a notice of the corrected price if a reported price is significantly erroneous; (4) verifiability - participating in an independent audit or verification of its processes annually and making the results of that audit public; and (5) accessibility - providing all interested customers reasonable access to the data in a timely fashion and providing the Commission access to the data to conduct an investigation. [9] The Commission intended for these standards to ensure that market participants and regulators have confidence that natural gas and electric price indices published by price index developers that are referenced in Commission-jurisdictional tariffs are based on consistent, transparent, and verifiable processes and methodologies that help to ensure reliable prices. [10]

12. On December 12, 2003, the Commission issued its *2003* Clarification Order. [11] The 2003 Clarification Order provided clarifications to the Commission's price index policy related to the standards for data providers in the Initial Policy Statement.

13. On July 5, 2005, the Commission issued its 2005 Clarification Order. [12] The *2005 Clarification Order* provided clarifications to emphasize the broad nature of the Commission's Safe Harbor Policy to encourage companies both to adopt the appropriate procedures to take advantage of the Safe Harbor Policy and to contribute their transaction information to the price formation process. The 2005 Clarification Order also reminded companies of their obligation to notify the Commission when there is a change in their reporting practices. [13]

### B. Price Index Order

14. On November 19, 2004, the Commission issued its *Price Discovery in Natural Gas and Electric Markets* [14] to address issues concerning price indices in natural gas and electricity markets. The Commission directed Commission staff to continue to monitor price formation in wholesale markets, including price index developer and market participant adherence to the previously enumerated standards from the Initial Policy Statement. [15] The Commission reviewed the submissions from price index developers and granted approval for their price indices to be referenced in Commission-jurisdictional tariffs. [16] The Commission also adopted the criteria for price indices to be referenced in Commission-jurisdictional tariffs. [17]

### C. The Use of Natural Gas Price Indices in Commission Jurisdictional Activities

**\*\*5** 15. Given that natural gas price index developers use physical fixed-price natural gas transactions to calculate the price of published natural gas indices, it is important that transaction reporting is robust and that price index development is transparent. The significant role played by natural gas price indices became apparent during the 2000-2001 Western Energy Crisis, when companies intentionally misreported transactions to price index developers to manipulate natural gas index prices in the Western United States. [18] In the Price Index Order, the Commission established guidelines to ensure that natural gas price indices that are used in Commission-jurisdictional tariffs are robust, free from manipulation, and reflect market fundamentals. [19] Subsequently, in the Energy Policy Act of 2005 (EPAct 2005), Congress amended the Natural Gas Act to give the Commission additional authority with respect to natural gas price indices. [20]

16. After the issuance of the *Policy Statement* and the Price Index Order, market participants increased the reporting of their fixed-priced **\*61356** natural gas transactions to price index developers, which resulted in greater confidence in those price indices. However, after 2010, the estimated traded volume of fixed-price natural gas transactions reported to price index


ADD-65

developers began to decline significantly. [21] Form No. 552 data show that the estimated volume of fixed-price transactions voluntarily reported to price index developers declined by approximately 58% from 2010 until 2020. [22] Figure 1 shows estimated physical natural gas volumes reported to price index developers based on Form No. 552 data.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

17. At the same time that fixed-price reporting to price index developers decreased, the traded volume of natural gas transactions that referenced natural gas price indices, also known as index gas, increased. For example, Form No. 552 data showed that index gas increased from 68% of the traded volumes in the U.S. physical natural gas market in 2010 to 82% in 2020.

### D. Standards for Price Indices used in Jurisdictional Tariffs

18. The Commission has a statutory obligation to ensure that jurisdictional rates are just and reasonable. Under the Natural Gas Act and Federal Power Act, the Commission's jurisdiction extends to sales of natural gas and electricity for resale in interstate commerce, interstate transmission of natural gas and electricity, and the related pricing mechanisms within jurisdictional tariffs. [23] One way the Commission helps to ensure just and reasonable jurisdictional rates is through the review and approval of natural gas price indices referenced in Commission-approved natural gas pipeline and public utility tariffs.

19. An interstate natural gas pipeline or public utility proposing to include a price index in its Commission-jurisdictional tariff bears the burden of supporting its proposed price index. In the Price Index Order, the Commission stated that, when a natural gas pipeline or utility proposes to use a new natural gas or electric price index reference in a jurisdictional tariff or to change an existing price index reference, the Commission would apply a presumption that the proposed price index at a defined location will result in just and reasonable rates if the natural gas pipeline or public utility: (1) proposes to use a price index at a defined location published by one of the price index developers that the Commission has previously found to meet the developer criteria established in the *Policy Statement*, and (2) demonstrates that the price index at a defined **\*61357** location meets one or more of the applicable liquidity criteria for the appropriate review period. [24] If parties to the proceeding protest the use of the proposed price index at a defined location, they are required to support the protest with evidence that the selected location does not meet the liquidity criteria or show good reason why the location will not result in just and reasonable rates and should not be used. An interstate natural gas pipeline or public utility may also file to reference a price index at a defined location that does not satisfy these two conditions. In such a case, the natural gas pipeline or public utility bears the burden of showing that the price index at a defined location will result in just and reasonable rates and must support its filing accordingly. [25]

**\*\*6** 20. Under the Commission's market behavior rules, [26] marketers and interstate natural gas pipelines making jurisdictional sales of natural gas and jurisdictional sellers of electric energy that have or are seeking market-based rate authority that elect to report to price index developers must submit accurate and factual information and report in a manner consistent with the procedures set forth in the Commission's price index policy. [27]

### E. Proposed Revised Policy Statement

21. Noting the significant downward trend in data providers reporting transactions to price index developers and the concurrent rise in traded volumes of natural gas transactions that referenced natural gas price indices, discussed above, Commission staff held the Developments in Natural Gas Index Liquidity and Transparency technical conference (2017 technical conference) on June 29, 2017, to address natural gas index liquidity and transparency issues, and potential actions the Commission could consider taking to increase both the volume of transactions reported to natural gas price index developers and the transparency of the natural gas price formation process. [28] The 2017 technical conference discussion and the post-technical conference comments demonstrated a need to revise the Commission's price index policy and provided the Commission a better


ADD-66

understanding of potential reforms to address declining data provider transaction reporting to price index developers and the robustness and reliability of price index formation.

22. On December 17, 2020, the Commission issued the Proposed Revised Policy Statement,[29] which proposed several revisions to the Commission's price index policy to encourage more market participants to report their transactions to price index developers and to provide greater transparency into the natural gas price formation process to increase confidence in the accuracy and reliability of wholesale natural gas prices.

## II. <u>Discussion</u>

23. As part of its mandate to ensure just and reasonable rates in the wholesale natural gas and electric markets, the Commission reviews its existing policies and regulations from time to time. The Commission's policies and regulations related to natural gas and electric price indices date to the early 2000s and were adopted in response to a lack of confidence in price indices.[30] Since then, the physical trading of natural gas, the reporting of those transactions, and the development of price indices by price index developers has changed.

24. In order to address the decline in reporting to price index developers, the Commission proposed several revisions to the Commission's price index policy in its Proposed Revised Policy Statement to decrease the reporting burden on data providers and potentially increase the number of market participants reporting transactions to Commission-approved price index developers. The Commission stated that increased price reporting would contribute to the robustness of Commission-approved price indices and could lead to more accurate and reliable price indices referenced in Commission-jurisdictional tariffs.[31]

**\*\*7** 25. In the Proposed Revised Policy Statement, the Commission also proposed several revisions to the Commission's price index policy applicable to Commission-approved price index developers. Specifically, the Commission proposed to modify how Commission-approved price index developers form natural gas price indices and to ensure that these natural gas price index developers continue to adhere to the Commission's policies. The Commission stated that these proposed revisions would increase the transparency of the natural gas price formation process and maintain industry confidence in the price indices.[32]

**\*61358** 26. Finally, the Commission proposed to clarify the timeframe over which to assess the liquidity for natural gas price indices referenced in natural gas and electric tariffs. This revision would ensure that natural gas price indices referenced in Commission-jurisdictional tariffs are liquid at the time of attestation.[33]

27. The Commission received 14 comments, including reply comments, in response to the Proposed Revised Policy Statement. The attached Appendix A lists those that submitted comments.[34]

### A. <u>Reporting Transactions to Price Index Developers</u>

#### 1. <u>Commission Proposal</u>

28. In the *Initial Policy Statement*, the Commission set forth standards for data providers reporting transactions to price index developers. For the "Data Reported" standard, the Commission stated that natural gas or electric data providers should report "each bilateral, arm's length transaction between non-affiliated companies in the physical (cash) markets."[35] The Commission also defined the term for transactions reported to price index developers as ""next day or next month."[36] The Commission later clarified that transactions reported to price index developers should be "non-index" based transactions for the next-day and next-month markets.[37] Regarding natural gas price indices, the Commission later acknowledged that physical basis transactions



occurring during bidweek "are a significant aspect of wholesale natural gas markets and utilize or could contribute to the formation of price indices."[38] Thus, the Commission requires natural gas data providers who elect to report their transactions to price index developers to report both their next-day fixed-price natural gas transactions and next-month fixed-price and physical basis natural gas transactions to price index developers.[39]

29. In the Proposed Revised Policy Statement, the Commission proposed to allow data providers to report either all non-index based next-day transactions, all non-index based next-month transactions, or both non-index based next-day and non-index based next-month transactions. Under this revision, whichever set of transactions a data provider chooses to report (next-day, next-month, or both), it should submit data on each bilateral, arm's length transaction within that set.[40] The Commission explained that these revisions would reduce the reporting burden for data providers who primarily transact in the next-month market because those data providers can now report their next-month transactions without being required to take on the daily burden of reporting their next-day transactions.

### 2. Comments

**\*\*8** 30. The majority of commenters express support for the proposed revision, with several commenters suggesting that the proposed revision will enhance price indices by reducing the burden of reporting and encouraging more robust participation.[41]

31. NGSA states that the proposed revision will foster more robust levels of participation in reporting to price index developers, particularly for bidweek[42] transactions.[43]

32. EEI states the proposed revision would significantly reduce the daily price reporting requirement burden on data providers, which may lead to increased reporting by "smaller and mid-sized companies."[44] Similarly, EQT supports the proposed revision because market participants who primarily conduct monthly transactions would not have to bear the cost and time burden of reporting occasional daily trades, and EQT suggests the proposal will increase the number of data providers and thereby the accuracy of published price indices.[45]

33. APGA and Platts state that allowing data providers to report next-day and/or next-month transactions would make market participants more willing to report transactions in markets where they most actively trade, potentially benefitting monthly price indices.[46] NGI states that the **\*61359** proposed revision will help market participants, mainly smaller local distribution companies, utilities, and end-users, that transact most of their volumes in the next-month (i.e., bidweek) market versus the next-day market.[47] NGI further states that such data providers could contribute bidweek volumes to a price index developer without the "onerous and resource-consuming price reporting function" in the next-day market for their infrequent daily deals.[48]

34. Similarly, Argus states that it has been informed by market participants that they often do not transact in both next-day and next-month markets, or that market participants do minimal trading in one market while consistently transacting in the other market. Argus explains that these market participants "lack the willingness to add manpower and systems" to report to price index developers when they transact so few transactions.[49]

35. American Forest & Paper Association and Process Gas Consumers Group (AFPA/PGC) believe the proposed revision will only result in a modest increase to the total amount of reported trades and finds that the proposed revision "does nothing to specifically encourage voluntary reporting by marketers." AFGA/PGC further state that the Commission should "strongly encourage" reporting by all natural gas marketers to increase the volume of transactions reported to price index developers.[50]

### 3. Commission Determination

ADD-68

**\*\*9** 36. We adopt the proposal in the Proposed Revised Policy Statement to allow data providers to elect to report either all non-index based next-day transactions, all non-index based next-month transactions, or both non-index based next-day and non-index based next-month transactions to price index developers. Under this modification to the price index policy, we require that for whichever set of transactions a data provider chooses to report (next-day, next-month, or both), that data provider must submit data on *each* bilateral, arm's length transaction within that set. We think that this revision will reduce the reporting burden for data providers because it will give them the ability to report data for the market (either next-day or next-month) that they primarily transact in. We expect that this revision may lead to additional reporting of next-month transactions as data providers who predominantly transact in the next-month market may choose to begin reporting their next-month transactions to price index developers now that they no longer have to take on the daily burden of reporting their next-day transactions as well.

37. The majority of commenters express support for the proposal to allow data providers to elect to report either all non-index based next-day transactions, all non-index based next-month transactions, or both non-index based next-day and non-index based next-month transactions to price index developers. [51] We agree with these commenters that adopting the proposal in the Proposed Revised Policy Statement would lower the reporting burden for data providers. As a result, it may also foster more robust participation in reporting to price index developers, increasing the accuracy of natural gas indices. [52] As noted by AFPA/PGC, [53] any increase in reporting to price index developers may be modest; nonetheless, we expect that any such increase will enhance the overall accuracy and robustness of the price indices they develop. Furthermore, we continue to think that, as stated in the Proposed Revised Policy Statement, adopting the proposal will increase reporting in the next-month market, where reporting to price index developers is most needed. [54] Further, to that end and as suggested by AFPA/PGC, [55] we strongly encourage all market participants (including marketers) to report their transactions to price index developers as additional data providers will lead to more robust price indices.

38. We note that the adoption of the proposal in the Proposed Revised Policy Statement to allow data providers to elect to report either all non-index based next-day transactions, all non-index based next-month transactions, or both non-index based next-day and non-index based next-month transactions to price index developers, necessitates a minor adjustment to the Form No. 552 to reflect a reporting company's [56] ability to identify the reporting of non-index based next-day transactions, non-index based next-month transactions, or both types of transactions in its Form No. 552. We revise the Form No. 552 to allow filers to identify if they report their next-day and/or their next-month fixed-price and physical basis transactions to price index developers. Appendix B explains this revision to the Form No. 552. [57]

**\*\*10** 39. Finally, we note that as of Fall 2021, several price index developers changed their bidweek price index determination period from the last five **\*61360** business days of every month to a three-business day period, generally concluding on the expiration date of the prompt-month NYMEX natural gas futures contract. Thus, physical natural gas transactions generally occurring during the last two business days of the month, which generally have less liquidity than the prior three business days and are subject to post-expiration price volatility, no longer contribute to the formation of several monthly price indices. Several price index developers made this change to align the price determination period during bidweek with higher volume trading days and to avoid price volatility from additional trading days. We find that this new timeframe for bidweek transactions still complies with the Commission's price index policy. [58]

### B. Encouraging Comprehensive Reporting

#### 1. Commission Proposal

40. In the Proposed Revised Policy Statement, the Commission proposed to encourage all data providers to report their transaction data to as many Commission-approved price index developers as possible. [59] The Commission's proposal sought



ADD-69

to address the incorrect view that the Commission's price index policy had limited data providers to reporting to only one price index developer.

### 2. Comments

41. Several commenters agree that reporting to multiple price index developers could lead to more robust price indices. [60] More specifically, APGA agrees with the Commission and finds that it would be helpful if all data providers reported to as many Commission-approved price index developers as possible. [61] Argus notes that if more market participants voluntarily report their transactions to multiple price index developers the price indices would be more robust; further, Argus volunteers to work with market participants to lighten and remove the burdens associated with reporting to multiple price index developers. [62]

42. Energy Intelligence notes that any additional burden on data providers is marginal and would be outweighed by the benefit of having multiple independent price index developers available to the marketplace. [63]

43. However, NGI and NGSA express concern about encouraging data providers to report to multiple price index developers. [64] NGSA stresses the importance of allowing data providers the flexibility to choose which price index developers they report to, further noting that a data provider's reporting decision should be based on what works best for each company. [65] NGI cautions the Commission against strengthening the language related to reporting to multiple price index developers, because doing so could reduce the number of data providers reporting to price index developers, with the benefits of reporting outweighed by the additional resources needed to report to additional Commission-approved price index developers. [66]

**11  44. NGI also proposes that the Commission should consider expanding the questions included in the Schedule of Reporting Companies and Price Index Reporting section of the Form No. 552 to require reporting companies to explain why they choose not to voluntarily report transactions to price index developers, if they indicate that they do not price report on Form No. 552. [67]

### 3. Commission Determination

45. We adopt the proposal in the Proposed Revised Policy Statement to encourage all data providers to report their transaction data to as many Commission-approved price index developers as possible. To clarify, there is no requirement that a data provider limit its reporting to only one price index developer. To reiterate, a data provider may report transactions to more than one price index developer. [68]

46. We find that, as stated in the Proposed Revised Policy Statement, the burden of reporting to multiple price index developers has fallen since issuance of the Initial Policy Statement. [69] For example, data providers can now submit transactional data to multiple price index developers via one joint email. Further, we find that reporting transaction data to multiple price index developers will help to increase the robustness of price formation for all price index developers. Energy Intelligence notes that the additional reporting burden to report to multiple price index developers is marginal, and the benefits of reporting to multiple price index developers outweigh the reporting burden. [70] Similarly, APGA and Argus highlight similar benefits from urging data providers to *61361 report to multiple price index developers. [71] We agree with commenters that adopting this proposal will provide clarity to data providers that there is no requirement that a data provider limit its reporting to only one price index developer. We also find that reporting to multiple price index developers could lead to more robust price formation.

47. NGI requests that the Commission expand the information requested on the Form No. 552 to require reporting companies to explain why they did not voluntarily report transaction data to price index developers, if they indicate on their respective


ADD-70

annual Form No. 552 submission that they do not price report to price index developers. [72] We decline NGI's request. NGI acknowledges that data providers are not required to, but can voluntarily, report transaction data to price index developers. We see no reason to impose a requirement that would increase the burden on data providers and potentially discourage voluntary reporting, and we decline to adopt this proposal.

## C. Reducing the Self-Audit Burden

### 1. Commission Proposal

48. Under the current price index policy, a data provider should perform a self-audit annually. In the Proposed Revised Policy Statement, the Commission proposed to allow data providers to perform a self-audit on a biennial basis. In other words, every other year a data provider would perform an audit covering the previous two years, if choosing this option. [73]

**12** 49. More specifically, the Commission proposed to revise the timing of the standard that a data provider have an independent auditor review the implementation of, and adherence to, the data gathering and submission process adopted by the data provider so that the audit be undertaken on a biennial basis. As stated in the Initial Policy Statement, the results of the audit should continue to be made available to any price index developer to which the data provider submits trade data, and the data provider should permit the price index developer to recommend changes to improve the accuracy and timeliness of data reporting. [74]

50. Further, the Commission stated that it continued to find it acceptable for auditors internal to the data providers to perform the self-audits, in order to avoid raising barriers to voluntary reporting. More specifically, the Commission stated that the internal audits could be performed by a data provider's internal auditor so long as internal audit personnel are independent from the trading and reporting departments and personnel, and the audit follows internal audit standards, such as those prescribed by the Institute of Internal Auditors or other similarly generally accepted auditing standards. [75]

### 2. Comments

51. Commenters who support the proposal generally agree that it would reduce the reporting burden on data providers. [76] Specifically, Argus, EEI, Energy Intelligence, and NGSA believe the proposal would reduce regulatory burden and increase price reporting, with NGSA noting enhanced market liquidity as an indirect benefit. [77]

52. EQT supports the Commission's proposal to retain the ability of data providers to use internal auditors to perform self-audits as long as the internal audit personnel are independent from the trading and reporting department and follow generally accepted auditing standards, noting that this proposal would reduce the cost and time burden for data providers. [78]

53. NGSA also recommends changes to the Commission's Office of Enforcement's audit process. Specifically, NGSA recommends that the Office of Enforcement adopt enhancements to its audit process, including taking a more targeted approach tailoring the scope of audits to a specific set of issues, ensuring data providers understand the audit scope, and committing to a reasonable, set timeframe for audits. NGSA further recommends that the Office of Enforcement refrain from changing or expanding the audit scope without good cause, and communicate any changes in the audit scope, completion date, or status immediately. [79]

### 3. Commission Determination

ADD-71

54. We adopt the proposal in the Proposed Revised Policy Statement to allow data providers to perform a self-audit on a biennial basis. In other words, every two years, a data provider would perform an audit covering the previous two years, if choosing this option.

**13** 55. Consistent with the existing requirements of the Commission's price index policy, the results of the audit should be made available to any price index developer to which the data provider submits trade data, and the data provider should permit the price index developer to recommend changes to improve the accuracy and timeliness of data reporting.

56. EEI, Argus, and NGSA state that the proposed audit changes would reduce regulatory **\*61362** burden and increase price reporting. We agree; adopting this proposal will ease the burden for data providers, which may lead to additional data providers reporting transaction data to price index developers.

57. Further, we continue to find it acceptable for internal auditors to perform the self-audits, in order to avoid raising barriers to voluntary reporting. More specifically, audits can continue to be performed by a data provider's internal auditor as long as internal audit personnel are independent from the trading and reporting departments and personnel, and the audit follows internal audit standards, such as those prescribed by the Institute of Internal Auditors or other similarly generally accepted auditing standards. We find that adequately documented and effective audits by an independent internal or external audit function can serve as an appropriate compliance control. Moreover, we believe the self-audits will ensure that price reporting by market participants is accurate and will support industry confidence in price indices.

58. NGSA recommended several enhancements to the Office of Enforcement's audit process, as summarized above.[80] We emphasize that many of NGSA's recommendations are already an inherent part of the Office of Enforcement's audit process. We decline to adopt NGSA's recommendations in this proceeding because they focus on changes to the Office of Enforcement's audit process, which is unrelated to the Commission's proposal to reduce the self-audit burden on data providers.

### D. Increasing Confidence in Price Indices

#### 1. Commission Proposal

59. In the Proposed Revised Policy Statement, the Commission proposed to clarify that, with respect to assessments, a price index developer's code of conduct should inform customers how it makes assessments in its publications and in its data distributions.[81] A price index developer is considered to use a "market assessment" when it uses "market information, other than the trades at the index's specified location, to determine the value of the index price."[82]

60. Further, the Commission proposed that price index developers indicate in their publications and data distributions when they use a market assessment to calculate a published index price. Specifically, the Commission proposed that price index developers clearly define in their code of conduct a method to determine if a price assessment is made in its data distributions.[83]

#### 2. Comments

**14** 61. The majority of commenters expressed support for the proposal, with some commenters noting that the market assessment clarification would add transparency to the market.[84] Further, Argus, Energy Intelligence, NGI, and Platts assert that they each currently comply with the proposal regarding market assessment identification.[85] APGA similarly notes that it believes that most price index developers have already adopted the proposed revision.[86]



ADD-72

62. AGA states that the proposal should assist market participants in identifying market assessments by distinguishing price indices calculated from the weighted averages of reported trades from price indices calculated by market assessments. AGA believes this proposal will increase transparency and provide the market with more information about liquidity of certain locations and should promote "confidence in price indices." [87] AGA also notes that AGA members have not voiced concerns regarding a loss of confidence in natural gas markets or concerns that natural gas price indices do not sufficiently reflect locational value of natural gas to permit decision making. [88] APGA notes its concerns with the "proliferation" of market assessments, highlighting that several smaller APGA members have experienced an increase in the number of market assessments at the price index hubs where they purchase natural gas. APGA welcomes the proposed policy changes. [89]

63. EQT notes that, subsequent to the guidelines established in Price Index Order, no process has been established to allow the Commission to reconfirm the liquidity of price index developers' indices once they have been included in natural gas pipeline tariffs. [90] EQT explains that the use of price indices in natural gas pipeline tariffs to settle imbalances or determine penalties is different from their use in commercial transactions; EQT stresses the importance of the integrity of price indices, since the use of set price indices as a reference point in Commission-jurisdictional tariffs does not present shippers with an option to choose their preferred price index and, therefore, has day-to-day financial impacts on "essentially **\*61363** captive parties.'" [91] Finally, EQT states that they do not believe that market assessments should be permitted to substitute for the relatively small minimum trading liquidity requirements adopted in the Price Index Order, and the Commission should so clarify in a revised policy statement. [92]

64. CAISO requests that the Commission require price index developers to report the daily volume traded, number of transactions, and number of counterparties, even on days when price index developers use market assessments. CAISO asserts that, without the above data points, RTOs/ISOs may be unable to assess liquidity based on the Commission's proposal for at least 180 continuous days out of the most recent 365 days. Alternatively, CAISO asks the Commission for additional clarity on how RTOs/ISOs should evaluate price index liquidity when price index developers use market assessments. [93] CAISO also requests that the Commission specify the extent to which price index developers must report criteria-related data when they rely on market assessments rather than weighted averages. [94]

 **\*\*15** 65. Argus requests that the Commission study whether the increase in market assessments, coupled with the requirement that price index developers publish when they use a market assessment, affects market participant contracting practices. Argus elaborates that market participants may include an alternative pricing methodology to replace a particular hub in their contracts, explaining that if the hub is subject to market assessments, it could indicate to market participants that it is a less liquid hub. [95]

### 3. Commission Determination

66. Consistent with the proposal in the Proposed Revised Policy Statement, we clarify that, with respect to assessments, a Commission-approved price index developer should indicate in its publications and data distributions when it uses a market assessment to calculate a published index price. Further, under the revised standards for price index developers, each price index developer's code of conduct should inform customers how it uses market assessments in calculating price indices by specifying the types of data it may use in producing a market assessment. Price index developers should also clearly explain in their code of conduct how to determine if a price assessment is made in its publications and its data distributions.

67. We find that, as noted in the Proposed Revised Policy Statement, adopting these proposals will enhance price index assessment transparency and give market participants better information about the liquidity of certain hub locations. [96] We agree with AGA that these modifications to the Commission's price index policy will increase transparency of price index development, and more generally, natural gas price formation. We find that these modifications may, in turn, increase the

ADD-73

industry's confidence in price indices. Finally, we agree with AGA and APGA that these modifications will give market participants a mechanism to identify market assessments. [97] We find that explicitly requiring price index developers to indicate when and how they use a market assessment will provide more clarity to market participants and increase price index assessment transparency.

68. In their comments, both EQT and CAISO request that the Commission clarify how market assessments might be used when determining price index liquidity. EQT specifically states that they do not believe market assessments should be permitted as a substitute for the current liquidity requirements, as those requirements are already relatively small. A market assessment is only used when a price index developer cannot determine a value for the index price using the trades at the index's specified location, indicating low liquidity for the specified index. Therefore, price index developers should clearly identify assessments in their publications and data distribution and to explain how to identify price indices that have been assessed in their code of conduct. [98] When measuring the average liquidity of a price index proposed for reference in a Commission-jurisdictional tariff, the Commission will consider any days the price index is assessed to have zero volume, zero transactions, and/or zero counterparties. The Commission's price index liquidity requirements [99] for price indices proposed for reference in Commission-jurisdictional tariffs still apply to price indices that use market assessments. However, we note that use of market assessments may affect the measured liquidity at any given price index when it is proposed for reference in a Commission-jurisdictional tariff because the Commission considers any days the price index is assessed to have zero volume, zero transactions, and/or zero counterparties.

**\*\*16** 69. CAISO also requests that the Commission specify the extent to which price index developers must report criteria-related data (i.e., daily volume traded, number of transactions, and number of counterparties), even on days when price index developers publish market assessments in lieu of price indices. [100] We understand that price index developers calculate market assessments when **\*61364** there is little or no liquidity at a hub on any given day. If a Commission-approved price index developer finds that the transaction data reported at a hub is insufficient to form a price, a price index developer may choose to use other information to determine the price at the hub. As long as a price index developer clearly states its methodology to identify market assessments, we find that an index developer need not report transaction data (i.e., daily volume traded, number of transactions, and number of counterparties) for that hub. We decline to require such reporting given that Commission-approved price index developers may use few (if any) of the reported transactions in developing the assessment, thus limiting the value of such reporting.

70. Additionally, Argus requests that the Commission study whether the increase in market assessments, coupled with the requirement that price index developers publish when they use a market assessment, affects market participant "contracting practices." [101] Though we acknowledge that market participants may undertake alternative pricing methodologies in future contracting practices, Argus has not explained the benefit of studying the impact of market assessments on market participant contracting practices. Accordingly, we decline to undertake such a study.

## E. Ensuring Price Index Developers' Continued Adherence to the Price Index Policy

### 1. Commission Proposal

71. In the Initial Policy Statement, the Commission set forth five standards for price index developers to demonstrate that their internal processes were sufficient to qualify as a Commission-approved price index developer and, thus, have their price indices referenced in Commission-jurisdictional tariffs. [102] As detailed above, those five standards include: (1) a code of conduct and confidentiality; (2) completeness; (3) data verification, error correction, and monitoring; (4) verifiability; and (5) accessibility. After the Commission issued the *Policy Statement*, 10 price index developers made filings with the Commission asserting that they complied with these standards. In the Price Index Order, the Commission approved those price index developers as



ADD-74

satisfying all or substantially all of the standards. [103] Since then, the Commission has granted approval to three additional price index developers. [104]

72. In the Proposed Revised Policy Statement, the Commission proposed that a Commission-approved price index developer should seek re-approval from the Commission every seven years that it continues to meet the five standards for price index developers. More specifically, the Commission proposed that, beginning six months after the effective date of this proposal, interstate natural gas pipelines and public utilities proposing to use price indices in jurisdictional tariffs will no longer be entitled to the rebuttable presumption that a price index developer's price indices produce just and reasonable rates unless the price index developer has obtained re-approval from the Commission within the last seven years that it continues to meet the criteria set forth in the Initial Policy Statement.

### 2. Comments

**\*\*17** 73. Price index developers generally support the Commission's proposal for price index developers to obtain re-approval every seven years as a way to ensure their continued adherence to the Commission's price index policy. [105]

74. Platts notes that the Commission has not described the re-approval requirements or re-approval process. [106] As a result, Platts proposes that price index developers demonstrate adherence to the International Organization of Securities Commissions (IOSCO) Principles for Oil Price Reporting Agencies for re-approval, as the IOSCO principles call for a third-party review on an annual basis and would add integrity to the re-approval process. [107]

75. EQT also seeks further clarification on whether or how the use of market assessments would factor into the "every seven-year" determination as to whether a price index developer continues to meet the Commission's threshold liquidity standard. [108]

### 3. Commission Determination

76. We adopt the proposal in the *Proposed Revised Policy Statement* for each Commission-approved price index developer to seek re-approval from the Commission every seven years that it continues to fully or substantially meet the five standards for publishing price indices. Beginning six months after the effective date of this revision, interstate natural gas pipelines and public utilities proposing to use price indices in jurisdictional tariffs will no longer be entitled to the rebuttable presumption that a price index developer's price **\*61365** indices produce just and reasonable rates unless the price index developer has obtained approval or re-approval from the Commission within the last seven years. [109]

77. Under the Commission's price index policy, after the Commission approves a price index developer, the Commission has no further verification process to ensure that price index developers continue to adhere to the five standards for publishing price indices. As a result, for most of the currently approved price index developers, the Commission has not reexamined their compliance with the price index developer standards in 18 years, despite the myriad changes in natural gas markets that have occurred during that time. [110] Having price index developers seek re-approval from the Commission every seven years will aid the Commission in ensuring that Commission-jurisdictional tariffs and rates that reference price indices remain just and reasonable.

78. In responses to comments from Platts asserting that the Commission has not yet described the re-approval process, we clarify that we have not changed the guidelines for the Commission's approval process for a price index developer's methodology. [111] As such, price index developers seeking Commission approval, or re-approval, should continue to follow the guidelines stated in the Commission's Initial Policy Statement. [112]



ADD-75

**\*\*18** 79. EQT seeks clarity on whether the use of market assessments would factor into the Commission's approval of a price index developer. [113] We find that the use of market assessments will not affect Commission approval of a price index developer as long as the price index developer's code of conduct adequately describes the methodology for use of market assessments as required by this Revised Policy Statement.

### F. Modifying Liquidity Standards for Price Index References

#### 1. Commission Proposal

80. In the Price Index Order, the Commission adopted a set of criteria delineating a price index developer's minimum reported level of activity at a particular trading location in order for that price index trading at that location to be referenced in a Commission-jurisdictional tariff - effectively known as liquidity standards. [114]

81. The Commission found that interstate natural gas pipelines and utilities, when proposing new natural gas and electric price indices to be used in Commission-jurisdictional tariffs, should confirm that the proposed price index at defined location(s) have met the minimum liquidity standards over a 90-day period for daily or weekly indices, and a six-month period for monthly indices. [115] The Commission did not specify any timeframe during which the applicant should show that the proposed price index at a defined location meets the liquidity threshold. As a result, interstate natural gas pipelines and RTOs/ISOs have used different 90-day or six month-periods to submit data on price indices at defined locations in order to assess liquidity. [116]

82. In the Proposed Revised Policy Statement, the Commission proposed to modify the review period over which a natural gas price index at a defined location should meet the minimum level of activity for natural gas price indices referenced in Commission-jurisdictional tariffs to at least 180 continuous days out of the most recent 365 days from the filing date of any such proposal. [117] The proposed modification of liquidity standards was intended to provide clarity to market participants that propose natural gas price index references in their Commission-jurisdictional tariff filings.

83. Specifically, the Commission proposed to revise the liquidity criteria established in the Price Index Order as follows (revised language shown in italics). The Commission also proposed to remove the term "daily" from the daily, weekly, and monthly liquidity requirements to provide clarity concerning the conditions that should be met for those types of price indices.

Daily or hourly indices should meet at least one of the following conditions, on average, for all non-holiday weekdays *for at least 180 continuous days out of the most recent 365 days*:
1. Average volume traded of at least 25,000 million Btu (MMBtu) *per day* for natural gas or 2,000 Megawatt hours (MWh) *per day* for power; or

**\*\*19** 2. Average number of transactions of five or more *per day*; or

**\*61366** 3. Average number of counterparties of five or more *per day*.

Weekly indices should meet at least one of the following conditions on average for all weeks *for at least 180 continuous days out of the most recent 365 days*:
1. Average volume traded of at least 25,000 MMBtu *per day* for gas or 2,000 MWh *per day* for power; or

2. Average number of transactions of eight or more per week; or



ADD-76

3. Average number of counterparties of eight or more per week.

Monthly indices should meet at least one of the following conditions on average *for at least 180 continuous days out of the most recent 365 days*:

1. Average volume traded of 25,000 MMBtu *per day* for gas or 2,000 MWh *per day* for power; or

2. Average number of transactions of ten or more per month; or

3. Average number of counterparties of ten or more per month.

## 2. Comments

84. Commenters generally supported the Commission's proposed revisions to the review period over which price indices at defined locations should meet the minimum level of activity. For instance, EQT notes that the proposed revisions would enhance the accuracy of the price indices referenced in Commission-jurisdictional tariffs, pricing of physical transactions, and settlement of financial hedges. [118]

85. CAISO raises several clarifying questions regarding applying the revised liquidity criteria. CAISO asks for clarification regarding how to address a scenario where a price index becomes insufficiently liquid based on the Commission's criteria, and requests that the Commission clarify that RTOs/ISOs are still obligated to comply with their tariffs, even where a price index becomes insufficiently liquid. CAISO also requests that the Commission clarify how often CAISO must evaluate its referenced price indices for liquidity (e.g., daily, annually, some other metric). Additionally, CAISO asks that the Commission clarify the meaning of "on average" in its proposed liquidity criteria and whether the term is applied to the liquidity criteria independent of its application to each criterion. Lastly, CAISO requests the Commission clarify whether CAISO must comply with the proposed liquidity criteria every time it uses an index price, or whether it may seek relief from applying those criteria where liquidity and the use of the index price is less critical, further requesting that the Commission identify cases where price indices must satisfy the liquidity criteria and other cases where price indices need not satisfy the liquidity criteria. [119]

86. EQT questions why the Commission did not consider a similar increase to the remaining liquidity criteria language laid out in the Price Index Order. As a less burdensome alternative, EQT recommends that the Commission consider requiring price index developers, upon re-approval, to meet at least two of the three liquidity metrics at each price location. [120]

**20 87. NGSA asks the Commission to apply the proposed liquidity criteria on a prospective basis, applying the criteria to future tariff filings that propose new or updated price index locations and allowing previously approved price index locations to remain in effect. NGSA explains that applying the new criteria to previously approved price index locations could inadvertently disrupt contractual arrangements based on natural gas pipeline tariffs previously approved by the Commission. [121]

88. Argus opposes the proposed changes and states that new liquidity criteria will likely have unintended and negative consequences and urges the Commission to leave the existing liquidity criteria intact or solicit alternative proposals. Argus cautions the Commission against increasing current liquidity criteria by expanding the time period to 180 days, contending the proposed timeframe may not be predictive of a subsequent period for which a tariff may apply. Argus also states that expanding the review period for price index locations may inadvertently reduce the number of price indices that qualify for use in Commission-jurisdictional tariffs, resulting in only a core group of very liquid hubs meeting the proposed liquidity standards. [122]



89. If the Commission adopts the 180-day proposal, Argus recommends that the Commission revisit and reconsider the specific information to accompany market assessments for locations possibly rendered less liquid by the 180-day change. Argus asserts that customers and market participants that do business at less-liquid locations may wish to have more detail about assessment methodologies on each instance of publication. Argus also states that it is prepared to provide such relevant data. [123]

90. Furthermore, Argus recommends that the Commission reconsider applying the liquidity standards to daily electric price indices. Argus elaborates that daily electric price indices are most predominantly used in the Western Electricity Coordinating Council, where power is traded in standard packages of 25 MWh for each peak or off-peak hour, smaller than the standard package for the remainder of the country. Argus states that **61367** in order to meet the 2,000 MWh per day volume criteria of the liquidity standards, an index would need either five trades during each of the 16 peak hours or 10 trades during each of the eight off-peak hours. Argus adds that it does not believe the Commission wants to inject a lack of clarity and encourages further discussion of the application of the liquidity standards to electricity. [124]

### 3. Commission Determination

91. In the Proposed Revised Policy Statement, the Commission stated generally that the proposed modifications would apply solely to natural gas price indices. [125] We recognize, however, that the proposed modifications to the liquidity standards would have, by their terms, applied to both natural gas and electric price indices (by referencing both MMBtu and MWh). Consistent with the Commission's earlier general statement, we adopt the proposed liquidity standards only for natural gas price indices. As noted below, Commission staff will continue to review potential reforms related to electric price index standards, including for the liquidity standards.

**\*\*21** 92. Accordingly, we adopt the revised liquidity standards for natural gas price indices as follows: (revised language shown in italics):
Daily *natural gas price* indices should meet at least one of the following conditions, on average, for all non-holiday weekdays *for at least 180 continuous days out of the most recent 365 days*:

1. Average volume traded of at least 25,000 million Btu (MMBtu) *per day*; or

2. Average number of transactions of five or more *per day*; or

3. Average number of counterparties of five or more *per day*.


Weekly *natural gas price* indices should meet at least one of the following conditions on average for all weeks *for at least 180 continuous days out of the most recent 365 days*:
4. Average volume traded of at least 25,000 MMBtu *per day*; or

5. Average number of transactions of eight or more per week; or

6. Average number of counterparties of eight or more per week.


Monthly *natural gas price* indices should meet at least one of the following conditions on average *for at least 180 continuous days out of the most recent 365 days*:
4. Average volume traded of 25,000 MMBtu *per day*; or

5. Average number of transactions of ten or more per month; or



ADD-78

6. Average number of counterparties of ten or more per month.

93. We clarify that a natural gas price index must meet at least one particular criterion for 180 continuous days and that alternating between multiple criteria in the 180-day time period is not sufficient to meet the index liquidity standard. The liquidity standards for electric price indices remain unchanged.

94. These revisions to the liquidity standards for natural gas indices are based on changes in natural gas markets. We find that shifts in regional production and market demand areas have resulted in changes in the liquidity of natural gas price index hubs across the United States. For example, although the Houston Ship Channel natural gas trading hub in South Texas historically was considered to be liquid with nearly 100 deals/day in 2008, liquidity has since fallen significantly. In 2021, the hub averaged 6 deals/day and on certain days did not have any transactions. In light of the dynamic and seasonal nature of natural gas trading, some natural gas price indices may not provide a reasonable representation of natural gas costs consistently enough to be included within Commission-jurisdictional tariffs. Further, we find that additional clarity would help to ensure applicants' approach to assessing liquidity is reflective of the most recent market activity. Additionally, we conclude that expanding the review period will ensure that natural gas price indices referenced in Commission-jurisdictional tariffs are sufficiently liquid, ultimately benefiting customers who are subject to the tariff provisions.

95. In response to EQT's concerns, we reiterate that applicants must present data that demonstrate a price index at a defined location meets a single liquidity criterion for 180 continuous days. EQT suggests that the Commission should have strengthened each of the three criteria or required a price index to meet at least two of the three criteria at each price location. [126] Consistent with the *Price Index Order*, we find that a price index is sufficiently liquid if it meets one of the three criteria based on transaction volumes, number of transactions, or number of counterparties. We do not adopt EQT's recommendation to require price indices to meet multiple criteria as we find that such additional requirement would unnecessarily limit flexibility. We find that the modifications to the review period outlined in the *Proposed Revised Policy Statement* provide clarity and ensure that natural gas price indices referenced in Commission-jurisdictional tariffs are sufficiently liquid.

**22 96. In response to the concerns of NGSA and CAISO, we reiterate that the liquidity standards apply to price indices when proposed in a tariff. We clarify that Commission-regulated entities will not be required to evaluate the price indices **61368 currently referenced in their tariffs to ascertain whether they meet the new criteria set forth above. Nonetheless, we encourage entities to periodically reevaluate their tariffs to ensure that referenced price indices have maintained adequate liquidity. If an entity wishes to revise a price index referenced in its Commission-jurisdictional tariff, it must file a proposed tariff revision with the Commission and provide supporting information that the new price index meets the established liquidity criteria. Other than the revisions adopted here, the underlying criteria remain unchanged from the Price Index Order. Also, consistent with the Price Index Order, the changes made herein will be applied on a prospective basis from the effective date of this Revised Policy Statement.

97. We disagree with Argus [127] that adopting the proposed liquidity standards would create a significant burden for jurisdictional entities with unintended and negative consequences. Rather, the changes to the liquidity standards encourage use of sufficiently liquid natural gas price indices and ensure that proposed tariff changes are held to consistent standards. Consistent with the Price Index Order, applicants still have flexibility to submit any price index for use in a Commission-jurisdictional tariff, as long as they provide relevant data demonstrating liquidity based on one of the defined criteria (i.e., transaction volumes, number of transactions, or number of counterparties). While Argus is correct in stating that a particular 180-day period may not be predictive of a future time period, we do not find this a convincing argument against the changes proposed to the liquidity standards for natural gas price indices. Using a specified time period to measure liquidity establishes a baseline and ensures consistent treatment for price indices. Argus also suggests that the Commission's adoption of the proposed changes should be conditioned on the reevaluation of other factors and the solicitation of alternatives; however, we are not persuaded that such a broader inquiry is warranted at this time given the limited changes to the liquidity standards.


ADD-79

### G. Additional Policy Changes to Electric Indices and Electric Price Index Developers

98. The modifications in the Proposed Revised Policy Statement apply solely to natural gas price indices and natural gas price index developers. [128] The Commission stated that staff would conduct outreach to explore the need for, and scope of, any potential policy updates for the electric industry. [129] We decline to update our policy for electric price indices in response to the comments submitted by Argus, EPSA and Platts. [130] Nonetheless, we continue to consider the need for, and scope of, any potential modifications to the price index policy for the electric industry.

### H. Other Issues Raised By Commenters

#### 1. Comments

**23** 99. Several commenters raised issues that were not specific to proposals in the Proposed Revised Policy Statement.

100. APGA expresses concerns regarding Operational Flow Order penalties during extreme events such as the February 2021 winter storm. APGA argues that the Commission should further examine this issue in the Commission's review of the market events that occurred as a result of that February 2021 winter storm. [131] APGA also recommends the Commission include periodic reports on price index liquidity trends in its State of the Markets report. APGA specifically requests the Commission provide more transparency on the types of entities that are price reporting. [132]

101. Platts believes that price reporting and the underlying methodology should evolve and incorporate changing markets and trading dynamics. Platts urges the Commission to explore "other ways" to include "all relevant trade information into indices, such as including daily basis trades." [133] Platts cites the increase in liquidity at the Florida city-gates due to their inclusion of "daily basis trades" at the hub [134] but did not further elaborate in its comments on how to include additional trade information into price indices.

102. AFPA/PGC argue the proposals in the Proposed Revised Policy Statement do not address the shrinking number of price indices that exist today. AFPA/PGC further state that the ability of one or two price index developers to exert market power over the price of their subscriptions undermines the Commission's efforts to increase reporting to price index developers because market participants cannot afford price index developer subscriptions. Accordingly, AFPA/PGC suggest that the Commission include subscription cost in the accessibility standard for price indices, stating that this revision is appropriate given the goal of the Commission's fifth standard, the accessibility standard, to ensure that all interested customers have reasonable access to published price indices on a timely basis. [135]

103. AFPA/PGC suggests the Commission should consider whether the number of remaining price index developers is sufficient to ensure that price index developers, as a whole, meet the **61369** accessibility standard. [136] Further, AFPA/PGC request the Commission consider establishing a minimum threshold number of price index developers needed for adequate competition, triggering an investigation of the competition in the price index developer market. [137]

104. AFPA/PGC also suggest that the Commission should consider investigating the creation of a non-profit or government-maintained source of trade data, further noting that the agency that oversees the trade data could "establish a fee to recover the cost of providing this service that would likely be more feasible for market participants than attempting to maintain subscriptions to the for-profit indices." [138]

ADD-80

#### 2. Commission Determination

**\*\*24** 105. The Proposed Revised Policy Statement did not propose reforms related to these issues. Therefore, we decline to address them here.

#### I. Safe Harbor Policy for Data Providers to Price Index Developers Notice of Proposed Rulemaking

106. Concurrent with issuing the Proposed Revised Policy Statement, the Commission also issued the *Safe Harbor Policy for Data Providers to Price Index Developers Notice of Proposed Rulemaking.*[139] The Commission proposed to amend the Commission's regulations to codify the Safe Harbor Policy established in the Commission's *Policy Statement*. Although the Commission is not acting on the notice of proposed rulemaking at this time, the Safe Harbor Policy in the Commission's Initial Policy Statement remains in effect.

#### III. Information Collection Statement

107. The Paperwork Reduction Act (PRA) requires each federal agency to seek and obtain the Office of Management and Budget's (OMB) approval before undertaking a collection of information (including reporting, record keeping, and public disclosure requirements) directed to ten or more persons or contained in a rule of general applicability. OMB regulations require approval of certain information collection requirements (including deletion, revision, or implementation of new requirements). Upon approval of a collection of information, OMB will assign an OMB control number and an expiration date. Respondents subject to the filing requirements will not be penalized for failing to respond to the collection of information unless the collection of information displays a valid OMB control number.

108. The Commission solicits comments from the public on the Commission's need for this information, whether the information will have practical utility, the accuracy of the burden estimates, ways to enhance the quality, utility and clarity of the information collected or retained, and any suggested methods for minimizing respondents' burden, including the use of automated information techniques. Specifically, the Commission asks that any revised burden or cost estimates submitted by commenters be supported by sufficient detail to understand how the estimates are generated.

109. This revised policy statement will affect the existing data collection: FERC-549, NGPA Title III Transactions and NGA Blanket Certificate Transactions and FERC-552, Annual Report of Natural Gas Transactions.

110. Estimates of the PRA-related burden and cost[140] follow. The following table summarizes the estimated increases and decreases in burden due to the proposed policy changes above.

**Modifications Due to the Revised Policy Statement in Docket No. PL20-3**

| No. of Respondents(1) | Annual No. of Responses Per Respondent (2) | Total No. of Responses (1)*(2)=(3) | Average Burden (Hrs.) & Cost ($) Per Response (4) | Total Annual Burden Hrs. & Total Annual Cost ($) (3)*(4)=(5) |
|---|---|---|---|---|
| **Burden Reductions[141] to FERC-549** | | | | |
| Data Providers-perform biennial self-audit (not annual) | 125 | .5 | 62.5 | 80 hrs.; $6,960 | 5,000 hrs.; $435,000 |



| | | | | |
|---|---|---|---|---|
| Data Providers—provide month-ahead (not day-ahead on a daily basis) [142] | 11 | 249 [143] | 2,739 | 4 hrs.; $348 | 10,956 hrs.; $953,712 |
| **Reductions to FERC-549** | | | | | **15,956 hrs.; $1,388,172** |

| | | | | |
|---|---|---|---|---|
| | | | **Burden Increases to FERC-549** | | |
| Price Index Developers—re-certify every 7 yrs. | 6 | 0.14 | 0.84 | 320 hrs.; $27,840 | 268.8 hrs.; $23,385.6 |
| Price Index Developers—code of conduct & confident.; & inform customers | 6 | 1 | 6 | 80 hrs.; $6,960 | 480 hrs.; $41,760 |
| Price Index Developers—identify assessed index price vs. calculated | 6 | 1 | 6 | 80 hrs.; $6,960 | 480 hrs.; $41,760 |
| **Increases to FERC-549** | | | | | **1,228.80 hrs.; $106,905.60** |
| **Net Total Reduction** | | | | | **14,727.2 hrs.; $1,281,266.40** |

[141]    The burden reductions are provided for information and comment. To be conservative, the Commission may not remove the hours from its information collection estimates in the OMB-approved inventory.

[142]    Commission staff assumes respondents with 2020 estimated volumes of next-month and physical basis transactions reported to price index developers that exceeded two thirds of their total estimated volumes reported to price index developers will no longer report their next-day transactions to price index developers.

[143]    We are allowing companies to report just monthly, instead of monthly and daily. The figure (249 annual responses per respondent) relates to reporting on all non-holiday trading days.

[144]    The burden reductions are provided for information and comment. To be conservative, the Commission may not remove the hours from its information collection estimates in the OMB-approved inventory.

[145]    Total Form No. 552 filers and their affiliates.

**Form No. 552 Modifications Due to the Revised Policy Statement in Docket No. PL20-3**

| | No. of Respondents(1) | Annual No. of Responses Per Respondent(2) | Total No. of Responses (1)*(2)=(3) | Average Burden (Hrs.) & Cost ($) Per Response (4) | Total Annual Burden Hrs. & Total Annual Cost ($) (3)*(4)=(5) |
|---|---|---|---|---|---|
| | | **Burden Increases [144] to FERC-552** | | | |
| Form No. 552 filers - indicate if they report their next-day and/or next-month transactions | 1,163 [145] | 1 | 1,163 | .25 hrs.; $21.75 | 290.75 hrs.; $25,295.25 |
| **Increases to FERC-552** | | | | | 290.75 hrs.; $25,295.25 |
| **Net Total Increase** | | | | | **290.75 hrs.; $25,295.25** |

**\*\*25**   The Commission seeks comments on the burden and cost related to complying with the proposed revised policy statement.


ADD-82

Title: FERC-549, NGPA Title III Transactions and NGA Blanket Certificate Transactions.

OMB Control No.: 1902-0086

Respondents: Natural Gas Data Providers (Market Participants That Report Transaction Data to Price Index Developers) and Price Index Developers.

Frequency of Responses: As discussed.

Title: FERC-552, Annual Report of Natural Gas Transactions

**\*61370** OMB Control No.: 1902-0242.

Respondents: Wholesale natural gas market participants (Market Participants That Report Transaction Data to Price Index Developers) and Price Index Developers.

Frequency of Responses: As discussed.

Necessity of the Information:

The collection of this information helps to provide accuracy and transparency to the formation of natural gas price indices.

Internal Review: These requirements conform to the Commission's goal for efficient information collection, communication, and management. The Commission has assured itself, by means of its internal review, that there is specific, objective support for the burden estimates associated with the information requirements.

Interested persons may obtain information on the reporting requirements by contacting the following: Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426, Attn: Ellen Brown, Office of the Executive Director, e-mail: DataClearance@ferc.gov, or phone: (202) 502-8663.

## IV. <u>Document Availability</u>

111. In addition to publishing the full text of this document in the Federal Register, the Commission provides all interested persons an opportunity to view and/or print the contents of this document via the Internet through the Commission's Home Page (http://www.ferc.gov). At this time, the Commission has suspended access to the Commission's Public Reference Room, due to the President's March 13, 2020 proclamation declaring a National Emergency concerning the Novel Coronavirus Disease (COVID-19).

112. From the Commission's Home Page on the Internet, this information is available on eLibrary. The full text of this document is available on eLibrary in PDF and Microsoft Word format for viewing, printing, and/or downloading. To access this document in eLibrary, type the docket number excluding the last three digits of this document in the docket number field.

113. User assistance is available for eLibrary and the Commission's website during normal business hours from FERC Online Support at (202) 502-6652 (toll free at 1-866-208-3676) or email at ferconlinesupport@ferc.gov, or the Public Reference Room at (202) 502-8371, TTY (202) 502-8659. E-mail the Public Reference Room at public.referenceroom@ferc.gov.

## V. <u>Effective Date</u>

ADD-83

**26** 114. This Policy Statement will become effective on December 31, 2022.

By the Commission. Commissioner Danly is concurring with a separate statement attached.

(SEAL)


Debbie-Anne A. Reese
Deputy Secretary


### Appendix A: Commenters

1) American Public Gas Association (APGA)

2) EQT Energy LLC (EQT)

3) S&P Global Platts (Platts)

4) Electric Power Supply Association (EPSA)

5) Energy Intelligence Group (Energy Intelligence)

6) American Gas Association (AGA)

7) Natural Gas Supply Association (NGSA)

8) Natural Gas Intelligence Press Inc (NGI)

9) Argus Media Inc. (Argus)

10) California Independent System Operator Corporation (CAISO)

11) American Forest & Paper Association and Process Gas Consumers Group (AFPA/PGC)

12) Edison Electric Institute (EEI)

13) Interstate Municipal Gas Agency (IMGA)


### Appendix B: Proposed Changes to Form No. 552

To reduce the burden on natural gas data providers who choose to report their fixed-price transactions to natural gas price index developers, the *Revised Policy Statement* modifies the Commission's price index policy to allow data providers to now report their next-day or the next-month transactions, or both, to price index developers.

As a result of this policy change, a minor modification needs to be made to FERC Form No. 552, Annual Report of Natural Gas Transactions (Form No. 552) to ensure that the Commission accurately collects information from market participants who report their natural gas transactions to price index developers. On May 1 of each year, filers submit the Form No. 552 which

ADD-84

collects aggregated physical natural gas transactional information from market participants that buy or sell more than 2.2 TBtus during the previous calendar year. Page 3 of Form No. 552 requires market participants to identify whether they report their transactions to price index developers. To account for the change in policy, the Commission modifies Form No. 552 to allow filers to identify if they report their next-day *and/or* their next-month fixed-price and physical basis transactions to price index developers. The revision to page 3 of Form No. 552 is set forth below in highlight and requires filers and their affiliates to now identify if they report their next-day (identified below as ""Daily") and/or their next-month fixed-price and physical basis transactions (identified below as "Monthly") to price index developers.


TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE


**\*61371  DANLY, Commissioner,** *concurring*:


1. I concur with today's order [146] adopting the revisions that the Commission proposed in December 2020 to its *Policy Statement on Natural Gas and Electric Price Indices,* [147] As part of its charge to ensure just and reasonable rates, [148] the **\*61372** Commission should take actions that enhance the liquidity and transparency of the price indices that are used in jurisdictional tariffs.

**\*\*27** 2. I write separately to suggest that the Commission might have acted otherwise on its parallel proposal to codify its *Safe Harbor Policy for Data Providers to Price Index Developers* in Docket No. RM20-7-000 (Proposed Rule). [149] Doubtless, there are good reasons for the Commission to decline to act at this time. [150] However, the Commission offers none.

3. Initially, the Commission had found that "[b]ased on industry comments during and after the technical conference, we believe that incorporation of the Safe Harbor Policy into the Commission's regulations will provide greater certainty to market participants and will lead to increased voluntary reporting to price index developers." [151] All but one entity [152] commenting on the Proposed Rule agreed. [153] Though entitled to decline to take action, it would have been preferable for the Commission to have cited specific evidence and to have explained why it is now deterred from acting within our jurisdiction on a proposal that it had initially believed would improve the indices.

For these reasons, I respectfully concur.

James P. Danly

Commissioner


[1]   *Actions Regarding the Comm'n's Pol'y on Price Index Formation & Transparency, & Indices Referenced in Nat. Gas & Elec. Tariffs,* 85 FR 83940 (Dec. 23,2020) 173 FERC ¶ 61,237 (2020) (Proposed Revised Policy Statement).

[2]   104 FERC ¶ 61,121 (Initial Policy Statement), *clarified, Order on Clarification of Pol'y Statement on Nat. Gas and Elec. Price Indices,* 105 FERC ¶ 61,282 (2003) (2003 Clarification Order), *clarified, Order Further Clarifying Pol'y Statement on Nat. Gas & Elec. Price Indices,* 70 FR 41002 (July 15, 2005) 112 FERC ¶ 61,040 (2005) (2005 Clarification Order) (collectively, price index policy).

[3]   Price index developers include Argus Media (Argus), Natural Gas Intelligence (NGI), Natural Gas Week, and S&P Global Platts (Platts).

[4]  See Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 28. A price index developer is considered to use a "market assessment" when it uses "market information, other than the trades at the index's specified location, to determine the value of the index price."

[5]  The term "fixed-price natural gas transactions" refers to fixed-price next-day delivery, fixed-price next-month delivery, and physical basis transactions (for next-month delivery). These transaction types are defined in the FERC Form No. 552: Annual Report of Natural Gas Transactions (Form No. 552) instructions. The Form No. 552 requires market participants that annually buy or sell more than 2.2 trillion British Thermal Units (Btu) of physical natural gas to provide aggregated data related to their fixed-price, physical basis, New York Mercantile Exchange (NYMEX) Trigger agreements, NYMEX Plus transactions made in the next-day and next-month markets, and index-based transactions referencing the next-day and next-month markets.

[6]  Initial Policy Statement, 104 FERC ¶ 61,121 at P 11.

[7]  Id. P 34.

[8]  Id. P 37.

[9]  Id. P 33.

[10]  See Initial Policy Statement, 104 FERC ¶ 61,121.

[11]  2003 Clarification Order, 105 FERC ¶ 61,282.

[12]  2005 Clarification Order, 112 FERC ¶ 61,040.

[13]  Id. P 21.

[14]  109 FERC ¶ 61,184 (2004) (Price Index Order).

[15]  Id. P 22.

[16]  Id. at ordering para. (B).

[17]  Id. at ordering para. (D).

[18]  Initial Policy Statement, 104 FERC ¶ 61,121 at P 8 & n.1.

[19]  Price Index Order, 109 FERC ¶ 61,184.

[20]  Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 691-692 (2005) (codified in relevant part at Natural Gas Act of 1938, 15 U.S.C. 717c-1, 717t-1, 717t-2).

[21]  Two price index developers now include fixed-price transactions from the InterContinental Exchange (ICE) to increase the liquidity of their price indices. Commission staff analysis of the estimated volumes reported to price index developers via the Form No. 552 does not include supplemental information from ICE.

[22]  The Commission must estimate the volume of transactions reported to price index developers using Form No. 552 submissions because Form No. 552 filers can provide aggregated data for themselves and their affiliates, some of whom may or may not report to price index developers. Commission staff estimates this volume by calculating the average of the minimum possible volume reported (based on the subset of filers with affiliates that all indicate that they report to price index developers) and the maximum possible volume reported (based on the larger set of filers with at least one affiliate that indicates that it reports to price index developers).

ADD-86

23    *See, e.g.*, 15 U.S.C. 717(b)-717(d); Natural Gas Policy Act of 1978, 15 U.S.C. 3431(a)(1)(A)-3431(a)(1)(D); 16 U.S.C. 824(b)-824(f).

24    Price Index Order, 109 FERC ¶ 61,184 at P 68 (citing *N. Nat. Gas Co.*, 104 FERC ¶ 61,182, at P 10 (2003)).

25    *Id.* P 69.

26    The Commission established the natural gas market behavior rules in 2003 in Order No. 644. *Amendment to Blanket Sales Certificates*, Order No. 644, 68 FR 66323 (Nov. 26, 2003), 105 FERC ¶ 61,217 (2003), *reh'g denied*, 107 FERC ¶ 61,174 (2004) (codified at 18 CFR 284.288, 18 CFR 284.403); *Investigation of Terms & Conditions of Public Utility Mkt.-Based Rate Authorizations*, 105 FERC ¶ 61,218 (2003), *order on reh'g and clarification*, 107 FERC ¶ 61,175 (2004). The electric market behavior rules were codified later in 2006. *Conditions for Pub. Util. Mkt.-Based Rate Authorization Holders*, Order No. 674, 71 FR 9695 (Mar. 29, 2006), 114 FERC ¶ 61,163 (2006) (codified at 18 CFR 35.41(c)).

27    18 CFR 35.41; 18 CFR 284.288(a); 18 CFR 284.403(a); Initial Policy Statement, 104 FERC ¶ 61,121 at P 37.

28    *See* Docket No. AD17-12-000. A Commission staff-led technical conference addressing similar issues was held in 2003 in Docket No. AD03-7-000.

29    173 FERC ¶ 61,237.

30    Initial Policy Statement, 104 FERC ¶ 61,121 at P 1.

31    Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 16.

32    *Id.* P 17.

33    *Id.*

34    Appendix A will not be published in the *Federal Register*.

35    Initial Policy Statement, 104 FERC ¶ 61,121 at P 34.

36    *Id.*

37    *See* 2003 Clarification Order, 105 FERC ¶ 61,282 at P 12 & n.4 ("As noted in Policy Statement ¶ 34.3, reportable transactions are non-index based "bilateral, arm's-length transaction between non-affiliated companies in the physical (cash) markets at all trading locations.' Note, however, that if a participant reports trades to an index developer that publishes only a limited or regional index, the market participant must report trades in other areas not covered by the limited or regional index to another index developer.").

38    *Transparency Provisions of Section 23 of the Nat. Gas Act*, Order No. 704, 73 FR 1014 (Jan. 4, 2008), 121 FERC ¶ 61,295 (2007), *order on reh'g and clarification*, Order No. 704-A, 73 FR 55726 (Sept. 26, 2008), 124 FERC ¶ 61,269, at P 89, *reh'g denied*, Order No. 704-B, 125 FERC ¶ 61,302 (2008).

39    The Form No. 552 collects information on these types of transactions acknowledging their role in next-day and next-month price index formation.

40    Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 21.

41    American Public Gas Association (APGA) Comments at 12; Argus Comments at 3; Edison Electric Institute (EEI) Comments at 4; Energy Intelligence Comments at 1; EQT Comments at 5; Electric Power Supply Association (EPSA)

ADD-87

Comments at 2-3; Interstate Municipal Gas Agency (IMGA) Comments at 4; NGI Comments at 3-4; Natural Gas Supply Association (NGSA) Comments at 4-5; Platts Comments at 4.

42    Bidweek is a time frame occurring during the last five business days of every month at which most next-month contracts are traded. Delivery of these contracts takes place the following month.

43    NGSA Comments at 4.

44    EEI Comments at 4-5.

45    EQT Energy LLC (EQT) Comments at 5.

46    APGA Comments at 12; Platts Comments at 4.

47    NGI Comments at 3-4.

48    *Id.* at 4.

49    Argus Comments at 4.

50    AFPC/PGC Comments at 4-5.

51    APGA Comments at 12; Argus Comments at 4; EEI Comments at 4; Energy Intelligence Comments at 1; EPSA Comments at 2-3; EQT Comments at 5; IMGA Comment at 4; NGI Comments at 3-4; NGSA Comments at 4-5; Platts Comments at 4.

52    EQT Comments at 5; NGSA Comments at 4.

53    AFPA/PGC Comments at 4-5.

54    *See* Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 20.

55    AFPA/PGC Comments at 4-5.

56    A reporting company is the legal entity whose information is being submitted to the Commission via a Form No. 552 filing. Reporting companies may or may not be data providers reporting transactional data to price index developers.

57    Appendix B will not be published in the *Federal Register*.

58    *See* Order No. 704, 121 FERC ¶ 61,295 at P 41. The Commission defined a next-month natural gas contract reported on its Form No. 552 as a transaction executed during the last five business days of one month for uniform delivery over the next month. This timeframe was commonly known as bidweek.

59    Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 22.

60    APGA Comments at 12; Argus Comments at 4; Energy Intelligence Comments at 1; EPSA Comments at 2-3.

61    APGA Comments at 12.

62    Argus Comments at 4.

63    Energy Intelligence Comments at 1.

64    NGI Comments at 4-5; NGSA Comments at 5.

ADD-88

65 NGSA Comments at 5.

66 NGI Comments at 4.

67 *Id.* at 4-5.

68 2003 Clarification Order, 105 FERC ¶ 61,282 at P 12 ("A participant, of course, may report transactions to more than one index developer.")

69 *See* Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at PP 22-23.

70 Energy Intelligence Comments at 1.

71 APGA Comments at 12; Argus Comments at 4.

72 NGI Comments at 4-5.

73 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 24.

74 Initial Policy Statement, 104 FERC ¶ 61,121 at P 34.

75 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 26.

76 APGA Comments at 12; Argus Comments at 5; EEI Comments at 5; Energy Intelligence Comments at 1-2; EPSA Comments at 2-3; EQT Comments at 4-5; IMGA Comments at 4; NGI Comments at 5-6; NGSA Comments at 5-6.

77 Argus Comments at 5; EEI Comments at 5; Energy Intelligence Comments at 1-2; NGSA Comments at 5-6.

78 EQT Comments at 4-5.

79 NGSA Comments at 6-8.

80 NGSA Comments at 6-9.

81 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 27.

82 *Id.* P 28.

83 *Id.* P 30.

84 American Gas Association (AGA) Comments at 3-5; APGA Comments at 13; Argus Comments at 5; California Independent System Operator Corporation (CAISO) Comments at 4-5; Energy Intelligence Comments at 2; EQT Comments at 8; IMGA Comments at 4; NGI Comments at 6; Platts Comments at 4.

85 Argus Comments at 5; Energy Intelligence Comments at 2; NGI Comments at 6; Platts Comments at 4.

86 APGA Comments at 13.

87 AGA Comments at 5.

88 *Id.*

89 APGA Comments at 9, 13.

90 EQT Comments at 5-6 (citing Price Index Order, 109 FERC ¶ 61,184 at P 42).

ADD-89

91    *Id.* at 6.

92    *Id.* at 8.

93    CAISO Comments at 4-5.

94    *Id.* at 2.

95    Argus Comments at 6.

96    Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 30.

97    AGA Comments at 5; APGA Comments at 13.

98    For example, some price index developers designate a market assessment by indicating a price index having zero volume, zero transactions, and zero counterparties.

99    Price Index Order, 109 FERC ¶ 61,184 at P 66.

100    CAISO Comments at 4-5.

101    Argus Comments at 6.

102    Initial Policy Statement, 104 FERC ¶ 61,121 at P 33.

103    Price Index Order, 109 FERC ¶ 61,184 at P 24 (approving indices published by Argus, Bloomberg L.P., Btu/Data Transmission Network, Dow Jones and Company, Energy Intelligence, ICE, Io Energy LLC, NGI, Platts, and Powerdex, Inc. (Powerdex)).

104    Many of the original indices have ceased publication or been acquired and rebranded and not reapproved. As such, only five approved price index developers remain: Argus, Energy Intelligence (Natural Gas Week), NGI, Platts, and Powerdex. Although it was not pre-approved, SNL Energy continues to publish indices after purchasing IO Energy LLC and BTU/Data Transmission Network in 2004 and 2009, respectively.

105    Argus Comments at 6; Energy Intelligence Comments at 2; NGI Comments at 6; Platts Comments at 3.

106    Platts Comments at 3-4.

107    *Id.*

108    EQT Comments at 6.

109    Consistent with prior practice, price index developers would file for both initial Commission approval and re-approval in the PL03-3-000 docket.

110    For instance: multiple price index developers now receive transactions from ICE; at some hub locations, index-based "daily basis" transactions are now being used to create next-day indices; and market assessments are being used to price historically liquid hub locations where liquidity declined.

111    Platts Comments at 3.

112    Initial Policy Statement, 104 FERC ¶ 61,121, *clar.fied*, 2003 Clarification Order, 105 FERC ¶ 61,282, *clar.fied*, 2005 Clarification Order, 112 FERC ¶ 61,040.

113    EQT Comments at 8.

ADD-90

114 Price Index Order, 109 FERC ¶ 61,184 at P 66.

115 *Id.* P 65.

116 *E.g.*, in Docket No. RP20-59-000, filed on October 10, 2019, Dominion Energy Transmission Inc. submitted transactions for a price index at a defined location for the period from June 4, 2019 to August 30, 2019. In Docket No. RP19-1395-000, filed on July 24, 2019, Southern Natural Gas Company, L.L.C. submitted transactions for a price index at a defined location from April 1, 2019 to July 16, 2019. Both of these filings were accepted given that the natural gas pipelines provided 90 days of data, but the latter filing included a review period closer to the date of filing.

117 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 38.

118 EQT Comments at 6.

119 CAISO Comments at 3-4.

120 EQT Comments at 6-7.

121 NGSA Comments at 8-9.

122 Argus Comments at 7-8.

123 *Id.* at 8.

124 *Id.* at 7, 9.

125 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 40.

126 EQT Comments at 6-7.

127 We do not address Argus's arguments against the application of the proposed revisions to the liquidity standards to electric price indices, Argus Comments at 9, because we are not applying those proposed revisions to electric price indices.

128 Proposed Revised Policy Statement, 173 FERC ¶ 61,237 at P 40.

129 *Id.*

130 Argus Comments at 9-10; EPSA Comments at 3; Platts Reply Comments at 2-3.

131 APGA Comments at 8-9.

132 *Id.* at 11.

133 Platts Comments at 4.

134 *Id.*

135 *See* AFPA/PGC Comments at 7.

136 AFPA/PGC Comments at 7.

137 *Id.* at 6-7.

138 *Id.* at 5-6.

ADD-91

139    173 FERC ¶ 61,238 (2020).

140    The Commission staff estimates that industry is similarly situated in terms of hourly cost (for wages plus benefits). Based on the Commission's Fiscal Year (FY) 2021 average cost of $180,703/year (for wages plus benefits, for one full-time employee), $87.00/hour is used.

146    *Actions Regarding the Commission's Policy on Price Index Formation & Transparency, & Indices Referenced in Nat. Gas & Elec. Tariffs*, 179 FERC ¶ 61,036 (2022) (Order).

147    *Actions Regarding the Commission's Policy on Price Index Formation & Transparency, & Indices Referenced in Nat. Gas and Elec. Tariffs*, 173 FERC ¶ 61,237 (2020).

148    *See* 15 U.S.C. § 717c(a); *id.* § 717t-2; *see also NAACP v. FPC*, 425 U.S. 662, 669 (1976) ("[I]t is clear that the principal purpose of [[the Natural Gas Act] was to encourage the orderly development of plentiful supplies of ... natural gas at reasonable prices.") (citations omitted).

149    173 FERC ¶ 61,238 (2020).

150    *See* Order, 179 FERC ¶ 61,036 at P 106.

151    *Safe Harbor Policy for Data Providers to Price Index Developers*, 173 FERC ¶ 61,238 at P 12 (citations omitted).

152    *See* Public Citizen, Inc., Comments, Docket No. RM20-7-000 (filed June 1, 2021).

153    *See, e.g.*, Argus Media, Inc., Comments, Docket No. RM20-7-000, at 3 (filed June 1, 2021) ("Market participants consistently have voiced concerns to Argus that federal authorities including the Commission may pursue enforcement actions because of inadvertent errors in reporting transactions to price index developers despite the existence of the Safe Harbor Policy. Inadvertent errors could still lead to costly and disruptive enforcement investigations and audits. This is made even more risky for the data provider as there are not any 'damage caps' for investigative costs or potential liability."); Energy Intelligence, Comments, Docket No. PL20-3-000, at 2 (filed Mar. 23, 2021) ("Energy Intelligence views the Commission's parallel proposal (in Docket No. RM20-7-000) to codify into its regulations the '>Safe Harbor Policy for Data Providers' ... as an essential component of the effort to encourage more market participants to report their transactions to price index developers. On numerous occasions, potential data providers have expressed a reluctance to report transactions due to perceived risks associated with inadvertently reporting something in error.").

**179 FERC P 61036 (F.E.R.C.), 2022 WL 1198441**

ADD-92


KeyCite Yellow Flag
Proposed Legislation

West's Kansas Statutes Annotated
　Chapter 50. Unfair Trade and Consumer Protection
　　Article 6. Consumer Protection (Refs & Annos)
　　　Consumer Protection (Refs & Annos)

K.S.A. 50-624

50-624. Definitions

Currentness

As used in this act:

(a) "Agricultural purpose" means a purpose related to the production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products by a consumer who cultivates, plants, propagates or nurtures the agricultural products. "Agricultural products" includes agricultural, horticultural, viticultural, and dairy products, livestock, wildlife, poultry, bees, forest products, fish and shellfish, and any products thereof, including processed and manufactured products, and any and all products raised or produced on farms and any processed or manufactured products thereof.

(b) "Consumer" means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes.

(c) "Consumer transaction" means a sale, lease, assignment or other disposition for value of property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with respect to any of these dispositions. "Consumer transaction" does not include the disposition of repossessed collateral by any supplier that is subject to and compliant with any state or federal law or rules and regulations with regard to disposition of such repossessed collateral.

(d) "Family partnership" means a partnership in which all of the partners are natural persons related to each other, all of whom have a common ancestor within the third degree of relationship, by blood or by adoption, or the spouses or the stepchildren of any such persons, or persons acting in a fiduciary capacity for persons so related.

(e) "Final judgment" means a judgment, including any supporting opinion, that determines the rights of the parties and concerning which appellate remedies have been exhausted or the time for appeal has expired.

(f) "Lender" means a bank, savings and loan association, savings bank, credit union, finance company, mortgage bank, mortgage broker and any affiliate.

ADD-93

(g) "Merchantable" means, in addition to the qualities prescribed in K.S.A. 84-2-314, and amendments thereto, in conformity in all material respects with applicable state and federal statutes and regulations establishing standards of quality and safety.

(h) "Mortgage trigger lead" means a consumer report obtained pursuant to section 604(c)(1)(B) of the federal fair credit reporting act, 15 U.S.C. § 1681b, where the issuance of the report is triggered by an inquiry made with a consumer reporting agency in response to an application for credit. Any consumer report on an applicant obtained by a lender with whom the applicant has initially applied for credit or who holds or services an existing extension of credit of the applicant who is the subject of the report is not considered a mortgage trigger lead.

(i) "Person" means any individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative or other legal entity.

(j) "Property" includes real estate, goods and intangible personal property.

(k) "Services" includes:

(1) Work, labor and other personal services;

(2) privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals and cemetery accommodations; and

(3) any other act performed for a consumer by a supplier.

(l) "Supplier" means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer.

## Credits

Laws 1973, ch. 217, § 2; Laws 1974, ch. 230, § 2; Laws 1976, ch. 236, § 2; Laws 1983, ch. 179, § 1; Laws 1991, ch. 159, § 1; Laws 2001, ch. 49, § 1; Laws 2005, ch. 22, § 1; Laws 2009, ch. 67, § 1, eff. July 1, 2009; Laws 2019, ch. 66, § 14, eff. July 1, 2019.

Notes of Decisions (63)

K. S. A. 50-624, KS ST 50-624
Statutes are current through laws enacted during the 2025 Regular Session of the Kansas Legislature effective on or before May 8, 2025. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-94

KeyCite Red Flag

Unconstitutional or Preempted  Preempted by  In re Winter Storm Uri Natural Gas Litigation,  D.Kan.,  Feb. 28, 2025

West's Kansas Statutes Annotated
  Chapter 50. Unfair Trade and Consumer Protection
    Article 6. Consumer Protection (Refs & Annos)
      Consumer Protection (Refs & Annos)

K.S.A. 50-627

50-627. Unconscionable acts and practices

Currentness

(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction.

(b) The unconscionability of an act or practice is a question for the court. In determining whether an act or practice is unconscionable, the court shall consider circumstances of which the supplier knew or had reason to know, such as, but not limited to the following that:

(1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

(2) when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

(3) the consumer was unable to receive a material benefit from the subject of the transaction;

(4) when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

(5) the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier;

(6) the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

(7) except as provided by K.S.A. 50-639, and amendments thereto, the supplier excluded, modified or otherwise attempted to limit either the implied warranties of merchantability and fitness for a particular purpose or any remedy provided by law for a breach of those warranties.

ADD-95

**Credits**

Laws 1973, ch. 217, § 5; Laws 1976, ch. 236, § 4; Laws 1983, ch. 180, § 1; Laws 1991, ch. 159, § 3; Laws 1998, ch. 99, § 1.

Notes of Decisions (131)

K. S. A. 50-627, KS ST 50-627

Statutes are current through laws enacted during the 2025 Regular Session of the Kansas Legislature effective on or before May 8, 2025. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-96

West's Kansas Statutes Annotated
Chapter 50. Unfair Trade and Consumer Protection
Article 6. Consumer Protection (Refs & Annos)
Profiteering from Disaster

K.S.A. 50-6,106

50-6,106. Unconscionable acts; remedies

Currentness

(a) It shall be an unconscionable act within the meaning of K.S.A. 50-627, and amendments thereto, for any supplier to profiteer from a disaster.

(b) As used in this section:

(1) "Profiteer from a disaster" means unjustifiably increasing during a time of disaster the price at which any necessary property or service is offered for sale to consumers. Actual sales at the increased price shall not be required for the increase to be considered unconscionable. In determining whether the price increase described in this subsection is unjustified, the court shall consider all relevant circumstances including, but not limited to, the following: (A) Whether the price charged by the supplier during the time of disaster grossly exceeded the price charged by the supplier for similar property or services on the business day before the disaster, and an increase of more than 25% shall be *prima facie* evidence of gross excess;

(B) whether the amount charged by the supplier during the time of disaster grossly exceeded the price at which the same or similar property or services were readily obtainable by other consumers in the trade area, and a price difference of more than 25% shall be *prima facie* evidence of gross excess; and

(C) whether the increase in the amount charged by the supplier during the time of disaster was attributable to additional costs incurred by the supplier in connection with the sale of the product or service, and proof the supplier incurred such additional costs shall be *prima facie* evidence that the price increase was justified when such additional costs were actually incurred by the supplier during the period in which the substantially increased price was being charged;

(2) "time of disaster" means the period of time when a declaration of a state of emergency by the president of the United States or the governor is in effect; or 30 days after the occurrence of the event that constitutes the disaster, whichever is longer;

(3) "disaster" means natural or man-made events including, but not limited to, tornado or other severe storm, earthquake, flood, fire, riot, act of war, terrorism, civil disorder or other extraordinary adverse circumstance. The court shall find that an event constitutes a disaster if the event results in the declaration of a state of emergency by the president of the United States or the governor. The court may find that an event constitutes a disaster in the absence of a declared state of emergency; and

(4) "necessary property or service" means any necessary property or service for which consumer demand does, or is likely to, increase as a consequence of the disaster and includes, but is not limited to, consumer food items or property, property or

ADD-97

services for emergency cleanup, emergency supplies, communication supplies and services, medical supplies and services, home heating fuel, building materials and services, freight, storage services, housing, lodging, transportation and motor fuels.

(c) The provisions of this section shall be part of and supplemental to the consumer protection act.

**Credits**

Laws 2002, ch. 179, § 3.

K. S. A. 50-6,106, KS ST 50-6,106
Statutes are current through laws enacted during the 2025 Regular Session of the Kansas Legislature effective on or before May 8, 2025. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-98

West's Kansas Statutes Annotated
   Chapter 66. Public Utilities
      Article 1. Powers of State Corporation Commission
         Electric Public Utilities

K.S.A. 66-101

66-101. Electric public utilities; power, authority and jurisdiction of state corporation commission

Currentness

The commission is given full power, authority and jurisdiction to supervise and control the electric public utilities, as defined in K.S.A. 66-101a, doing business in Kansas, and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction.

**Credits**
Laws 1969, ch. 302, § 2; Laws 1981, ch. 255, § 1; Laws 1985, ch. 224, § 1; Laws 1985, ch. 225, § 7.

**Codifications:** R.S. 1923, 66-101.

K. S. A. 66-101, KS ST 66-101
Statutes are current through laws enacted during the 2025 Regular Session of the Kansas Legislature effective on or before May 8, 2025. Some statute sections may be more current, see credits for details.

End of Document          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD-99

# Section 1345.03 | Unconscionable consumer sales acts or practices.

Ohio Revised Code  /  Title 13 Commercial Transactions  /
Chapter 1345 Consumer Sales Practices

*Effective:* April 6, 2017    ***Latest Legislation:*** *Senate Bill 227 - 131st General Assembly*

(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

ADD-100

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;

(7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

(C) This section does not apply to a consumer transaction in connection with the origination of a residential mortgage.

## Available Versions of this Section

- January 1, 2007 – Senate Bill 185 - 126th General Assembly
- April 6, 2017 – Senate Bill 227 - 131st General Assembly

ADD-101

**CERTIFICATE OF DIGITAL SUBMISSIONS**

I hereby certify that all required privacy redactions have been made to the foregoing pleading. I further certify that all hard copies submitted to the clerk's office are exact copies of the foregoing pleading. I further certify that this ECF submission was scanned for viruses with the commercial virus scanning program Vipre, which has been updated to the latest version of this program (13.1.8510) as of August 1, 2025.

Dated: August 1, 2025                    */s/ Alexandra Foulkes Grafton*

## CERTIFICATE OF SERVICE

I certify that on the 1st day of August, 2025, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. I further certify that all parties required to be served have been served.

/s/ *Stephen R. McAllister*
Stephen R. McAllister